IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

DONALD EDWARD BEATY,                                    )
   Arizona State Prison Complex – Eyman       )
   P.O. Box 3400                                )
   Florence, AZ  85232,                         )
                                     )   Civil Action No.
                                      )
                And                        )
                                        )

DANIEL WAYNE COOK,                                      )
   Arizona State Prison Complex – Eyman       )
   P.O. Box 3400                                )
   Florence, AZ  85232,                         )
                                        )
                And                        )
                                        )

ERIC J. KING,                                           )
   Arizona State Prison Complex – Eyman       )
   P.O. Box 3400                                )
   Florence, AZ  85232,                         )
                                        )
                And                        )
                                        )

STEVE LIVADITIS,                                        )
   San Quentin State Prison                   )
   San Quentin, CA  94974,                     )
                                        )
                And                        )
                                        )

BRETT PATRICK PENSINGER,                                )
   San Quentin State Prison                   )
   San Quentin, CA  94974,                     )
                                        )
                And                        )
                                        )

STEPHEN MICHAEL WEST,                                   )
   Riverbend Maximum Security Institution     )
   7475 Cockrill Bend Boulevard                )
   Nashville, TN  37209-1048,                  )
                                        )
               Plaintiffs,                 )
                                        )
              v.                          )
                                        )

*(Additional Caption on the following page)*

FOOD AND DRUG ADMINISTRATION, )
  10903 New Hampshire Avenue )
  Silver Spring, MD  20993, )
           )
        And )

UNITED STATES DEPARTMENT )
  OF HEALTH AND HUMAN SERVICES, )
  200 Independence Avenue, S.W. )
  Washington, DC  20201, )
           )
        And )
           )

KATHLEEN SEBELIUS, *in Her Official Capacity as* )
*Secretary of Health and Human Services*, )
  200 Independence Avenue, S.W. )
  Washington, DC  20201, )
           )
        And )
           )

MARGARET A. HAMBURG, M.D., *in Her Official* )
*Capacity as Commissioner of Food and Drugs,* )
  10903 New Hampshire Avenue, )
  Silver Spring, MD  20993, )
           )
        Defendants. )
_____ )

## COMPLAINT
## FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

| | |
|---|---|
| *Of Counsel* | Bradford A. Berenson (DC Bar No. 441981) |
| Jon M. Sands | Coleen Klasmeier (DC Bar No. 465050) |
| Dale A. Baich | Eric A. Shumsky (DC Bar No. 477926) |
|   OFFICE OF THE FEDERAL PUBLIC DEFENDER | Sean C. Griffin (DC Bar No. 499537) |
|     FOR THE DISTRICT OF ARIZONA |   SIDLEY AUSTIN LLP |
|   850 West Adams Street, Suite 201 |   1501 K Street, N.W. |
|   Phoenix, Arizona 85007 |   Washington, DC  20005 |
|   (602) 382-2816 |   (202) 736-8000 |
|   (602) 889-3960 (fax) |   (202) 736-8711 (fax) |
|   dale_baich@fd.org |   sgriffin@sidley.com |
| | |
| | *Attorneys for Plaintiffs* |

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ............................................................................................1

PARTIES ......................................................................................................................8

    I.    PLAINTIFFS ..........................................................................................8

    II.   DEFENDANTS .......................................................................................9

JURISDICTION AND VENUE .......................................................................................10

GENERAL ALLEGATIONS ..........................................................................................11

    I.    THIOPENTAL IS AN OUTDATED MEDICATION THAT IS NO LONGER
        AVAILABLE IN THE UNITED STATES. ...................................................11

    II.   THIOPENTAL IS BOTH A "DRUG" AND AN UNAPPROVED "NEW DRUG"
        UNDER THE FDCA. ...........................................................................12

    III.  IMPORTED THIOPENTAL IS MISBRANDED UNDER THE FDCA. .............15

    IV.  IMPORTED THIOPENTAL IS ADULTERATED UNDER THE FDCA. ...........16

    V.   THE FDCA PROHIBITS THE IMPORTATION OF ANY MISBRANDED DRUG,
        ADULTERATED DRUG, OR UNAPPROVED NEW DRUG. ...........................17

    VI.  THE FDCA MANDATES THAT FDA DENY ADMISSION TO ANY MISBRANDED
        DRUG, ADULTERATED DRUG, OR UNAPPROVED NEW DRUG PRESENTED FOR
        IMPORTATION INTO THE UNITED STATES. .............................................18

    VII. FDA HAS CONSISTENTLY MAINTAINED THAT NO ONE—NOT EVEN STATE
        GOVERNMENTS—MAY LAWFULLY IMPORT UNAPPROVED NEW DRUGS...............20

    VIII. FDA'S PROCEDURES PROHIBIT THE COMMERCIAL IMPORTATION OF
        UNAPPROVED NEW DRUGS AND CONTROLLED SUBSTANCES.................................25

    IX.  FDA HAS ALLOWED STATE CORRECTIONS DEPARTMENTS TO IMPORT
        UNAPPROVED, MISBRANDED, AND POTENTIALLY ADULTERATED
        THIOPENTAL. ....................................................................................25

        A.    Identified FDA Actions Admitting Unapproved, Unlisted,
                Unregistered, Misbranded, And Adulterated Thiopental Into The
                United States ...................................................................27

        B.    FDA's Statement Dated January 4, 2011................................29

X.    FDA'S ACTIONS ALLOWING STATES TO IMPORT UNAPPROVED,
      MISBRANDED, AND/OR ADULTERATED THIOPENTAL VIOLATES THE
      ADMINISTRATIVE PROCEDURE ACT. ........................................................31

      A.    FDA's Actions Are Final. ...........................................................31

      B.    FDA Has Acted Contrary To Law. .............................................31

      C.    FDA Has Unlawfully Withheld Mandatory Agency Action. ....................33

      D.    FDA Has Acted Arbitrarily And Capriciously And Has Abused Its
            Discretion. ..................................................................................33

XI.   FDA'S UNLAWFUL BEHAVIOR DIRECTLY INJURES PLAINTIFFS. ............................36

COUNT I – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
      AGENCY ACTION NOT IN ACCORDANCE WITH LAW ...........................................43

COUNT II – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
      AGENCY ACTION UNLAWFULLY WITHHELD .......................................................44

COUNT III – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—
      AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AND/OR AN
      ABUSE OF DISCRETION ................................................................................45

PRAYER FOR RELIEF ....................................................................................47

Plaintiffs complain and allege as follows against Defendant Food and Drug Administration ("FDA"), Defendant United States Department of Health and Human Services ("HHS"), Defendant Kathleen Sebelius ("Secretary Sebelius"), in her official capacity as Secretary of Health and Human Services, and Defendant Margaret A. Hamburg, M.D. ("Commissioner Hamburg"), in her official capacity as Commissioner of Food and Drugs:

## SUMMARY OF THE ACTION

1.      This lawsuit seeks declaratory and injunctive relief to compel the Defendants to follow the clear mandate of the import provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*  Section 801(a) of the FDCA, codified at 21 U.S.C. § 381(a), establishes a straightforward system of border screening.  According to the plain language of Section 801(a), Secretary Sebelius *must* (a) ensure that all drugs presented for importation into the United States are screened if they do not come from a registered foreign drug establishment, and (b) deny admission to any screened drug if it even appears to be in violation of the FDCA:

> The Secretary of Health and Human Services *shall furnish* to the Secretary of the Treasury a list of establishments registered [pursuant to 21 U.S.C. § 360(i)] and *shall request* that if any drugs . . . manufactured, prepared, propagated, compounded, or processed in an establishment not so registered are imported or offered for import into the United States, samples of such drugs . . . be delivered to the Secretary of Health and Human Services . . . .  If it appears from the examination of such samples or otherwise that . . . (3) such article is adulterated, misbranded, or in violation of [21 U.S.C. § 355] . . . *then such article shall be refused admission* . . . .

21 U.S.C. § 381(a)(3) (emphasis added).

2.      The obligations imposed on Secretary Sebelius by Section 801(a) of the FDCA have been delegated to Commissioner Hamburg.  *See* FDA Staff Manual Guide § 1410.10(1)(A)(1), available at http://bit.ly/hX4JVw (visited Jan. 18, 2011).

3.      The obligations imposed by Section 801(a) are mandatory.  *See* Report on

Prescription Drug Importation, HHS Task Force On Drug Importation, at 27, available at

http://bit.ly/gQWM8L (visited Jan. 18, 2011) ("Section 381(a) . . . *requires FDA to refuse to admit*

into the U.S. any drug that appears to be misbranded." (emphasis added)); *id.* at 30 ("Under section

381(a), *FDA must refuse to admit* any drug that "appears" . . . to be an unapproved new drug

within the meaning of section 355, an adulterated drug within the meaning of section 351, or a

misbranded drug within the meaning of section 352." (emphasis added)); *id.* at 31 ("Under 381(a),

*FDA shall detain* any drug that appears to be adulterated, misbranded, or an unapproved new

drug." (emphasis added)).

4.      FDA's regulations reflect the mandatory nature of the obligations imposed by

Section 801(a).  *See, e.g.*, 21 C.F.R. § 314.410(a)(1) (a new drug may be imported into the United

States only if it "is the subject of an approved application under this part" or "complies with the

regulations pertaining to investigational new drugs"); 21 C.F.R. § 207.40(b) (no drug may be

imported "unless it is listed [with FDA] and manufactured, prepared, propagated, compounded or

processed at a registered foreign drug establishment"); 21 C.F.R. § 1.94(a) ("If it *appears* that the

article may be subject to refusal of admission, *the district director shall give* the owner or

consignee a written notice to that effect, stating the reasons therefor." (emphasis added)).

5.      FDA's published procedures also reflect the command of Section 801(a).  FDA's

procedures require full border screening for all commercial shipments of drugs, as well as all

shipments of controlled substances.  *See* FDA Regulatory Procedures Manual, Chapter 9: Import

Operations and Actions, at Section 9-2, available at http://bit.ly/huUD7c (visited Jan. 18, 2011);

FDA Investigations Operations Manual, Chapter 6: Imports, at Section 6.2.3, available at

http://bit.ly/f0jXeq (visited Jan. 18, 2011); Import Policy and Information by Product, Policy on Importation of Drugs (1998), available at http://bit.ly/mItLD (visited Jan. 18, 2011).

6.      In practice, FDA has consistently sought to preclude the importation of unapproved new drugs.  *See, e.g.*, Information on Importation of Drugs Prepared by the Division of Import Operations and Policy, FDA, available at http://bit.ly/ZKNbn (visited Jan. 18, 2011) ("[T]he importation of drugs that lack FDA approval, whether for personal use or otherwise, violates the [FDCA].").  For instance, in 2003, FDA asserted that, "if an entity or person within the State of California (including any state, county, or city program, any public pension, or any Indian Reservation) were to import prescription drugs into the State of California from Canada, it would violate [the FDCA] in virtually every instance."  Ltr. from FDA to the State of California, available at http://bit.ly/hgUmYi (visited Jan. 18, 2011).

7.      FDA's strict adherence to the command of Section 801(a) has been challenged repeatedly in the federal courts, but has always been sustained.  *See, e.g.*, *Vermont v. Leavitt*, 405 F. Supp. 2d 466 (D. Vt. 2005) (affirming FDA's denial of a petition from the State of Vermont that sought permission to import Canadian prescription drugs for state employees); *Montgomery County Md. v. Leavitt*, 445 F. Supp. 2d 505 (D. Md. 2006) (affirming FDA's denial of a similar petition submitted by Montgomery County, Maryland); *United States v. Genendo Pharma., N.V.*, 485 F.3d 958 (7th Cir. 2007) (affirming FDA's seizure of Lipitor® purchased in Brazil); *United States v. RX Depot, Inc.*, 290 F. Supp. 2d 1238 (N.D. Okla. 2003) (granting FDA's request to enjoin the importation of prescription drugs from Canada); *Andrews v. United States HHS*, No. 04-0307, 2005 U.S. Dist. LEXIS 5710 (D.D.C. Mar. 31, 2005) (upholding HHS's refusal to certify that Canadian prescription drugs pose the same risks as FDA-approved products).

8.      Recently, however, FDA has knowingly allowed the States of Arizona, California, and Tennessee (collectively, "the Importing States") to import bulk amounts of the drug thiopental sodium for injection ("thiopental").  FDA has also allowed several other States (including, at a minimum, the States of Arkansas, Nebraska and Georgia) to import bulk amounts of thiopental.  In addition, in January of 2011, FDA announced its intention to allow all States to freely bring future shipments of thiopental into the United States.

9.      FDA's recent actions with respect to thiopental are manifestly contrary to law and amount to an abdication of the obligations imposed by Section 801(a) of the FDCA.  As explained in detail below, thiopental is an unapproved new drug, a misbranded drug, and an adulterated drug under the FDCA.  The imported thiopental in question has not been listed with FDA, was manufactured by foreign companies that have not registered with FDA, and was exported by a wholesaler located in the United Kingdom.

10.     First, FDA is without authority to allow shipments of unapproved new drugs, misbranded drugs or adulterated drugs into this country.  21 U.S.C. § 381(a)(3).  Second, FDA must deny entry to any drug presented for importation into the United States if that drug is an illegal export under the law of the country of origin, and exporting thiopental is a violation of the law of the United Kingdom.  *Id.* § 381(a)(2).  Third, FDA's own regulations preclude the importation of any unapproved new drug and/or any drug that is not listed with FDA and produced at a registered foreign source.  21 C.F.R. §§ 314.410(a)(1), 207.40(b).

11.     FDA's actions are also arbitrary, capricious, and an abuse of discretion because they are contrary to FDA's longstanding procedures and practices, which forbid the commercial importation of any unapproved new drug or the importation of any controlled substance.  The

shipments at issue in this litigation were all commercial, and thiopental is a controlled substance under the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801, *et seq.*

12.     FDA's actions are arbitrary, capricious, and an abuse of discretion for the additional reason that FDA has never inspected the processes used to manufacture the thiopental at issue in this litigation.  FDA has not determined whether the thiopental being imported into the United States is safe and effective, whether the imported thiopental is adulterated, or whether the imported thiopental is counterfeit.

13.     Finally, FDA's actions are arbitrary, capricious, and an abuse of discretion because they are contrary to the public health, undermine the FDCA, and are manifestly unreasonable.

14.     Plaintiffs are directly injured by FDA's misconduct.  Plaintiffs are each death-row inmates currently imprisoned in one of the Importing States, where the penalty of death is carried out by lethal injection using a three-step method.  The first step is the administration of a drug capable of inducing a state of general anesthesia.  The second step is the administration of a drug that causes paralysis of all voluntary muscles, including the diaphragm.  The third step is the administration of a drug that causes cardiac arrest and death.

15.     Each of the Importing States has adopted a protocol that requires thiopental to be used as the critical first drug.  In these protocols, thiopental is used for the sole purpose of inducing general anesthesia—that is, inducing a surgical level of unconsciousness in order to prevent the subject from experiencing pain or sensation associated with paralysis, respiratory arrest, and/or cardiac arrest.

16.     Since 2009, thiopental has not been available from any manufacturer located in the United States.  Accordingly, each of the Importing States currently plans to use imported thiopental to anesthetize Plaintiffs prior to administering the other two drugs.

17.     Administering imported thiopental (which is unapproved, unlisted, unregistered, misbranded, and adulterated) greatly increases the risk that Plaintiffs will not be properly anesthetized.  That risk has constitutional dimensions.  "It is uncontested that, failing a proper dose of [anesthetic] that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation . . . and pain." *Baze v. Rees*, 553 U.S. 35, 53 (2008).  FDA's compliance with the clear legal requirements of Section 801(a) of the FDCA (or its own regulations, procedures and practices) would properly mitigate that risk.

18.     There exist any number of alternative drugs that are appropriate for use as general anesthetics and approved by FDA as safe and effective.  If the illegal importation of unapproved thiopental is stopped, each of the Importing States can and likely will alter its protocol to provide for the use of FDA-approved anesthetics.  Indeed, at least one State—Ohio—refused to import illegal thiopental when the domestic product went into shortage, and chose instead to change its lethal injection protocol to rely on a different, FDA-approved anesthetic.

19.     Because Plaintiffs are each directly injured by FDA's unlawful conduct, they seek:

(a)     a declaration that thiopental is a misbranded drug, an adulterated drug, and/or an unapproved new drug within the meaning of the FDCA;

– 6 –

(b)     a declaration that thiopental cannot lawfully be introduced or delivered for introduction into interstate commerce or lawfully be imported into the United States;

(c)     a declaration that FDA's recent actions allowing foreign thiopental to enter the United States were each contrary to law, arbitrary, capricious, and/or an abuse of discretion under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*;

(d)     a declaration that FDA's failure to deny admission to foreign thiopental as required by Section 801(a) of the FDCA amounts to agency action unlawfully withheld under the APA;

(e)     a declaration that FDA's announcement that it will allow future shipments of foreign thiopental to enter the United States is contrary to law, arbitrary, capricious, and/or an abuse of discretion under the APA;

(f)     an order prohibiting FDA from granting entry to any foreign thiopental product that is not covered by an approved new drug application or abbreviated new drug application (or exempt under applicable law, e.g., 21 U.S.C. § 355(i), 21 C.F.R. § 312.110(a)); and

(g)     an order compelling FDA to take reasonable steps to recover and require the exportation or destruction of any foreign thiopental product that it has permitted to enter the United States in violation of Section 801(a) within the past 12 months.

## PARTIES

**I.**     **PLAINTIFFS**

20.     Plaintiff Donald Edward Beaty (Arizona Prisoner 054558) is a death-row inmate currently incarcerated at the Arizona State Prison Complex – Eyman.  His mailing address is Post Office Box 3400, Florence, Arizona, 85232.

21.     Plaintiff Daniel Wayne Cook (Arizona Prisoner 069007) is a death-row inmate currently incarcerated at the Arizona State Prison Complex – Eyman.  His mailing address is Post Office Box 3400, Florence, Arizona, 85232.

22.     Plaintiff Eric J. King (Arizona Prisoner 046518) is a death-row inmate currently incarcerated at the Arizona State Prison Complex – Eyman.  His mailing address is Post Office Box 3400, Florence, Arizona, 85232.

23.     Plaintiff Steve Livaditis (California Prisoner D61400) is a death-row inmate currently incarcerated at San Quentin State Prison.  His mailing address is San Quentin State Prison, San Quentin, CA, 94974.

24.     Plaintiff Brett Patrick Pensinger (California Prisoner C54200) is a death-row inmate currently incarcerated at San Quentin State Prison.  His mailing address is San Quentin State Prison, San Quentin, CA, 94974.

25.     Plaintiff Stephen Michael West (Tennessee Prisoner 115717) is a death-row inmate currently incarcerated at Riverbend Maximum Security Institution.  His mailing address is Riverbend Maximum Security Institution, 7475 Cockrill Bend Boulevard, Nashville, Tennessee, 37209-1048.

26.     Pursuant to applicable law, each Plaintiff's death sentence will be carried out by lethal injection.  Pursuant to the protocol currently in place in each of the Importing States, lethal injection requires thiopental to be used to induce general anesthesia.  Upon information and belief, each of the Importing States currently possesses only unapproved thiopental that has been unlawfully imported from the United Kingdom within the past twelve months.

## II.     DEFENDANTS

27.     FDA, which has its principal office at 10903 New Hampshire Avenue, Silver Spring, Maryland 20993, is a federal agency headquartered in Maryland.  FDA regulates drugs under authority delegated by Congress and the Secretary of Health and Human Services.

28.     HHS, which has its principal office at 200 Independence Avenue, S.W., Washington, D.C. 20201, is a federal agency headquartered in the District of Columbia of which FDA is a constituent part.

29.     Secretary Sebelius is sued solely in her official capacity as Secretary of HHS, in which capacity Secretary Sebelius has the ultimate responsibility for the activities of the HHS, including the actions complained of herein.  Secretary Sebelius maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201.

30.     Commissioner Hamburg is sued solely in her official capacity as Commissioner of Food and Drugs, in which capacity Commissioner Hamburg has the ultimate responsibility for the activities of the FDA, including the actions complained of herein.  Commissioner Hamburg maintains an office at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action because it is a case arising under the laws of the United States.  *See* 28 U.S.C. § 1331.

32.     The relief requested herein is authorized by the APA, 5 U.S.C. §§ 702-706, as well as by 28 U.S.C. § 1651 (writs), and 28 U.S.C. §§ 2201-02 (declaratory and further relief).

33.     Plaintiffs will suffer irreparable harm if foreign thiopental is allowed to enter and/or remain the United States.  Allowing an illegal and unregulated anesthetic to enter and remain in this country for use in lethal injection greatly increases the risk that Plaintiffs will not be properly anesthetized prior to or during their executions.

34.     Plaintiffs have a right to bring this action pursuant to the APA because FDA's actions allowing thiopental to enter and remain in the United States constitutes final agency action that presents an actual controversy ripe for judicial review.

35.     Plaintiffs have a right to bring this action pursuant to the APA because FDA's actions granting entry to foreign thiopental amounts to a clear violation of an unambiguous statute and an abdication of FDA's responsibilities and duties under Section 801(a) of the FDCA.

36.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because this is a civil action in which one of the defendants is an officer of the United States who resides in this judicial district or an agency of the United States that resides in this judicial district.

## GENERAL ALLEGATIONS

**I.    THIOPENTAL IS AN OUTDATED MEDICATION THAT IS NO LONGER AVAILABLE IN THE UNITED STATES.**

37.    Thiopental is an intravenously administered, ultra-short-acting barbiturate intended to assist in the induction of general anesthesia.

38.    Because thiopental is ultra-short-acting, it takes effect and wears off very quickly. Even when thiopental is fully potent and properly administered, its anesthetic effects can wear off within just a few minutes.

39.    Due to its ultra-short-acting nature, thiopental is generally considered inappropriate for maintaining a surgical plane of unconsciousness.  Thus, thiopental is generally only used to induce anesthesia for purposes of intubation,[1] after which an inhaled drug (e.g., nitrous oxide) is administered to maintain anesthesia.

40.    Thiopental was developed in the 1930s by a company called Abbott Laboratories, Inc. ("Abbott").  Thiopental was among the most frequently used anesthetics from the 1930s through the 1970s.  Beginning in the late 1980s, however, thiopental was largely supplanted by a new drug called propofol.

41.    Propofol (which was originally developed under the trade name Diprivan) was developed in the late 1970s and first approved by FDA in 1989.  Several generic versions of propofol are approved by FDA for use in the United States.

---

[1] Intubation is the process of placing a flexible plastic tube into a person's trachea (windpipe) in order to establish and maintain a viable airway.  Intubation is a typical first step in surgical procedures.  However, because intubation is invasive and extremely uncomfortable, it is generally not performed until after the patient has been rendered unconscious by a quick acting anesthetic.

42.     Propofol is a short-acting drug capable of inducing a surgical plane of unconsciousness.

43.     In late 2008, another similar short-acting anesthetic drug called fospropofol disodium was approved by FDA (under the brand name Lusedra).

44.     Since the introduction of propofol, the use of thiopental in the United States has declined to a minimal level.  Indeed, FDA's Deputy Commissioner recently stated that even if thiopental were available in the United States, thiopental would be administered to well under 5% of patients presenting for a general anesthetic.

45.     Thiopental was produced in the United States by Abbott until approximately 2004, when Abbott spun off a new company called Hospira, Inc. ("Hospira").  However, Hospira stopped producing thiopental in 2009.  In January 2011, Hospira announced its decision to permanently discontinue production of thiopental.

46.     Because no other firm located in the United States manufactures or sells (or desires to manufacture or sell) thiopental, it has not been available in the United States since 2009.

II.     **Thiopental Is Both A "Drug" And An Unapproved "New Drug" Under The FDCA.**

47.     Substances intended to induce general anesthesia are "drugs" within the meaning of the FDCA and are subject to FDA regulation.  *See* 21 U.S.C. § 321(g)(1); *see also, e.g.*, FDA Guidelines For The Clinical Evaluation Of General Anesthetics, available at http://bit.ly/gryhQB (visited Jan. 18, 2011).

48.     Substances intended to induce general anesthesia are "drugs" under the FDCA even when they are used as part of a process designed to cause death.  *See* FDA Compliance Policy Guide § 650.100, available at http://bit.ly/g4ASM7  (visited Jan. 18, 2011) (FDA "considers products used for animal euthanasia to conform to the definition of drug under [21 U.S.C. § 201(g)(1)(C)] since they are clearly intended to affect the function of the body by inducing death."); *see also United States v. Articles of Drug . . . Labeled in Part . . . Beuthanasia D*, No. 77-0-396, Food Drug Cosm. L. Rep. (CCH) P38265 (D. Neb. Aug. 1, 1979) (upholding FDA's position that pentobarbital sodium is a "drug" when used during animal euthanasia).

49.     Because it is intended to induce general anesthesia, thiopental is a "drug" within the meaning of the FDCA and is subject to FDA regulation.  *See* 21 U.S.C. § 321(g)(1)(C); *see also Chaney v. Heckler*, 718 F.2d 1174, 1182 (D.C. Cir. 1983) (holding that drugs used during lethal injection are subject to regulation under the FDCA), *rev'd on other grounds sub. nom Heckler v. Chaney*, 470 U.S. 821 (1985).

50.     Thiopental is not generally recognized as safe and effective ("GRAS/E"), as that phrase is used in the FDCA's "new drug" definition.  *Compare* 21 U.S.C. § 321(p), *with The Unapproved Universe*, Deborah M. Autor, Esq., Director, Office of Compliance, Center for Drug Evaluation and Research, FDA, at 7 (Jan. 9, 2007), available at http://bit.ly/9R1xvB (visited Jan. 18, 2011) ("Unapproved Universe") ("The agency believes it is not likely that any currently marketed prescription drug is GRAS/E.").

51.     Thiopental is not covered by either of the FDCA's "grandfather" provisions. *Compare* 21 U.S.C. § 321(p) (1938 clause), *and* Pub. L. No. 87-781 § 107, 76 Stat. 781, 788-89

(Oct. 10, 1962) (1962 clause), *with* Unapproved Universe at 8 ("The agency believes it is not likely that any currently marketed prescription drug is grandfathered.").

52.     Because thiopental is not GRAS/E and is not grandfathered, thiopental is a "new drug" within the meaning of the FDCA.  *See* 21 U.S.C. § 321(p); *see also* 36 Fed Reg. 6609-10 (Apr. 7, 1971) (FDA pronouncement that thiopental sodium in suppository form is a "new drug" under 21 U.S.C. § 321(p) and that a "new drug application is required from any person marketing such drug without approval").

53.     Like any new drug, thiopental requires FDA approval before it may be lawfully introduced into interstate commerce or delivered for introduction into interstate commerce. 21 U.S.C. § 355(a).

54.     Despite its long history, thiopental sodium for injection has never been approved by FDA or otherwise evaluated by FDA for safety or effectiveness.  For decades, Abbott and Hospira produced and sold thiopental without FDA approval.

55.     It is not unheard of for a drug to be marketed or sold in the United States without FDA approval.  According to FDA, there are several thousand such drugs currently marketed in the United States.  Such drugs remain unapproved "new drugs" under the FDCA.  *See* FDA Compliance Policy Guide § 440.100, at 2, available at http://bit.ly/5Bz5x2 (visited Jan. 18, 2011) ("as many as several thousand drug products are marketed illegally without required FDA approval"); *id.* at 10 (these products are "marketed illegally, unless the manufacturer of such a drug can establish that its drug is grandfathered or otherwise not a new drug.").  Companies that produce and sell marketed unapproved drugs do so subject to the constant risk of FDA

enforcement.  *Id.* at 4 ("any product that is being marketed illegally is subject to FDA enforcement action at any time").

### III.   IMPORTED THIOPENTAL IS MISBRANDED UNDER THE FDCA.

56.    Under the FDCA, a drug can be "misbranded" for numerous reasons.  For instance, a drug is misbranded if its labeling fails to include adequate warnings or required information about side effects and contraindications.  21 U.S.C. §§ 352(f)(2), 352(n).

57.    A drug is also misbranded if it was manufactured by a foreign firm that has not registered with FDA.  21 U.S.C. §§ 352(o), 360(i).  Similarly, a drug is misbranded if it is not listed with FDA.  21 U.S.C. §§ 352(o), 360(j).

58.    A prescription drug is misbranded if its labeling fails to prominently display the symbol "Rx only."  21 U.S.C. § 353(b)(4)(A); *see* 21 C.F.R. § 201.16; *cf. In re Canadian Imp. Antitrust Litig.*, 385 F. Supp. 2d 930, 933 (D. Minn. 2005) ("Section 353(b)(4) does not allow for the substitution of another country's "equivalent" symbol for the United States' "Rx only" symbol."), *aff'd* 470 F.3d 785 (8th Cir. 2006).

59.    Imported thiopental is a misbranded drug for each of the reasons discussed in paragraphs 56-58.  First, the labeling for imported thiopental fails to include many of the warnings, side effects, and/or contraindications that were provided by Abbott and Hospira.  For instance, the labeling for imported thiopental fails to warn that thiopental is habit forming and fails identify at least six potential drug-drug interactions.  Second, imported thiopental is not listed with FDA and was manufactured by an unregistered foreign source.  Finally, thiopental is a prescription drug and the labeling for imported thiopental fails to display the "Rx only" symbol.

**IV.     IMPORTED THIOPENTAL IS ADULTERATED UNDER THE FDCA.**

60.     As used in the FDCA, the term "adulterated" refers to more than just the purity of a

product.  For instance, a drug is adulterated if its composition varies in any respect from the

standard formulation established by the official United States Pharmacopeia.  *See* 21 U.S.C.

§§ 351(b) (a drug is adulterated if "its strength differs from, or its quality or purity falls below, the

standard set forth" "in an official compendium"), 321(j) (the term "official compendium" means

"the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United

States, official National Formulary, or any supplement to any of them").

61.     Upon information and belief, the imported thiopental at issue in this litigation is

adulterated within the meaning of 21 U.S.C. § 351(b).  Much of the imported thiopental in

question came from Great Britain.  As such, assuming it is not counterfeit, it would have been

produced according to the definition of thiopental established by the British Pharmacopeia.  The

British Pharmacopeia defines thiopental sodium for injection to be

> a mixture of [thiopental – $C_{11}H_{17}N_2NaO_2S$, $M_r$ 264.3] and anhydrous sodium
> carbonate, containing *the equivalent of not less than 84.0 and not more than 87.0*
> *per cent of thiopental* and not less than 10.2 per cent and not more than 11.2 per
> cent of Na, both calculated with reference to the dried substance.

In contrast, the official United State Pharmacopeia defines thiopental sodium for injection to

contain "*not less than 93.0 percent and not more than 107.0 percent* of the labeled amount of

$C_{11}H_{17}N_2NaO_2S$."  The apparent discrepancy between the British and United States standards

means that any thiopental produced in accordance with the former definition would necessarily be

adulterated under the FDCA.

62.     Additionally, even if a drug is not pharmacologically deficient, drugs are deemed

adulterated under the FDCA if they are not manufactured in accordance with FDA's current good

manufacturing practice ("cGMP") regulations.  *See* 21 U.S.C. § 351(a)(2)(B); *see also Vermont v. Leavitt*, 405 F. Supp. 2d 466, 473 (D. Vt. 2005).  Indeed, if the process used to produce the drug does not conform to FDA's cGMP regulations, the drug is adulterated under the law even if the drug is not chemically flawed in any way.  *See Nutritional Health Alliance v. FDA*, 318 F.3d 92, 100 n.9 (2d Cir. 2003) (collecting cases).

63.     Upon information and belief, imported thiopental was not produced in accordance with FDA's cGMP regulations.  FDA has not inspected the facilities and/or processes used to manufacture or package thiopental, and there exists evidence that those facilities and/or processes are deficient.  *See infra* ¶¶ 134-135.  Imported thiopental is an adulterated drug under the FDCA for this reason as well.

### V.     THE FDCA PROHIBITS THE IMPORTATION OF ANY MISBRANDED DRUG, ADULTERATED DRUG, OR UNAPPROVED NEW DRUG.

64.     Under the FDCA, it is unlawful to "introduce or deliver for introduction into interstate commerce" any unapproved new drug.  21 U.S.C. §§ 355(a), 331(d).  It is similarly unlawful to introduce or deliver for introduction into commerce any drug that is misbranded or adulterated, as those terms are defined in the FDCA.  21 U.S.C. § 331(a).  A violation of any of these provisions is a crime punishable as a misdemeanor or felony.  21 U.S.C. § 333(a).

65.     Importation of a drug amounts to introduction or delivery for introduction of that drug into interstate commerce.  *See* 21 U.S.C. § 321(b)(1) ("The term 'interstate commerce' means . . . commerce between any State or Territory and any place outside thereof . . . ."); *see also, e.g.*, Information on Importation of Drugs Prepared by the Division of Import Operations and Policy, FDA, available at http://bit.ly/ZKNbn (visited Jan. 18, 2011) ("The [FDCA] prohibits the interstate shipment (which includes importation) of unapproved new drugs.").  The act of

importing an unapproved new drug, a misbranded drug, or an adulterated drug is therefore

unlawful under 21 U.S.C. §§ 355(a), 331(d), 331(a) and criminal under § 333(a).

66.     The act of importing an unapproved new drug is also prohibited by FDA

regulations.  21 C.F.R. § 314.410(a)(1).  In addition, importing *any* drug—new, old, approved or

unapproved—is prohibited by FDA regulations unless the drug is listed with FDA and was

produced at a registered foreign drug establishment.  *Id.* § 207.40(b).

## VI.    THE FDCA MANDATES THAT FDA DENY ADMISSION TO ANY MISBRANDED DRUG, ADULTERATED DRUG, OR UNAPPROVED NEW DRUG PRESENTED FOR IMPORTATION INTO THE UNITED STATES.

67.     Section 801(a) of the FDCA establishes mandatory border screening for all drugs

presented for importation if those drugs were not produced by a manufacturer that has complied

with the registration requirements of Section 510(i) of the FDCA.   21 U.S.C. § 381(a).  Pursuant

to Section 510(i), a foreign drug establishment must both register with FDA and provide FDA with

a list of all drugs manufactured at that establishment.  21 U.S.C. §§ 360(i)(2), 360(j).  Thus,

Section 801(a) of the FDCA mandates that FDA screen every unregistered or unlisted drug that is

imported or presented for importation into the United States.

68.     Pursuant to Section 801(a)(3) of the FDCA, FDA must deny admission to any

screened article that even "appears" to be a misbranded drug, an adulterated drug, or an

unapproved new drug.  *See* 21 U.S.C. § 381(a)(3); *accord* 21 C.F.R. § 1.94(a) ("If it *appears* that

the article may be subject to refusal or admission, *the district director shall give* the owner or

consignee a written notice to that effect, stating the reasons therefor." (emphasis added)).

69.     The "appearance" standard established by Section 801(a) broadly prohibits

admission.  According to FDA, an imported drug "appears" to be an unapproved new drug within

the meaning of the statute unless there exists affirmative evidence that the drug has been approved by FDA and was manufactured in a facility specifically approved by FDA to manufacture the drug. *See* Information on Importation of Drugs Prepared by the Division of Import Operations and Policy, FDA, available at http://bit.ly/ZKNbn (visited Jan. 18, 2011) ("Absent evidence that the specific drugs sought to be imported from a foreign country/area have been manufactured pursuant to an approved new drug application, in the manufacturing facility permitted under the application, such drugs would appear to be unapproved new drugs."); *see also* Report on Prescription Drug Importation, HHS Task Force On Drug Importation, at 27, available at http://bit.ly/gQWM8L (visited Jan. 18, 2011) ("refusal of admission does not have to meet the same evidentiary burden required to prevail in a civil action").

70.     FDA has implemented a computerized screening process to fulfill its obligations under Section 801(a).  *See* FDA Regulatory Procedures Manual, Chapter 9: Import Operations and Actions, available at http://bit.ly/huUD7c (visited Jan. 18, 2011); FDA Investigations Operations Manual, Chapter 6: Imports, available at http://bit.ly/f0jXeq (visited Jan. 18, 2011); Admissibility Determinations for Shipments of Foreign-origin (OASIS), available at http://bit.ly/2Jw18s (visited Jan. 18, 2011); Operational and Administrative System for Import Support, available at http://bit.ly/fRyWDD (visited Jan. 18, 2011); Manufacturer/Shipper Transmission Requirements, available at http://bit.ly/hHLg9v (visited Jan. 18, 2011).

71.     Upon information and belief, FDA's computerized screening system uses a combination of international product codes, manufacturer registrations, and FDA product codes to automatically determine when an article presented for importation has received FDA approval and therefore may be admitted and, conversely, when an article presented for importation is an unapproved new drug such that entry into the United States must be denied.

72.     Upon information and belief, FDA's computerized screening system also automatically determines when an article presented for importation is a drug that is listed (or not listed) with FDA and when an article presented for importation originates (or does not originate) from a registered foreign source.

73.     Upon information and belief, FDA's computerized screening system should automatically deny admission to any article that is identified as an unapproved new drug, as an unlisted drug, or as a drug that originates from an unregistered source.  *See, e.g.*, OASIS Violation Code Translations, available at http://bit.ly/f9hkwU (visited Jan. 18, 2011) (explaining that the automated violation code "UNAPPROVED" means the article presented for importation "appears to be a new drug without an approved new drug application," that the code "NOT LISTED" means that "[i]t appears that the drug or device is not included in a list required" by the FDCA or FDA regulations, and that the code "FRNMFGREG" means the "foreign manufacturer has not registered as required" by the FDCA and FDA regulations).

## VII.   FDA HAS CONSISTENTLY MAINTAINED THAT NO ONE—NOT EVEN STATE GOVERNMENTS—MAY LAWFULLY IMPORT UNAPPROVED NEW DRUGS.

74.     FDA's actions allowing the importation of unapproved thiopental are unprecedented.

75.     FDA has long maintained that even state governments would violate federal law were they to import unapproved new drugs.  FDA has repeatedly sent warning letters to state and local governments warning that public programs seeking to import foreign prescription drugs would violate federal law.

(a)     In August 2003, FDA advised the California Attorney General that any
state program that sought to purchase lower-cost drugs from Canada would
be illegal.  *See* Ltr. from FDA to the State of California, available at
http://bit.ly/hgUmYi (visited Jan. 18, 2011).

(b)     In November 2003, FDA stated that a program proposed by the Governor of
Illinois to allow senior citizens to purchase drugs from Canada "would be in
direct conflict with [the FDCA]."  Ltr. from FDA to Special Advocates for
Prescription Drugs, available at http://bit.ly/ed0tGC (visited Jan. 18, 2011).

(c)     In February 2004, FDA informed the State of Minnesota that a website
encouraging citizens to obtain prescription drugs from Canada was
"unwise," "unsafe," and "illegal[]."  Ltr. from FDA to the Honorable Tim
Pawlenty, available at http://bit.ly/eWjO6q (visited Jan. 18, 2011).

(d)     In March 2004, FDA informed the Governor of New Hampshire that
endorsing any program to purchase drugs from Canada would "undermine
one of our nation's key consumer protection statutes [*i.e.*, the FDCA]."
FDA further warned that any drugs purchased from Canada "will clearly be
illegal in virtually all instances."  Ltr. from FDA to the Honorable Craig
Benson, available at http://bit.ly/fHKnzU (visited Jan. 18, 2011).  FDA also
asserted that employees of New Hampshire's Department of Corrections
were not qualified to determine whether a particular vendor of foreign drugs
was a permissible source of imports.  *See id.*

(e)     In April 2004, FDA sent a follow-up letter decrying a nascent program established by the New Hampshire State Police Laboratory that purported to assess whether Canadian drugs were equivalent to FDA-approved products in terms of potency and purity.  FDA found such efforts wholly lacking because they could not "reveal if a foreign drug is expired, contaminated, was stored under adverse or inappropriate conditions, or is counterfeit."  Ltr. from FDA to the New Hampshire Pharmacists Assoc., available at http://bit.ly/h53dVW (visited Jan. 18, 2011).

(f)     Between 2004 and 2008, when multiple jurisdictions were considering drug importation programs, FDA sent numerous similar letters to local and state government officials around the country.  *See generally* Importing Prescription Drugs, FDA Letters to State and Local Officials, available at http://bit.ly/16z4x4 (visited Jan. 18, 2011).

76.     In addition to sending warning letters, FDA has denied several formal citizen petitions that sought FDA's permission to import unapproved new drugs.  Thus, in October 2003, FDA received a petition requesting that FDA "use its enforcement discretion to allow importation of Canadian versions of drugs that are [FDA-approved]."  Petition of the City of Springfield, Mass. dated Oct. 7, 2003, Docket No. 2003P-0479, Doc. No. FDA-2003-P-0238-0002, available at http://bit.ly/hS08QS (visited Jan. 18, 2011).  FDA denied that petition on August 9, 2004, on the ground that the agency lacked authority to implement such a policy:

> [T]he petition requests that FDA ignore the will of Congress and sanction the complete and systematic violation of the statutory provisions that FDA was created to enforce.  FDA cannot simply substitute its (or your) judgment over the judgment of Congress as expressed in the Act.

Petition Response (Denial), Docket No. 2003P-0479, Doc. No. FDA-2003-P-0238-0010, available at http://bit.ly/hRtOTP (visited Jan. 18, 2011).

77.     Similarly, in December 2003, FDA received a petition from the State of Vermont requesting that FDA "waive or revoke the current FDA interpretation of statutes and regulations that prohibit" Vermont from establishing a program "to obtain prescription medications from sources in Canada." Petition of the State of Vermont dated Dec. 4, 2003, Docket No. 2003P-0479, Document No. FDA-2003-P-0238-0005, available at http://bit.ly/hucZsy (visited Jan. 18, 2011). FDA denied the petition on August 4, 2004, on the ground that Vermont's "proposal would not be consistent with . . . [FDA's] statutory responsibility to protect the nation's drug supply." Petition Response (Denial), Docket No. 2003P-0479, Doc. No. FDA-2003-P-0238-0011, available at http://bit.ly/fUD96d (visited Jan. 18, 2011).

78.     When Vermont sought judicial review of FDA's denial, FDA moved to dismiss on the ground that "FDA is not authorized to issue regulations permitting the importation of drugs from Canada." Mem. in Support of FDA's Mot. to Dismiss, at 4, Doc. No. 5, Case 04-206 (D. Vt. Nov. 29, 2004); *id.* at 9 (the only exception to the FDCA's importation prohibition "remains the exception for drugs required for emergency medical care"); *id.* at 10 ("permitting foreign drugs to be freely imported . . . [would be] directly <u>contrary</u> to current law" (emphasis in the original)); *id.* at 11 ("The Federal Defendants cannot approve, or promulgate regulations that would permit the importation of prescription drugs from Canada."); *see also* Reply in Support of FDA's Mot. to Dismiss, at 2, Doc. No. 21, Case 04-206 (D. Vt. Feb. 9, 2005) ("[FDA] cannot, under the law as it now exists, approve of any importation program."); *id.* ("FDA lacked any legal authority to grant Vermont's requests.  In short, Vermont petitioned FDA to approve an illegal program.  Thus, FDA's refusal to approve such an illegal program was neither arbitrary nor capricious."); *id.* at 2-3

("It is not within the power of FDA to waive or revoke [21 U.S.C. § 381]." (quotation marks omitted)); *id.* at 3 ("FDA did not and does not have the power to approve any importation program or provide guidance regarding an approvable program of importation because such a program would be illegal." (quotation marks and citation omitted)).  The United States District Court for the District of Vermont agreed with FDA and dismissed Vermont's complaint with prejudice.  *See Vermont v. Leavitt*, 405 F. Supp. 2d 466, 474 (D. Vt. 2005) ("There is no question that Vermont's proposed program would violate the FDCA.").

79.      Similar agency refusals to condone the illegal importation of unapproved drugs have been upheld by other federal courts.  *See, e.g.*, *Montgomery County Md. v. Leavitt*, 445 F. Supp. 2d 505 (D. Md. 2006) (upholding FDA's denial of a similar request made by Montgomery County, Maryland); *Andrews v. United States HHS*, No. 04-0307, 2005 U.S. Dist. LEXIS 5710 (D.D.C. Mar. 31, 2005) (upholding HHS's refusal to certify that Canadian prescription drugs pose the same risks as FDA-approved products).

80.      Finally, FDA has launched successful enforcement actions against firms that sought to import unapproved new drugs.  *See, e.g.*, *United States v. Rx Depot, Inc.*, 290 F. Supp. 2d 1238, 1240 (N.D. Okla. 2003) (entering a preliminary injunction against a firm and its principals where the firm's business was to assist "individuals in procuring prescription medications from pharmacies in Canada"); *United States v. Genendo Pharmaceutical, N.V.*, 485 F.3d 958, 960 (7th Cir. 2007) (affirming seizure and condemnation of drugs offered for import, as well as permanent injunctive relief where a firm was "obtaining prescription drugs overseas and importing them into the United States for resale"); *see also* FDA Talk Paper: Court Halts Illegal Importation of Prescription Drugs, available at http://bit.ly/fEWYFR (visited Jan. 18, 2011) (describing preliminary injunction entered in *United States v. Canada Care Drugs, Inc.*).

## VIII.   FDA's PROCEDURES PROHIBIT THE COMMERCIAL IMPORTATION OF UNAPPROVED NEW DRUGS AND CONTROLLED SUBSTANCES.

81.     FDA has developed and published procedures intended to implement FDA's obligations under Section 801(a).  *See* Import Policy and Information by Product, Policy on Importation of Drugs (1998), available at http://bit.ly/mItLD (visited Jan. 18, 2011); FDA Regulatory Procedures Manual, Chapter 9: Import Operations and Actions, available at http://bit.ly/huUD7c (visited Jan. 18, 2011); FDA Investigations Operations Manual, Chapter 6: Imports, available at http://bit.ly/f0jXeq (visited Jan. 18, 2011).

82.     FDA's published import/export procedures broadly prohibit admitting commercial shipments of unapproved new drugs into the United States.

83.     FDA's published import/export procedures also prohibit the importation of controlled substances.

84.     The shipments of thiopental at issue in this Complaint are commercial shipments and are not personal importations.

85.     Thiopental is also a Schedule III controlled substance under the CSA.  *See* Controlled Substances by Drug Code Number, available at http://bit.ly/fJDlEk (visited Jan. 18, 2011) (code 2100).

## IX.   FDA HAS ALLOWED STATE CORRECTIONS DEPARTMENTS TO IMPORT UNAPPROVED, MISBRANDED, AND POTENTIALLY ADULTERATED THIOPENTAL.

86.     The allegations in this section (for the avoidance of doubt, ¶¶ 86-104) are made upon information and belief formed through a review of certain public documents obtained

through freedom of information and open records requests.  A more complete picture of these events will emerge from discovery in this action.

87.     Over the course of the past six to twelve months, several state departments of corrections have imported unapproved, misbranded, and adulterated thiopental in violation of the FDCA and FDA regulations.  In each case, FDA has reviewed the thiopental being offered for import into the United States and has released the drug despite being aware that imported thiopental is an unapproved new drug, misbranded, and/or adulterated, and that federal law strictly prohibited its admission into the country.  In at least one case, FDA released the imported thiopental on an expedited basis and thereby took extraordinary steps to facilitate the violation of law.

88.     The shipments of thiopental in question share a common pedigree.  Each shipment was shipped via Federal Express by a small wholesaler in London doing business under the name Dream Pharma, Ltd. ("Dream").  Dream is a closely held corporation located in West London that is run by a single man and his wife (who are Dream's only shareholders, directors, or officers). Dream's only physical presence is rented space at the rear of a West London driving school called the El Gone Driving Academy.

89.     Dream purchased each batch of finished thiopental from another United Kingdom company called Link Pharmaceuticals, Ltd. ("Link"), which is a subsidiary of a third company called Archimedes Pharma UK, Ltd. ("Archimedes").  Link purchased unfinished thiopental from a German company called Sandoz International GmbH ("Sandoz").  Sandoz produced the thiopental at a facility located in Austria.

90.     Neither Dream, nor Link, nor Archimedes, nor Sandoz has any approval or license from FDA to manufacture, sell, or import thiopental into the United States.  There is no approved new drug application or abbreviated new drug application covering thiopental generally or the thiopental produced or sold by Dream/Link/Archimedes/Sandoz in particular.  FDA has therefore not determined that any of the thiopental produced by these manufacturers and brought illegally into the United States is either safe or effective for its intended anesthetic use.

91.     Neither Dream, nor Link, nor Archimedes, nor Sandoz has listed or registered any thiopental product with FDA.  Neither Dream, nor Link, nor Archimedes, nor Sandoz has registered with FDA as a foreign drug establishment.

92.     FDA has not inspected the facilities maintained, or the processes used, by Dream, Link, Archimedes, or Sandoz.

A.      Identified FDA Actions Admitting Unapproved, Unlisted, Unregistered, Misbranded, And Adulterated Thiopental Into The United States

93.     Over the course of the last several months, FDA has reviewed and granted entry to at least eight shipments of thiopental produced by Sandoz, sold by Archimedes and/or Link, and imported by Dream.

94.     The first known thiopental shipment from Dream appears to have arrived in the United States on or about June 28, 2010 (recipient unknown).  FDA's screening systems easily identified the shipment as a misbranded drug because the imported thiopental was not listed with FDA and came from an unregistered foreign source.  On July 15, 2010, FDA issued a formal notice of detention explaining that the imported thiopental was misbranded for these reasons. Nevertheless, FDA released the shipment on or about August 13, 2010.

95.     The second known thiopental shipment from Dream appears to have arrived in the United States on or about September 17, 2010, bound for the Arkansas Department of Correction. This time, FDA's screening system identified the shipment as an unapproved new drug, and FDA issued a formal notice of detention on that basis on September 22, 2010.  Nevertheless, FDA released the shipment on or about September 27, 2010.

96.     Shortly after receiving their thiopental shipment, officials with Arkansas's Department of Correction shared the idea to import unapproved thiopental with the Arizona Department of Corrections.  Arkansas also explained the difficulties it had experienced in getting foreign thiopental through FDA's border screening system.

97.     In September of 2010, Arizona purchased a shipment of unapproved thiopental from Dream.

98.     Arizona gave advance notice of its intention to import thiopental to FDA officials and requested that the shipment be given expedited treatment by the agency.  FDA agreed and expedited Arizona's unlawful shipment of unapproved thiopental:  Arizona's shipment arrived in the United States on or about September 28, 2010, and Arizona took possession of its thiopental shipment the next day, on or about September 29, 2010.

99.     Arizona officials shared their successful importation method with California officials on September 28, 2010, while FDA was expediting Arizona's shipment.  On or about October 1, 2010, Arizona actually distributed a portion of its imported thiopental to California's Department of Corrections and Rehabilitation.

100.     Shortly after obtaining thiopental from Arizona, California placed its own order for thiopental with Dream.  California's order was initially detained by FDA.  However, FDA eventually released the shipment on or about January 7, 2011.

101.     Tennessee's Department of Corrections has also unapproved, misbranded, and adulterated thiopental from Dream.  Tennessee took possession of its imported thiopental on October 26, 2010.

102.     FDA has allowed other states to bring unapproved, unlisted, unregistered, misbranded, and adulterated thiopental into the United States.  At a minimum, FDA has also allowed Georgia and Nebraska to do so.

B.     FDA's Statement Dated January 4, 2011

103.     On January 4, 2011, FDA issued a statement regarding its role in the importation of unapproved thiopental.  The statement was not announced as a press release or posted on FDA's website.  Rather, the statement was emailed directly to the media.

104.     FDA's statement to the media is available online (*see* FDA Statement, available at http://bit.ly/dOFGCZ (visited Jan. 18, 2011)) and is reproduced here in its entirety:

> The U.S. Food and Drug Administration (FDA) is charged by Congress with protecting the public health.  Ensuring the safety and effectiveness of pharmaceuticals used for medical purposes is a core part of FDA's mission.
>
> Reviewing substances imported or used for the purpose of state-authorized lethal injection clearly falls outside of FDA's explicit public health role.  FDA does not verify the identity, potency, safety, or effectiveness of substances imported for this purpose.  FDA exercises similar enforcement discretion when these drugs are manufactured and purchased within the United States.
>
> Accordingly, FDA chooses to continue to defer to law enforcement on all matters involving lethal injection, consistent with the U.S. Supreme Court's ruling in Heckler v. Chaney (1985).

– 29 –

**Following is information that addresses the import of sodium thiopental –**

So far this year with the imports of sodium thiopental, in 2009 and 2010, FDA permitted the importation of several shipments of sodium thiopental to state Departments of Correction.  In doing so, FDA deferred to law enforcement in the use of substances for lethal injection, which is consistent with the agency's longstanding policy.  The agency did not conduct any review of these products for safety, effectiveness or quality.

In the context of two death penalty cases in the fall of 2010, it was suggested that FDA "approves" the importation of these drugs for use in lethal injections and/or reviews them for safety, effectiveness, and quality.  In actuality, the FDA neither approves nor reviews these drugs for use in lethal injections and feels it necessary to clear up any confusion. Also, FDA reviewed its procedures for the importation of sodium thiopental in concert with CBP.  The agencies decided that since FDA does not conduct a review of pharmaceuticals intended for lethal injection, FDA will continue to exercise its enforcement discretion not to review these shipments and allow processing through CBP's automated system for importations. The agencies are working together to develop a system for future shipments that avoids any confusion about whether FDA evaluates shipments of drugs intended for lethal injection.

Is the importation of unapproved sodium thiopental for lethal injection illegal?

In deferring to law enforcement on matters involving pharmaceuticals for lethal injection, FDA is exercising enforcement discretion.  This approach by the agency was upheld by the Supreme Court in Heckler v. Chaney (1985).  Among the reasons cited by the Court for its decision not to review FDA's non-enforcement against lethal injection drugs is that agencies are responsible for prioritizing their enforcement resources to most effectively achieve their statutory missions.  Again, FDA similarly defers to law enforcement with respect to transport of these substances within the United States.

What will happen to any shipments for correctional facilities that are currently pending?

*FDA is releasing these with the comment: "FDA releases this shipment, which is being imported by or on behalf of state correctional authorities.  In keeping with established practice, FDA does not review or approve products for the purpose of lethal injection.  FDA has not  reviewed the products in this shipment to determine their identity, safety, effectiveness, purity, or any other characteristics."

X.   **FDA's Actions Allowing States To Import Unapproved, Misbranded, And/Or Adulterated Thiopental Violates The Administrative Procedure Act.**

A.   FDA's Actions Are Final.

105.   A decision from FDA's district office releasing an import constitutes the agency's final word under Section 801(a).  *See FDA Investigations Operations Manual* § 6.2.3.6.2, available at http://bit.ly/eSVcyy (visited Jan. 18, 2011) (Notices of FDA Action issued by district offices "are official documents which provide FDA decisions on entries.").

106.   Upon information and belief, FDA's January 4, 2011 statement to the media represents FDA policy regarding foreign thiopental.  Upon information and belief, FDA has adopted a policy of allowing states to import unapproved thiopental for use in lethal injection.  Upon information and belief, that policy has been vetted by the highest officials at FDA and HHS, including Secretary Sebelius and/or Commissioner Hamburg.  Upon information and belief, neither FDA nor HHS is willing to reconsider the policy announced on January 4, 2011.

107.   Absent action by this Court, FDA intends to continue to allow the unlawful importation of unapproved thiopental into the United States for use in lethal injections.

B.   FDA Has Acted Contrary To Law.

108.   FDA's actions are contrary to law within the meaning of 5 U.S.C. § 706(2)(A).  First, FDA is without authority to permit unapproved new drugs, misbranded drugs, or adulterated drugs to be imported into the United States, and thiopental is an unapproved new drug and is both misbranded and adulterated.  21 U.S.C. § 381(A)(3); 21 C.F.R. § 314.410(a)(1).  Second, FDA is without authority to allow drugs into the United States when the export of those articles is illegal in their country of origin.  21 U.S.C. § 381(A)(2).  Thiopental is an unlawful export in the United Kingdom.  *See supra* ¶ 10.

109.     FDA is bound to obey these statutory commands.  They are not matters of enforcement discretion.  When commercial shipments of unapproved, misbranded, or adulterated drugs are presented for inspection at the border, FDA *must* refuse to admit them into the United States.  FDA is not taking an enforcement action when it does so; it is simply obeying the law governing its actions.

110.     Contrary to FDA's statement to the media, *Heckler v. Chaney*, 470 U.S. 821 (1985), does not authorize FDA to ignore the clear mandate of 21 U.S.C. §§ 381(a)(2) or 381(a)(3).

111.     *Heckler* dealt with different statutory provisions.  Specifically, it held that FDA has discretion to not investigate or commence proceedings under 21 U.S.C. §§ 332-337 against possible violations of 21 U.S.C. § 331.  *See Heckler*, 470 U.S. at 836-37.  *Heckler* says nothing about FDA's obligations under 21 U.S.C. § 381, and this Court has previously rejected the idea that *Heckler* could insulate FDA's implementation of 21 U.S.C. § 381(a) from judicial review.  *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 69 n.8 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v.*FDA, 2010 U.S. App. LEXIS 24883 (D.C. Cir. Dec. 7, 2010).

112.     More fundamentally, *Heckler* was about "'[t]he unapproved use of *approved* drugs.'"  470 U.S. at 824-25 (quoting FDA).  This case is about the importation of an *unapproved* new drug that is also misbranded, adulterated, and in violation of the FDCA's listing and registration requirements.  Courts have soundly rejected the notion that FDA has discretion to allow unapproved new drugs to be sold or shipped in the United States.  Indeed, this Court has on three occasions entered injunctions compelling FDA to take action to enforce the FDCA's ban on unapproved new drugs.  *American Public Health Assoc. v. Veneman*, 349 F. Supp. 1311, 1315

(D.D.C. 1972) ("[I]t could not be clearer that [FDA] *must* begin the procedures to withdraw a drug when [it] concludes that there is no substantial evidence of efficacy." (emphasis in the original)); *Hoffman-LaRoche, Inc. v. Weinberger*, 425 F. Supp. 890, 893 (D.D.C. 1975) ("FDA's policy of permitting new drugs to be marketed without an approved new drug application contravenes the clear statutory requirement of preclearance."); *Allergan, Inc. v. Shalala*, No. 94-1223, 1994 U.S. Dist. LEXIS 21716, at *6 (D.D.C. Nov. 10, 1994) (FDA must act "where [it] has already determined that the products in question are new drugs").

113.    Such cases teach, and Congress has confirmed, that "FDA has no legal authority to permit the marketing of any unapproved 'new drug.'"  H. Rep. No. 98-1168, at 21 (1984).

114.    Finally, FDA's actions are contrary to law for the additional reason that FDA has ignored its own regulations.  FDA regulations prohibit the importation of unlisted/unregistered drugs, and the thiopental at issue is both unlisted and produced by foreign sources that have not registered with FDA.  21 C.F.R. § 207.40(b).

C.    FDA Has Unlawfully Withheld Mandatory Agency Action.

115.    Because FDA's recent actions allowing the Importing States to bring unapproved thiopental into the United States were (and any similar actions in the future would be) in violation of the FDCA's express mandate, such actions also amount to agency action unlawfully withheld within the meaning of 5 U.S.C. § 706(1).

D.    FDA Has Acted Arbitrarily And Capriciously And Has Abused Its Discretion.

116.    FDA's actions are arbitrary, capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A).  They conflict with the FDA's own regulations, procedures, and

practices in important respects and irrationally deviate from the FDA's statutory obligations to ensure that medications used in the United States are safe and effective for their intended uses.

117.    FDA's actions are inconsistent with its own regulations.  FDA's regulations clearly state that (1) no unapproved new drug may be imported into this country; (2) no unlisted drug may be imported into this country; (3) no drug from an unregistered foreign source may be imported into this country; and (4) whenever a drug presented for importation appears to be in violation of these provisions, FDA's district offices must take appropriate action to deny entry to that drug. *See* 21 C.F.R. §§ 314.410(a)(1), 207.40(b), 1.94(a).

118.    FDA's actions are inconsistent with its own procedures.  FDA's procedures state that all commercial shipments and shipments of controlled substances must be screened in accordance with Section 801(a) of the FDCA.  *See supra* § VIII.

119.    FDA's actions are inconsistent with its established practice.  For several years, FDA has consistently maintained that no state program could lawfully import an unapproved new drug.  *See supra* § VII.

120.    FDA's actions are also contrary to the public health and undermine the FDCA.

(a)     As FDA has itself stated countless times, Congress's intent in passing the FDCA was to create a "closed system" in which virtually every drug used in the United States was pre-approved for safety and effectiveness.

(b)     By allowing unapproved thiopental to be imported into the United States, FDA has opened that closed system.  Further, FDA has done so in circumstances where the need to ensure effectiveness is at its zenith:  the

Importing States will each use the thiopental they obtain as a general anesthetic to prevent pain and the acute distress and suffering that would otherwise result from paralysis and cardiac arrest.  By allowing the Importing States to use an unapproved, foreign drug, FDA is drastically increasing the chances that the medication will not work as intended and that unconstitutional pain and suffering will be inflicted by the States as they end the lives of Plaintiffs.

(c)     Allowing unapproved thiopental into the stream of interstate commerce also undermines the FDCA because FDA has little ability to prevent the unapproved drug from being further distributed or diverted.

(d)     Indeed, at least one such distribution of imported thiopental has already occurred among the Importing States, *see supra* ¶ 99, and thiopental is generally known to abused recreationally and frequently diverted for such purposes, *see, e.g.*, *Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Ca. 2006) (noting that the former "execution team leader" in California responsible for maintaining custody of thiopental was discovered be an illicit drug smuggler); *id.* at 979 n.9 (noting "an extremely troubling" pattern of evidence showing that "substantial quantities" of thiopental had been diverted at California's San Quentin prison).

121.     FDA's actions are arbitrary, capricious and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A) because allowing the importation of illegal thiopental is not

necessary to serve any legitimate state interest or medical need.  The Importing States could easily substitute lawful, FDA-approved drugs as the general anesthetic used in lethal injection.

122.    That FDA's actions are arbitrary and capricious is demonstrated most clearly by the fact that FDA has allowed corrections officials to import an unapproved anesthetic for use in lethal injection but will not allow anesthesiologists or other medical professionals (who are capable of actually determining whether imported thiopental succeeds in inducing anesthesia) to import the same drug.

## XI.    FDA'S UNLAWFUL BEHAVIOR DIRECTLY INJURES PLAINTIFFS.

123.    Every jurisdiction in this country that practices capital punishment authorizes lethal injection as a method of execution.  *See generally Baze v. Rees*, 553 U.S. 35, 40, 42-43 (2008).

124.    Of the jurisdictions that authorize lethal injection, approximately 30 follow a three-step protocol that entails (1) using a general anesthetic to induce a deep coma-like unconsciousness, followed by (2) the administration of a paralytic agent that inhibits all muscular-skeletal movements, including respiration, and (3) the administration of a potassium-based drug that induces cardiac arrest.  *Baze*, 553 U.S. at 43.

125.    Each of the Importing States currently adheres to a version of this three-step protocol and uses thiopental as the anesthetic for the first step. *See Arizona Department of Corrections Order 710, Execution Procedures*, Attachment F at ¶¶ 3-4, available at http://bit.ly/hCWKl6 (visited Jan. 18, 2011); *State of California San Quentin Operational Procedure No. 0-770, Execution by Lethal Injection* § V(S)(4)(e), available at http://bit.ly/fVtnxA (visited Jan. 18, 2011); *Tennessee Execution Procedures For Lethal Injection*, at 44, available at

http://bit.ly/gdxhKv (visited Jan. 18, 2011).  Each of the Importing States currently intends to use unlawfully imported, unapproved thiopental in Plaintiffs' executions.

126.    The proper administration of a safe and effective anesthetic during lethal injection is critical from a public health perspective, and to the lawful administration of Plaintiffs' death sentences.

127.    If a safe and effective anesthetic is properly administered, the subject should reach a coma-like level of unconsciousness before paralysis, respiratory arrest, cardiac arrest, and death. But if the anesthetic is ineffective, counterfeit, adulterated or subpotent, then the three-step protocol will result in the condemned prisoner experiencing the severe pain and distress associated with paralysis, respiratory arrest, and cardiac arrest.

128.    The public health need to ensure a proper level of anesthesia has constitutional implications.  The failure to render a prisoner fully unconscious during a three-step lethal injection protocol would violate the Eighth Amendment.  *See Baze*, 553 U.S. at 53 ("It is uncontested that, failing a proper dose of [anesthethic] that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation . . . and pain.").

129.    There is a very real risk that unapproved thiopental will not actually render a condemned prisoner unconscious.  Even when produced according to the United States standard, unapproved thiopental was associated with a higher rate of "anesthesia awareness"—that is, a failure to render a subject unconscious—than other drugs that are FDA-approved for use in inducing general anesthesia.  Moreover, the medical record is replete with adverse events related to unapproved thiopental.  FDA's own databases reflect more than 2100 such reports from 1972 to

2008.  Of those, at least 220 reports describe cases in which unapproved thiopental was associated with a failure to achieve the intended drug effect.

130.    As a matter of law, unapproved drugs are of unknown quality, lack evidence of effectiveness, and present increased risks of impurity or subpotency.  *See generally Guidance for FDA Staff And Industry:  Marketed Unapproved Drugs—Compliance Policy Guide, § 440.100 (June 2006)*, available at http://bit.ly/5Bz5x2 (visited Jan. 18, 2011) ("CPG § 440.100"); *see also, e.g., FDA's Concerns About Unapproved Drugs*, available at http://bit.ly/asZzhQ (visited Dec. 27, 2007) ("The Agency has serious concerns that drugs marketed without required FDA approval may not meet modern standards for safety, effectiveness, quality, and labeling.").

131.    Unapproved *foreign* drugs are presumptively *un*safe and *in*effective.  FDA has previously stated that such products are also highly likely to be adulterated.  *See, e.g., In re Canadian Import Antitrust Litigation*, 470 F.3d 785 (8th Cir. 2006) ("FDA's Office of Compliance has cautioned that '[d]rugs from foreign countries do not have the same assurance of safety as drugs actually regulated by the FDA,' due to the risk that counterfeit or unapproved drugs will be sent to consumers, and also because '[w]ithout regulation of repackaging, storage conditions, and many other factors, drugs delivered to the American public from foreign countries may be very different from FDA approved drugs with respect to formulation, potency, quality, and labeling.'"); *see also Importing Prescription Drugs*, available at http://bit.ly/16z4x4 (visited Jan. 18, 2011) ("FDA cannot ensure the safety and effectiveness of products that are not FDA-approved and come from unknown sources and foreign locations, or that may not have been manufactured under proper conditions.  These unknowns put patients' health at risk if they cannot be sure of the product's identity, purity, and source.").

132.     FDA's experience teaches that foreign products are often not just adulterated, but actually counterfeit.  In 2004, FDA took action against 4 foreign websites that claimed to be able to ship drugs that were equivalent to FDA-approved drugs.  In reality, those foreign websites were shipping products into the United States that were from unknown sources, were of unknown safety and efficacy, and did not include an active pharmaceutical ingredient.  *See FDA News Release, Feb. 12, 2004*, available at http://bit.ly/dKJ1kD (visited Jan. 18, 2011).  The risk of purchasing an adulterated and/or counterfeit drug increases greatly when products are sourced online or from small distributors.  *See, e.g.*, *FDA Initiative to Combat Counterfeit Drugs*, available at http://bit.ly/eFzBTR (visited Jan. 18, 2011) ("[S]ome smaller wholesalers also knowingly or unknowingly take higher risks by obtaining drugs that may not have a clear "pedigree" traceable back to a legitimate manufacturer."); *id.* ("Counterfeit drugs . . . enter the U.S. market via disguised imports from other countries.").  Moreover, as is the case here, the purchase of small lots from small distributors for uses which the country of origin would consider illegal or contrary to public policy raises the risk of adulteration and counterfeiting.

133.     In other settings, FDA has concluded that the dangers posed by foreign unapproved drugs are so severe that they outweigh even compelling countervailing public policy concerns.  *See, e.g.*, *Andrews v. United States HHS*, No. 04-0307, 2005 U.S. Dist. LEXIS 5710 (D.D.C. Mar. 31, 2005).  In this setting, the dangers posed by foreign unapproved drugs (unknown safety and effectiveness, and risks of adulteration or being counterfeit) remain equally strong, but are not balanced by any countervailing public policy or health concern.

134.     This case involves a situation in which the dangers generally posed by foreign unapproved drugs are patent.  The Importing States (and others) have imported a foreign drug from an unregistered, closely-held wholesaler—Dream—who is highly unlikely to have conformed to

FDA's cGMP regulations or have taken the necessary steps to preserve thiopental.  For instance, thiopental must be produced and stored under aseptic, refrigerated conditions, and Dream shares its physical space with a driving school.  Upon information and belief, Dream does not even possess a refrigerator capable of storing thiopental.

135.    Nor is Dream the only weak link in the chain that developed the imported thiopental in question.  A recent FDA import alert confirms that FDA has never inspected the Sandoz facility that produced the thiopental for compliance with FDA's cGMP regulations for human drugs.  *See FDA Import Alert No. 66-66* (Dec. 21, 2010), available at http://bit.ly/htudDi (visited Jan. 18, 2011).  Further, FDA has in the past taken the position that the Sandoz facility in question fails to distinguish between animal drugs and those intended for human consumption. *See FDA Warning Letter to Sandoz GmbH*, available at http://bit.ly/egqvVe (visited Jan. 18, 2011).  Finally, press reports indicate that the facility in question has had quality control problems in the past specifically with regard to thiopental, which caused Polish pharmaceutical regulators to temporarily ban thiopental produced by Sandoz from the Polish market—once in 2007 and once again in 2009.

136.    Further, even if Sandoz were in perfect compliance with FDA's cGMP regulations, its product still is adulterated under the FDCA due do the differences between the British and United States standards for thiopental.  *See supra* ¶ 61.

137.    The public record is replete with instances of botched executions where unapproved thiopental was used but the subject was not rendered unconscious.  For instance:

(a)     During the execution of Angel Diaz, which occurred in Florida in December 2006, the condemned prisoner spent 30 minutes gasping for air, grimacing, and trying to speak after the fatal drugs had been administered.

(b)     During the execution of Joseph Clark in Ohio in May 2006, the condemned prisoner actually raised his head off the gurney and spoke for several minutes after the thiopental had begun to flow, with witnesses reporting cries of pain for almost 10 minutes.

(c)     A federal district court found evidence that six of thirteen condemned prisoners executed by California between 1999 and 2006 remained conscious when the paralytic was administered.  *Morales v. Hickman*, 415 F. Supp. 2d 1037, 1045 (N.D. Cal. 2006).

(d)     Another federal district court found, based on eyewitness accounts, that at least five condemned prisoners executed by the State of North Carolina had experienced pain and suffering well beyond the administration of thiopental.  *Brown v. Beck*, No. 06-3018, 2006 U.S. Dist. LEXIS 60084, at *16-18 (E.D.N.C. Apr. 7, 2006).

(e)     A third federal district court found, again based on eye witness accounts, that several condemned prisoners executed by the State of Arkansas had remained conscious during their executions.  *Nooner v. Norris*, No. 06-96183, 2006 U.S. Dist. LEXIS 96183, at *7-8 (E.D. Ark. June 26, 2006), *rev'd on other grounds*, 491 F.3d 804 (8th Cir. 2007).

(f)     A federal appellate judge recently concluded that two of the four most

recently executed prisoners in Tennessee were not properly anesthetized by

thiopental prior to the administration of the other two drugs.  *West v. Ray*,

No. 10-6196, 2010 U.S. App. LEXIS 23043, at *16-18 (6th Cir. 2010)

(Nelson Moore, J., dissenting) ("Tennessee's lethal-injection protocol has

become, in practice, death by suffocation.").

138.    In addition, eyewitnesses to the few executions that have gone forward using

imported thiopental report anomalies indicating that the drug did not in fact succeed in inducing

anesthesia.

139.    FDA's decision to ignore the clear mandate of the FDCA, its own regulations, its

own procedures, and its longstanding practices regarding the importation of unapproved new

drugs have subjected Plaintiffs to irreparable injury.  As a result of FDA's actions, each Plaintiff

faces a significantly increased risk of experiencing unconstitutional pain, suffering, and distress in

connection with his impending execution by lethal injection.  There is no adequate remedy at law

for these injuries and constitutional torts:  they must be prevented before they occur if Plaintiffs are

to have a meaningful remedy for FDA's violations of law.

140.    If FDA is compelled to fulfill its mandate under Section 801(a) of the FDCA, the

risks of ineffective anesthesia and the resulting unconstitutional suffering by condemned prisoners

will be appropriately and lawfully redressed.

141.    By definition, FDA is not prejudiced by an injunction compelling it to fulfill its

statutory mandate or otherwise comply with the law.

142.    The Importing States will also not be prejudiced by any injunction against FDA.  If prevented from obtaining illegal, unapproved thiopental, the Importing States may simply use FDA-approved anesthetics to carry out the sentences imposed according to their laws.

143.    For the same reason, compelling FDA to fulfill its mandate will not meaningfully impair or burden the public interest in carrying out the sentences of death imposed on Plaintiffs.

## COUNT I – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— AGENCY ACTION NOT IN ACCORDANCE WITH LAW

### (5 U.S.C. § 706(2)(A))

144.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 143 (and all subparts thereto) as if set forth fully herein.

145.    Thiopental is an unapproved new drug, a misbranded drug, and an adulterated drug under the FDCA.  As such, FDA is required by the plain terms of the FDCA to deny entry to any shipments of thiopental presented for entry into the United States.  *See* 21 U.S.C. § 381(a)(3); *see also* 21 C.F.R. §§ 1.94(a), 314.410(a)(1); Report on Prescription Drug Importation, HHS Task Force On Drug Importation, at 27, available at http://bit.ly/gQWM8L (visited Jan. 18, 2011) ("*FDA must refuse to admit* any drug that 'appears' (based on examination of samples or otherwise) to be an unapproved new drug." (emphasis added)).

146.    Thiopental is an illegal export under the laws of the United Kingdom.  For this reason too, FDA is required by the plain terms of the FDCA to deny entry to any shipments of thiopental presented for entry into the United States.  *See* 21 U.S.C. § 381(a)(2).

147.    The thiopental at issue in this case is not listed with FDA.  The thiopental at issue in this case was also not produced at an FDA-registered foreign drug establishment.  For these

reasons too, the thiopental at issue in this case could not lawfully be imported into the United States.  *See* 21 C.F.R. § 207.40(b).

148.    FDA has allowed the Importing States to import unapproved, misbranded, adulterated, unlisted, and unregistered thiopental.  FDA has also announced its intention to allow future shipments of unapproved thiopental to be imported into the United States for use in lethal injection.  FDA's decisions on these matters are final agency actions and warrant judicial review.

149.    FDA's actions with respect to imported thiopental conflict with the clear commands of the FDCA.  *See* 21 U.S.C. §§ 381(a)(2), 381(a)(3).  FDA's actions also conflict with the plain terms of FDA's own regulations, which have the force of law.  *See* 21 C.F.R. §§ 1.94(a), 207.40(b), 314.410(a)(1).  For these reasons, and all of the reasons discussed above, FDA's actions with respect to imported thiopental are contrary to law.

## COUNT II – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— AGENCY ACTION UNLAWFULLY WITHHELD

### (5 U.S.C. § 706(1))

150.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 149 (and all subparts thereto) as if set forth fully herein.

151.    FDA has allowed the Importing States to import unapproved, misbranded, adulterated, unlisted, and unregistered thiopental.

152.    Under the plain terms of the FDCA and FDA's own regulations, FDA was required to deny admission to those and any similar thiopental shipments.  *See* 21 U.S.C. §§ 381(a)(2), 381(a)(3); 21 C.F.R. §§ 1.94(a), 207.40(b), 314.410(a)(1).

– 44 –

153.    For these reasons, and all of the reasons discussed above, FDA's failure to deny admission to unapproved, unlisted, and unregistered thiopental amounts to agency action unlawfully withheld.

## COUNT III – VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT— AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AND/OR AN ABUSE OF DISCRETION

### (5 U.S.C. § 706(2)(A))

154.    Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 153 (and all subparts thereto) as if set forth fully herein.

155.    FDA's actions with respect to imported, unapproved thiopental are arbitrary, capricious and an abuse of agency discretion for several reasons.  First, FDA does not have discretion to ignore the clear command of the FDCA.  *See* 21 U.S.C. §§ 381(a)(2), 381(a)(3). Similarly, FDA does not have discretion to ignore the plain requirements of its own regulations, which have the force of law.  21 C.F.R. §§ 1.94(a), 207.40(b), 314.410(a)(1).

156.    Second, FDA's actions conflict with its established procedures.  FDA's procedures clearly forbid the commercial importation of any unapproved new drug or the importation of any controlled substance.  Here, each shipment was a commercial one, and there is no question that thiopental is a controlled substance.

157.    Third, FDA's actions conflict with its established practice.  For years, FDA has consistently maintained that state governments could not lawfully import unapproved new drugs, even when doing so would advance compelling public policies (such as providing affordable medication to at-risk populations, including senior citizens).  FDA's actions allowing the Importing States to bring thiopental into this country simply cannot be reconciled with FDA's

established practice of denying state governments the ability to import lower-cost, life-saving medications from Canada and elsewhere.

158.    FDA has not offered a sufficient justification for this deviation from its consistent practice.  The fact that the unapproved imported thiopental at issue in this action is intended for use in lethal injunction does not alter the fact that the drug is still being used for its intended anesthetic purpose, and that it must therefore be safe and effective for that intended use.  Although death, rather than surgery or resuscitation, is the end result of the process in which the unapproved imported thiopental is to be used, the desired and intended effect of the drug is the same: anesthesia to prevent undue pain – here, of a constitutional dimension.

159.    Fourth, FDA has not inspected any link in the chain of companies that manufactured or sold the thiopental at issue in this litigation.  Nor has FDA inspected the processes used to produce the thiopental at issue.  Allowing the Importing States to import unapproved thiopental without conducting such inspections is patently unreasonable.  FDA's actions appear to be motivated by an arbitrary desire on FDA's part to refuse to acknowledge that it has any role in capital punishment, even though the safe and effective administration of a drug such as thiopental is essential to the constitutional implementation of Plaintiffs' death sentences and falls squarely within FDA's statutory mandate.

160.    Fifth, FDA's actions are also contrary to the public health and undermine the FDCA.  Allowing unapproved thiopental to be freely imported into this country for purposes of lethal injection undermines the public health and constitutionally-required goal of assuring that lethal injections are carried out with adequate anesthesia.  It also increases the risk that thiopental

will be diverted through subsequent unlicensed distributions, a point already proven by the actions of Arizona and California.

161.    Sixth, FDA's actions are irrational.  FDA has chosen to allow state corrections officials to import unapproved thiopental for use as an anesthetic, but maintains that other institutions or persons (such as hospitals or anesthesiologists) may not do the same, despite the fact that those institutions actually have the expertise to determine whether the unapproved thiopental has succeeded in inducing anesthesia.

162.    For all of the reasons discussed above, FDA's actions with respect to unapproved thiopental are arbitrary, capricious, and an abuse of discretion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter:

A.    A declaratory judgment pursuant to 28 U.S.C. § 2201(a) in favor of Plaintiffs and against Defendants declaring that the imported thiopental at issue in this action is a misbranded drug, an adulterated drug, and an unapproved new drug within the meaning of the FDCA; and

B.    A declaratory judgment pursuant to 28 U.S.C. § 2201(a) in favor of Plaintiffs and against Defendants declaring that such thiopental cannot lawfully be introduced or delivered for introduction into interstate commerce or lawfully be imported into the United States; and

C.    A declaratory judgment pursuant to 28 U.S.C. § 2201(a) in favor of Plaintiffs and against Defendants declaring that that FDA's recent actions allowing foreign thiopental to enter the United States were each contrary to law, arbitrary, capricious, and/or an abuse of discretion under the APA; and

D.      A declaratory judgment pursuant to 28 U.S.C. § 2201(a) in favor of Plaintiffs and against Defendants declaring that that FDA's failure to deny admission to foreign thiopental as required by Section 801(a) of the FDCA, 21 U.S.C. § 381(a), amounts to agency action unlawfully withheld under the APA; and

E.      A declaratory judgment pursuant to 28 U.S.C. § 2201(a) in favor of Plaintiffs and against Defendants declaring that that FDA's announcement that it will allow future shipments of foreign thiopental to enter the United States is contrary to law, arbitrary, capricious, and/or an abuse of discretion under the APA; and

F.      A permanent injunction prohibiting FDA from releasing any future shipments of unapproved foreign thiopental into interstate commerce; and

G.      An order compelling FDA to immediately take reasonable steps to recover and remove from interstate commerce all shipments of foreign thiopental that have been released by FDA into interstate commerce during the preceding twelve months; and

H.      An order pursuant to 28 U.S.C. § 2412(b) awarding Plaintiffs their costs and reasonable attorneys' fees incurred in prosecuting this action; and

I.      Such other relief as the Court may deem just and proper.

Respectfully submitted,


       /s/ Bradford A. Berenson

*Of Counsel*                    Bradford A. Berenson (DC Bar No. 441981)

Jon M. Sands              Coleen Klasmeier (DC Bar No. 465050)

Dale A. Baich              Eric A. Shumsky (DC Bar No. 477926)

  Office of the Federal Public Defender    Sean C. Griffin (DC Bar No. 499537)

    for the District of Arizona         Sidley Austin LLP

  850 West Adams Street, Suite 201      1501 K Street, N.W.

  Phoenix, Arizona 85007            Washington, DC  20005

  (602) 382-2816                   (202) 736-8000

  (602) 889-3960 (fax)             (202) 736-8711 (fax)

  dale_baich@fd.org               sgriffin@sidley.com


                              *Attorneys for Plaintiffs*


DATED: February 2, 2011