**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD EDWARD BEATY, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) Civil Action No. 11-0289 (RJL) |
| FOOD & DRUG ADMINISTRATION, *et. al.*, | ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND/OR
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

This case is controlled by *Heckler v. Chaney*, 470 U.S. 821 (1985). Both in *Chaney* and

here, plaintiffs, death row inmates, sued the United States Food and Drug Administration

("FDA") for not taking investigative and enforcement actions to prevent the use of sodium

thiopental ("thiopental") for capital punishment. *Id.* at 823. The *Chaney* Court held, and so too

should this Court, that "FDA's decision . . . is . . . not subject to judicial review" because "agency

refusals to institute investigative or enforcement proceedings" are "'committed to agency

discretion.'" *Id.* at 837–38 (quoting 5 U.S.C. § 701(a)(2)).

To distinguish this case from *Chaney*, plaintiffs strain to identify insignificant differences

that do not even graze the *Chaney* Court's reasoning. The "biggest differences" relied on by

plaintiffs are that this case involves decisions not to refuse admission to imports and that the

import provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 381(a),

use the word "shall." *See* Pls.' Mem. Supp. Summ. J. 22–32. Upon examination, these

"distinctions" evaporate because these import decisions, like the enforcement decisions in *Chaney*, are discretionary and because the *Chaney* Court considered FDCA provisions using the word "shall" and found that the word "shall" did not alter its conclusion that FDA's decision against initiating an investigation or enforcement action was not subject to judicial review. *Id.* at 835.

Plaintiffs also fail to establish subject matter jurisdiction in that they cannot establish either the causation or injury prongs of the Article III standing inquiry. Because any alleged past instances of ineffective anesthesia may be attributable to a variety of factors, including improper administration and dosage of the drug, rather than to the drug itself, plaintiffs cannot establish that the injury is fairly traceable to the action or inaction of FDA regarding imports, and not the result of the independent action of some third party. *See infra* Arg. Part II.B. Plaintiffs' assertion that they are at risk of injury from defects in thiopental is pure speculation and, as a matter of law, insufficient to satisfy the standing requirement of "injury-in-fact." *See infra* Arg. Part II.C.

Lastly, and in the alternative, FDA's decision is in accordance with law, constitutes agency action lawfully withheld, and is not arbitrary, capricious, or an abuse of discretion. The governing statute does not require FDA to refuse admission to thiopental, and to the extent there is any ambiguity, FDA's interpretations of the governing statute and its own regulations are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See infra* Arg. Part III.A. FDA's decisions not to refuse admission to thiopental for use in capital punishment are also reasonable given the agency's public health mission, enforcement priorities, and deference to law enforcement on matters involving drugs for use in capital punishment. *See infra* Arg. Part III.B. Moreover, plaintiffs' statutory interpretation leads to odd

results that Congress could not have intended, including vesting the agency with enforcement

discretion over domestic, but not imported, products; vitiating the agency's personal import and

drug shortage policies; and imposing on the agency the impossible task of requiring investigative

and enforcement action without the resources to do so.  *See infra* Arg. Part III.C.  This Court

should dismiss plaintiffs' complaint in its entirety and/or grant defendants' motion for summary

judgment.

<u>**REGULATORY AND FACTUAL BACKGROUND**</u>

**I.      FDA'S REVIEW OF IMPORTS**

Several federal agencies have overlapping and concurrent jurisdiction over imported

products.  U.S. Customs and Border Protection ("CBP") coordinates with several agencies  to

notify agencies when products are offered for import into the United States within each agency's

respective jurisdiction.  The FDCA provides FDA with the authority to review imported products

within its jurisdiction:  "If it appears" that an article imported or offered for import into the

United States "is forbidden or restricted in sale in the country in which it was produced or from

which it was exported," or "is adulterated, misbranded, or [an unapproved new drug] in violation

of . . . [21 U.S.C. § 355] . . . , then such article shall be refused admission . . . ."  21 U.S.C.

§§  381(a)(2), (3); *see* 21 U.S.C. §§ 351 (adulterated drug and device provisions); 352

(misbranded drug and device provisions); 21 U.S.C. § 355 (unapproved new drug provisions).

Under the FDCA, the appearance of a violation may be based on "the examination of such

samples or otherwise."  21 U.S.C. § 381(a).

There are three main ways that products enter the United States: through traditional

conveyances arriving at air, sea, and land ports; via international mail, and transported by express

courier.  *See* U.S. Dep't of Health & Human Servs. ("HHS") Task Force on Drug Importation,

Report on Prescription Drug Importation ("2004 HHS Report") 11 (2004), *available at*

http://archive.hhs.gov/importtaskforce/Report1220.pdf (last visited Apr. 16, 2011).  In 2004, there were

355 "points of entry" for access into the United States, which include 312 ports, 14 international

mail branches, and 29 express consignment facilities.  *Id.*  The volume of imported products far

exceeds the government's inspection capacity.  *See id.*  ("[T]here are too many packages to

monitor and control the influx of drugs sent into the U.S., much less perform comprehensive

examinations of all packages.").

      To import a commercial entry through one of these avenues, the importer, or his/her

representative, must first file an entry notice.  Most commercial importers file their entry notices

electronically and that information is viewed by CBP through its Automated Commercial System

("ACS").  *See* FDA's Regulatory Procedure Manual ("RPM") p. 9-4 (Mar. 2010),

http://www.fda.gov/downloads/ICECI/ComplianceManuals/RegulatoryProceduresManual/UCM074300.pdf.  For

products within FDA's jurisdiction, the filer identifies, among other things, the FDA product,

manufacturer, foreign shipper, and the country of origin.  *Id.* p. 9-3.  The information is

subsequently forwarded electronically to FDA through ACS and screened against the criteria

developed by FDA in its electronic entry system, Operational and Administrative System for

Import Support ("OASIS").[1]  *Id.* pp. 9-3, 9-4.

      Using OASIS and any other pertinent available information, an FDA entry reviewer

---

[1] The electronic screening part of OASIS is being replaced by a new electronic screening
system for imports called PREDICT, which will score entries on the basis of a wide range of risk
factors identified by FDA.  *See* PREDICT, http://www.fda.gov/ForIndustry/ImportProgram/ucm172743.htm
(last visited Apr. 16, 2011).

determines initially whether to admit the product into U.S. commerce without further review, "detain" the product based on available information, or gather further information such as by conducting a physical examination or requesting a sample.  *See id.* pp. 9-3, 9-6.  If the product appears not to be in violation of the FDCA, then FDA may admit the product into U.S. commerce without further examination and enters in the Notice of FDA Action a "may proceed" line, indicating that FDA has made no determination that the product complies with all provisions of the FDCA.  *See id.* p. 9-7.  Even if the product appears to violate the FDCA, FDA may exercise its discretion to release a product into the United States, usually accompanied by a comment in the Notice of FDA Action.[2]  *See id.* p. 9-17.

In 2010, over 21 million import lines[3] within FDA's jurisdiction were offered for importation into the United States.  *See* HHS, Fiscal Year 2012, FDA, Justification of Estimates for Appropriations Committees ("2012 FDA Budget Justification") 383–88, *available at* http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Reports/BudgetReports/UCM243370.pdf (last visited Apr. 16, 2011).  Of those, about 240,000 import lines, or about 1%, were physically examined by FDA, and about 26,000 import lines, or 0.13%, were ultimately refused admission.  *See id.*

---

[2]  *See, e.g.*, RPM pp. 9-12 to 9-15 (describing FDA's enforcement discretion not to refuse admission to personal shipments of drugs or devices); FAQs About Drug Shortages, http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm (last visited Apr. 16, 2011) (describing FDA's enforcement discretion not to refuse admission to a medically necessary drugs when its shortage has a significant effect on public health).

[3]  The terms "line," or " line item," refers to "[e]ach portion of an import shipment that is listed as a separate item on an entry document."  RPM Glossary Ch. 11 (defining "line item").  A line may consist of several items of the same product, such as a quantity of frozen breaded shrimp.  FDA considers a line to be an "article" under 21 U.S.C. § 381, and it may make admissibility decisions on a line-by-line basis.

II.     **THIOPENTAL**

Thiopental is a short-acting barbiturate used to assist in the induction of general anesthesia in surgeries and other diagnostic procedures.  Compl. ¶ 37.  Once a frequently used anesthetic, thiopental has largely been replaced by alternative drugs, including propofol.  *Id.* ¶ 40. Yet, thiopental is still used as an anesthetic in a small percentage of patients.  *Id.* ¶ 44; *see* Nathan Koppel, *Execution Drug Halt Raises Ire of Doctors*, Wall Street J., Jan. 25, 2011, http://online.wsj.com/article/SB10001424052748704279704576102380584250672.html (explaining that doctors prefer using thiopental in patients "for whom the side effects of other medications could lead to serious complications" (quotations marks omitted)).

Thiopental is also a schedule III non-narcotic controlled substance under the Comprehensive Drug Abuse Prevention and Control Act of 1970, popularly known as the Controlled Substances Act ("CSA"), Pub. L No. 91-513, 84 Stat. 1242 (1970) (codified in scattered sections of titles throughout U.S.C.).  *See* 21 U.S.C. §§ 812(b)(3), 812(c) Schedule III(b)(1); 21 C.F.R. § 1308.13(c).  The CSA generally prohibits importation of controlled substances except by DEA registrants who are specifically authorized to import.  *See* 21 U.S.C. §§ 957, 958, 960; 21 C.F.R. §§ 1301.11(a), 1301.13(e).  A DEA registrant seeking to import a schedule III non-narcotic such as thiopental must submit a controlled substances import declaration to DEA.  *See* 21 U.S.C. § 952(b); 21 C.F.R. § 1312.18(b).  Any entity that imports a controlled substance without proper DEA registration and any DEA registrant that imports a schedule III controlled substance without submitting an import declaration to DEA may be prosecuted, *see* 21 U.S.C. § 960, and the shipment of the illegally imported controlled substance is subject to seizure and forfeiture, *see* 21 U.S.C. §§ 853, 881, 970.

Thiopental was developed in the 1930s and manufactured domestically by Abbott Laboratories ("Abbott"), until 2004, when Abbott spun off a new company called Hospira, Inc. ("Hospira").  Compl. ¶¶ 40, 45.  In 2009, Hospira stopped manufacturing thiopental and, in January 2011, announced its decision to permanently discontinue its production.  *Id.* ¶ 45. Despite its long history of use, thiopental for injection in humans has never been approved nor evaluated for safety and effectiveness by FDA.  *Id.* ¶ 54.  For decades, Abbott and Hospira manufactured and sold thiopental for injection without FDA approval.  *Id.* ¶ 54.

Various states that carry out capital punishment by three-drug lethal injection protocols administer thiopental to anesthesize (step 1) before administration of drugs to paralyze (step 2) and cause cardiac arrest (step 3) of the person to be executed.  *Id.* ¶ 15.  Due to the shortage of domestic unapproved thiopental for injection in humans, certain state Departments of Corrections ("DOCs") ordered thiopental from foreign entities.  Compl. ¶ 16.  In September 2010, FDA released a shipment of thiopental from Dream Pharma, Ltd. ("Dream") located in the United Kingdom after the Arizona DOC provided FDA with advance notice of its intention to use the shipment for use in capital punishment.[4]  *See* Defs.' Admin. Record ("AR") 1–4.

On January 4, 2011, FDA e-mailed a statement to members of the media, describing its practice to exercise enforcement discretion and to defer to law enforcement with respect to matters involving pharmaceuticals for lethal injection.  *See* AR 34–37.  FDA explained that under its policy upheld in *Heckler v. Chaney*, it had released several shipments of thiopental to

---

[4]  Following the shipment, FDA received two letters from the Office of the Federal Public Defender for the District of Arizona, Capital Habeas Unit, asking FDA to initiate various investigative and enforcement actions pertaining to the importation of non-FDA-approved sodium thiopental, which the State of Arizona intended to use during the execution of death row inmate Jeffrey Landrigan.  *See* AR 8–12, 28–29..

state DOCs.  *Id.*  FDA also announced its intention to release pending and future shipments of

thiopental to correctional facilities with the following comment in the Notice of FDA Action:

> FDA releases this shipment, which is being imported by or on behalf of state
> correctional authorities.  In keeping with established practice, FDA does not
> review or approve products for the purpose of lethal injection.  FDA has not
> reviewed the products in this shipment to determine their identity, safety,
> effectiveness, purity, or any other characteristics.

*Id.*  Since January 6, 2011, FDA has released shipments of thiopental to Arizona and California

DOCs with this comment in the Notice of FDA Action.  *See* AR 58–61.

## III.    PLAINTIFFS' ALLEGATIONS

Plaintiffs' complaint, filed on February 2, 2011, alleges that FDA's decisions not to

refuse admission to shipments of thiopental are not in accordance with the law, constitute agency

action unlawfully withheld, and are arbitrary, capricious, and/or an abuse of discretion under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(a), 706(a), for three reasons.  *See*

Compl. ¶¶ 144–162.  First, plaintiffs allege that 21 U.S.C. § 381(a)(3) "require[s]" FDA to refuse

admission of an unapproved new drug, a misbranded drug, and an adulterated drug imported or

offered for import into the United States, and thiopental is an unapproved new drug, a

misbranded drug, and an adulterated drug.  *Id.* ¶ 145.  Second, plaintiffs allege that 21 U.S.C.

§ 381(a)(2) "require[s]" FDA to refuse admission to a drug forbidden or restricted in sale in the

country in which it was produced or from whom it was exported, and thiopental is an illegal

export under the laws of the United Kingdom.  *Id.* ¶ 146.  Third, plaintiffs allege that two FDA

regulations, 21 C.F.R. §§ 207.40(b), and 314.410(a)(1), "require[ ]" FDA to refuse admission to

thiopental.[5]  *Id.* ¶ 149.

## IV.    RECENT DEVELOPMENTS

Since plaintiffs filed their complaint, there have been several developments regarding foreign exporters of thiopental, as well as the lethal injection protocols and thiopental supplies of various state DOCs, including two of the three states in which plaintiffs reside (i.e., Arizona and Tennessee).  First, it has been widely reported that foreign governments and foreign manufacturers are refusing to allow thiopental shipments to the United States because of objections to its use in administering the death penalty.[6]  Sandoz, the alleged Austrian supplier of thiopental here, has announced that it will not permit any future shipments to the United States.[7]

Second, Arizona, along with several other states, has announced that it will no longer use

---

[5]  Plaintiffs allege in their complaint, *see* Compl. ¶ 149, but do not argue in their motion, *see* Pls.' Mem. Supp. Summ. J. 33–34, that FDA's actions also conflict with 21 C.F.R. § 1.94(a). Because of its omission from Plaintiffs' motion, Defendants do not respond to Plaintiffs' allegation, except to say that 21 C.F.R. § 1.94(a) is a procedural regulation that provides procedures to implement the notice and hearing requirements of 21 U.S.C. § 381(a) and does not limit the agency's enforcement discretion with respect to the import decisions at issue here.

[6]  *See, e.g.,* Nathan Koppel, *Indian Firm To Stop Selling Execution Drugs to Prisons*, Wall St. J., Apr. 7, 2011, http://online.wsj.com/article/SB10001424052748704013604576246813390152424.html (Indian manufacturer); The Associated Press, *Germany Urges EU Export Ban of U.S. Execution Drug*, Apr. 1, 2011, *available at* http://www.msnbc.msn.com/id/42380173/ns/world_news-europe (Germany and European Union) (last visited Apr. 16, 2011); Brandi Grissom, *A Drug Used in Executions Becomes Very Hard To Get*, N.Y. Times, Feb. 5, 2011, http://www.nytimes.com/2011/02/06/us/06ttdrug.html (Italy); Pls.' SMF ¶ 84 (United Kingdom).

[7]  *See* Pls.' Mot. Summ. J., Foa Decl., Ex. 2 (Letter from Sandoz to Reprieve) ("Use of [injectable thiopental] for capital punishment purposes is not an approved indication.  Sandoz . . . do[es] not support the sale or use of this or any product for use in non-approved treatments."); *see also* John Gever, *Noose Tightens Around Thiopental Supply*, MedPage Today, Feb. 11, 2011, http://www.medpagetoday.com/tbprint.cfm?tbid=24830 ("Sandoz has also advised all of its subsidiaries . . . to not export or sell [thiopental] to the U.S., or supply it to distributors or third parties that may be selling it into the U.S." (quotation marks omitted)).

thiopental for capital punishment.  *See* The Associated Press, *Arizona Inmate Executed Amid Questions Over Drug*, NPR, Mar. 31, 2011,

http://www.npr.org/templates/story/story.php?storyId=134942994 (announcing Arizona's switch to pentobarbital after the executions of plaintiffs Eric J. King and Daniel Wayne Cook); Nathan Koppel, *Texas to Use Animal Drug for Executions*, Wall Street J., Mar. 16, 2011,

http://online.wsj.com/article/SB10001424052748703899704576204453351518330.html (stating that Oklahoma, Ohio, and Texas have switched to pentobarbital).  Likewise, other states and the federal government are looking into alternatives to using thiopental for capital punishment.[8]

Lastly, news reports indicate that, on April 1, 2011, the Tennessee and Kentucky DOCs turned over their entire supplies of thiopental to the DEA as part of an investigation into potential CSA violations committed by the domestic importer.  *See* Nathan Koppel, *[Kentucky, Tennessee] Turn Over Execution Drug to U.S.*, Wall St. J., Apr. 2, 2011,

---

[8]  *See* Nathan Koppel, *South Carolina Requests DEA Review of its Execution Drugs*, Wall St. J. Blogs, Apr. 15, 2011,
http://blogs.wsj.com/law/2011/04/15/south-carolina-requests-dea-review-of-its-execution-drugs/ (South Carolina); The Associated Press, *Ga. Considers Execution Drug Switch*, Apr. 11, 2011, *available at* http://www.chron.com/disp/story.mpl/ap/nation/7517101.html (last visited Apr. 16, 2011) (Georgia); The Associated Press, *Miss. AG: State Likely To Use New Execution Drug*, Mar. 22, 2011, *available at*
http://www.wkrg.com/crime/article/miss.-ag-state-likely-to-use-new-execution-drug/1205672/Mar-22-2011_2-52-pm (last visited Apr. 16, 2011) (Mississippi); *see also* Nathan Koppel, *Texas Adopts Animal Drug for Executions*, Wall Street J., Mar. 17, 2011,
http://online.wsj.com/article/SB10001424052748703899704576204453351518330.html ("The move by Texas . . . could encourage other states to switch drugs."); The Associated Press, *Substitutes Sought for Deadly Drug*, N.Y. Times, Mar. 10, 2011, at A17,
http://www.nytimes.com/2011/03/11/us/11brfs-SUBSTITUTESS_BRF.html ("The federal government told state attorneys general that it had run out of [thiopental] and was exploring alternatives . . . ."); Andrew Welsh-Huggins, *States Ask Justice Department for Execution Help*, Business Week, Feb. 8, 2011,
http://www.businessweek.com/ap/financialnews/D9L8QL0O0.htm ("States are scrambling to find enough [thiopental] after its [Hospira] ceased production and some overseas supplies dried up.").

http://online.wsj.com/article/SB10001424052748703806304576236931802889492.html?mod=googlenews_wsj;

*see also* Nathan Koppel, *South Carolina Requests DEA Review of its Execution Drugs*, Wall St.

J. Blogs, Apr. 15, 2011,

http://blogs.wsj.com/law/2011/04/15/south-carolina-requests-dea-review-of-its-execution-drugs/.[9]  Two weeks

prior, DEA had seized a shipment of thiopental received by the Georgia DOC as potentially

violative of the CSA.  *See id.*

## ARGUMENT

### I.    FDA'S DECISIONS NOT TO REFUSE ADMISSION OF THIOPENTAL ARE DISCRETIONARY AND UNREVIEWABLE.

FDA's decisions not to refuse admission to imports of thiopental are "committed to

agency discretion by law," and therefore are not subject to judicial review.[10]  5 U.S.C.

§ 701(a)(2).  This case cannot fairly be distinguished from the Supreme Court's decision in

*Heckler v. Chaney*, which held that 5 U.S.C. § 701(a)(2) precluded judicial review of FDA's

decisions not to take investigative and enforcement action under the FDCA regarding thiopental

for lethal injection.  470 U.S. at 837–38.  Thus, this Court should dismiss plaintiffs' claims in

---

[9]  Defendants cannot vouch for the accuracy of these news reports or any other such reports referenced in this memorandum.  Neither, by referencing such reports, do defendants intend to confirm, deny, or otherwise comment upon the existence or non-existence of any investigation.

[10]  Defendants have moved to dismiss all of the claims for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  Although defendants have included background information and material to provide the Court with a more complete context under which this case arose, none of that material is necessary to determine whether plaintiffs have failed to state a claim.  To the extent the Court chooses to rely on that material in evaluating those arguments, defendants request that the Court enter summary judgment in favor of the government.  *See* Fed. R. Civ. P. 12(d).  *But see infra* n.25 (explaining that agency action based on an administrative record can be reviewed on a Rule 12(b)(6) motion).

their entirety.[11]

**A.     *Heckler v. Chaney* and Its Progeny Establish that the Agency's Decisions Are Not Subject to Judicial Review.**

In *Heckler v. Chaney*, prison inmates sentenced to death by lethal injection filed a citizen petition with FDA, alleging that the use of thiopental, succinylcholine, and potassium chloride to execute prisoners violated the provisions of the FDCA prohibiting interstate distribution of an approved drug for an unapproved use, 21 U.S.C. § 355(a), and a misbranded drug, 21 U.S.C. § 352(f)(1).  470 U.S. at 823–24; *Chaney v. Schweiker*, No. 81-2265, slip op. at 3 n. *, ** (D.D.C. Aug. 30, 1982).  Their petition further alleged that the use of these drugs would result in a painful death for the inmates.  *Chaney,* 470 U.S. at 823.  For relief, they requested FDA take investigatory and enforcement action to prevent the States from using these drugs in administering the death penalty, including affixing warnings to the drug labels, sending statements to the drug manufacturers and prison administrators, seizing and condemning the drugs from departments of corrections, and recommending the prosecution of manufacturers who knowingly sold the drugs for use in lethal injections.  *Id.* at 824.

FDA denied the petition without addressing the merits of the allegations of unapproved use of an approved drug and misbranding.  *Id.* at 824–25; *Schweiker*, No. 81-2265, at *8.  In its response, FDA relied on its inherent enforcement discretion to decline to pursue the requested

---

[11] Notwithstanding plaintiffs' lack of standing to pursue this action, *see infra* Arg. Part II.B.*,* the court may dismiss this case at the outset on the authority of *Heckler v. Chaney*. Although standing "would normally be considered a threshold question that must be resolved in [plaintiffs'] favor before proceeding to the merits," the Court is permitted to dismiss for failure to state a claim as a threshold matter "when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998) (quotation marks omitted).

investigative and enforcement action.  *Chaney*, 470 U.S. at 824.  Respondents then filed suit in

the District Court for the District of Columbia, and, after limited discovery, the court granted

FDA judgment as a matter of law, upholding that FDA's "defensible exercise of [its]

considerable investigative and enforcement discretion under the [FDCA]."  *Schweiker*, No. 81-

2265, at *2.  On appeal, a divided panel of the Court of Appeals for the District of Columbia

Circuit reversed, holding that FDA's refusal to take investigative and enforcement action was

both reviewable and arbitrary and capricious.  *Chaney*, 470 U.S. at 826–27.  Judge Scalia, in

dissent, expressed the view that an agency's decision not to institute enforcement action is

generally unreviewable and nothing in the FDCA or FDA regulations provided a basis for a court

to review FDA's decision.  *Id.* at 827.

     The Supreme Court granted respondents' petition for certiorari "to review the implausible

result that the FDA is required to exercise its enforcement power to ensure that States only use

drugs that are 'safe and effective' for human execution," and reversed.  *Id.*  The *Chaney* Court

determined that an agency's refusal to take enforcement steps is "presumptively unreviewable,"

for several reasons.  *Id.* at 832.  "First, an agency decision not to enforce involves a complicated

balancing of a number of factors which are peculiarly within its expertise," including assessing

"whether agency resources are best spent on this violation or another, whether the agency is

likely to succeed if it acts, whether the particular enforcement action requested best fits the

agency's overall policies, and, indeed, whether the agency has enough resources to undertake the

action at all."  *Id.* at 831.  Second, "when an agency refuses to act it generally does not exercise

its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon

areas that courts often are called upon to protect."  *Id.* at 832.  Third, "an agency's refusal to

-13-

institute proceedings shares to some extent the characteristics of the decision of a prosecutor in

the Executive Branch not to indict—a decision which has long been regarded as the special

province of the Executive Branch." *Id.*

The presumption of unreviewability "may be rebutted where the substantive statute has

provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833.

Turning to the FDCA, the Supreme Court determined that Congress had neither indicated an

intent to circumscribe agency enforcement discretion nor provided meaningful standards for

defining the limits of that discretion. *Id.* at 835. The FDCA's injunction provision, 21 U.S.C.

§ 332, "gives no indication of when an injunction should be sought," and the seizure provision,

21 U.S.C. § 334, "is framed in the permissive—[the violative article] '*shall* be liable to be

proceeded against.'" *Id.* (quoting 21 U.S.C. § 334 (emphasis added)). As for the criminal

provision, 21 U.S.C. §§ 333, the Court acknowledged its mandatory language ("Any person who

violates a provision of section 301 *shall* be imprisoned . . . or fined . . . ." (emphasis added)), but

found "no indication in case law or legislative history that" Congress intended to mandate

criminal prosecution of every violator of the FDCA. *Id.* "Conclud[ing] that the presumption that

agency decisions not to institute proceedings are unreviewable under 5 U.S.C. § 701(a)(2) is not

overcome by the enforcement provisions of the FDCA," *id.* at 837, the *Chaney* Court held that

"FDA's decision . . . is therefore not subject to judicial review under the APA," *id.* at 838.

To our knowledge, post-*Chaney* no court of appeals has held that FDA's failure to take

enforcement action under the FDCA is reviewable under the APA. The absence of such cases is

hardly surprising. This Circuit, for example, has consistently upheld FDA's discretion not to

take enforcement action under the FDCA based on *Chaney*. *See Jerome Stevens Pharm., Inc. v.*

-14-

*FDA*, 402 F.3d 1249, 1258 (D.C. Cir. 2005) ("Each of [the deadline extensions] is an exercise of

FDA's enforcement discretion and [plaintiff] fails to demonstrate how 21 U.S.C. § 355 and 21

U.S.C. § 393 provide guidelines for the exercise of such discretion."); *Cutler v. Hayes*, 818 F.2d

879, 893 (D.C. Cir. 1987) ("The [FDCA] imposes no clear duty upon FDA to bring enforcement

proceedings to effectuate either the safety or the efficacy requirements of the Act. . . . Congress

has not given FDA an inflexible mandate to bring enforcement actions against all violators of the

Act."); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 950 (D.C. Cir. 1987) ("[T]he gravamen of

[plaintiffs'] complaint is that FDA failed to initiate enforcement proceedings.  But as the

[*Chaney*] Court held . . . , FDA enjoys complete discretion not to employ the enforcement

provisions of the [FDCA], and those decisions are not subject to judicial review."); *Schering*

*Corp. v. Heckler*, 779 F.2d 683, 686 (D.C. Cir. 1985) ("The Court's decision in *Chaney*

manifestly forecloses judicial review here in a case involving the same agency and the identical

statute."); *cf. Int'l Ctr. for Tech. Assessment v. Thompson*, 421 F. Supp. 2d 1, 7 (D.D.C. 2006)

("FDA is simply exercising its discretion not to take enforcement actions against these particular

fish." (quotation marks omitted)).

      **B.**    **FDA's Decisions Not To Refuse Admission of Thiopental Are Presumptively**
               **Unreviewable.**

      FDA's decisions not to take enforcement action against shipments of thiopental are

presumptively unreviewable decisions under *Heckler v. Chaney*.  FDA's enforcement decision

not to refuse admission to imports under 21 U.S.C. § 381 is directly analogous to the plainly

discretionary and non-reviewable enforcement decisions not to institute a seizure action under 21

U.S.C. § 334, an injunctive proceeding under 21 U.S.C. § 332, or a criminal prosecution under

21 U.S.C. § 337.  Just as FDA's decisions not to institute seizure, injunctive, or criminal

proceedings under the FDCA regarding thiopental for lethal injection were presumptively

unreviewable in *Chaney*, so too are FDA's decisions not to refuse admission of foreign

thiopental for lethal injection.

 All of the reasons that make agency non-enforcement generally unsuitable for judicial

review apply in this case.  First, FDA's refusal to deny admission of thiopental—like its refusals

in *Chaney* to seize thiopental and enjoin states from using thiopental—shares "the characteristics

of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long

been regarded as the special province of the Executive Branch."  *Chaney*, 470 U.S. at 832.

 Second, FDA's decision not to refuse admission of thiopental "involves a complicated

balancing of a number of factors which are peculiarly within its expertise," including whether

FDA resources are best spent on prohibiting importation of thiopental for lethal injection and

whether refusal to admit thiopental for use in capital punishment best fits FDA's overall policies.

*Chaney*, 470 U.S. at 831; *see* AR 34–35 ("Among the reasons cited by the Court for its decision

not to review FDA's non-enforcement against lethal injection drugs is that agencies are

responsible for prioritizing their enforcement resources to most effectively achieve their statutory

missions."); *id.* ("FDA deferred to law enforcement in the use of substances for lethal injection,

which is consistent with the agency's longstanding policy."); *see also infra* Arg. Part III.C

(describing the lack of agency resources to interdict all violative articles offered for import).

 Lastly, when FDA decides not to refuse admission of thiopental, it does not "exercise its

*coercive* power over an individual's liberty or property rights, and thus does not infringe upon

areas that courts often are called upon to protect."  *Chaney*, 470 U.S. at 832.  FDA's issuance of

a Notice of FDA Action with a "may proceed" line means that FDA will not interfere with the entry of the thiopental into the United States.  In contrast, an FDA decision to detain and ultimately refuse admission of thiopental would be accompanied by multiple affirmative acts and the expenditure of significant resources, including detaining the drug, notifying the appropriate individuals of the opportunity for a hearing, holding a hearing, rendering a decision, providing an opportunity for reconsideration, reviewing its decision, and supervising the re-export or destruction of the thiopental.  *See* 21 U.S.C. § 381; 21 C.F.R. § 1.94.

This last reason supporting unreviewability is a critical distinction between this case and the decision in *Smoking Everywhere, Inc. v. Sottera, Inc.*, 680 F. Supp. 2d 62, 69 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).  In *Smoking Everywhere*, this Court noted that FDA does not have "unfettered discretion to refuse an article that obviously is beyond the scope of the FDCA."  *Id.* at 69 n.8.  Here, however, FDA has not "refuse[d] an article that is obviously beyond the scope of the FDCA"; to the contrary, FDA has *declined* to refuse admission of thiopental, a drug well *within* the scope of the FDCA.  Thus, plaintiffs' allegation that "this Court has previously rejected the idea that *Heckler* could insulate FDA's implementation of 21 U.S.C. § 381(a) from judicial review," Compl. ¶ 111, ignores two important distinctions between the cases:  (1) *Smoking Everywhere* involved a decision to refuse the importation of an article, whereas this case involves FDA's non-coercive release of the article; (2) *Smoking Everywhere* involved a jurisdictional challenge, whereas plaintiffs' claims here rely entirely on FDA's jurisdiction over thiopental.

    **C.**    **The FDCA Does Not Provide "Law To Apply" to FDA's Non-Enforcement Decisions.**

The *Chaney* presumption of unreviewability afforded to FDA's decisions not to refuse importation of thiopental is not rebutted by the FDCA or FDA's regulations. Section 381(a) vests FDA with the discretion to refuse admission of articles that "appear" violative of the FDCA based on examinations of samples or "otherwise." Although plaintiffs assert that the statute's use of "shall" in § 381 eliminates the agency's discretion, both Congress and the courts, including the *Chaney* Court, have indicated that "shall" is not to be read as mandatory in the enforcement context. Furthermore, nothing in FDA's import regulations circumscribes FDA's enforcement discretion under § 381(a).

### 1.     Section 381 does not circumscribe FDA's non-enforcement discretion.

The FDCA's import provision does not "provide[ ] guidelines for the agency to follow in exercising its enforcement powers," and, therefore, does not rebut the presumption of unreviewability. *Chaney*, 470 U.S. at 833. Section 381(a) states in relevant part: "If it appears from the examination of such samples or otherwise that . . . (2) such article is forbidden or restricted in sale of the country in which it was produced or from which it was exported, or (3) such article is adulterated, misbranded, or in violation of . . . [21 U.S.C. § 355] . . ., then such article shall be refused admission . . . ." 21 U.S.C. § 381(a).

Under this provision, a prerequisite to any enforcement action against thiopental is an FDA determination that an article "appears" to have been forbidden or restricted in sale in the country in which it was produced or from which it was exported or adulterated, misbranded, or in violation of 21 U.S.C. § 355, based on an examination of samples or "otherwise." A long line of court decisions confirm that the use of the terms "appear[ ]" and "otherwise" in § 381(a) establishes Congress' intent to provide FDA with broad discretion in determining whether an

article appears to violate the FDCA.[12]  By providing FDA with broad discretion in determining

whether an article "appears" violative, Congress also intended to provide FDA with discretion

not to refuse admission of an imported violative article.[13]

Where, as here, the article clearly "appears" to be an unapproved new drug in violation of

21 U.S.C. § 355, plaintiffs contend that the language "then the article shall be refused admission"

mandates FDA to refuse admission of thiopental.  *See, e.g.*, Compl. ¶¶ 1, 68, 110, 115, 139–41;

Pls.' Mem. Supp. Summ. J. 21.  This contention relies primarily on the tenet of statutory

construction that the word "shall" is usually a command, particularly where a statute uses both

"may" and "shall" in the same section of the statute.  *See* Pls.' Mem. Supp. Summ. J. 21–27.

---

[12] *See K & K Merch. Group v. Shalala*, Civ. No. 95-10082, 1996 WL 183023, at *8 (S.D.N.Y. Apr. 17, 1996) (noting "the wide discretionary power FDA enjoys to determine the factors regarding its decision to grant or refuse admission of imported goods"); *Seabrook Int'l Foods, Inc. v. Harris*, 501 F. Supp. 1086, 1090–1091 (D.D.C. 1980) ("The use of the term 'appears' in the statute is a striking and clear indication of Congress' intent to forego formal procedural requirements."), *aff'd sub nom.*, *Cont'l Seafoods, Inc. v. Schweiker*, 674 F.2d 38, 42-43 (D.C. Cir. 1982)(noting "FDA's broad authority to prohibit import of any food that 'appears' to be adulterated"); *Sugarman v. Forbragd*, 267 F. Supp. 817, 825 (N.D. Cal. 1967) ("Congress intended that [FDA] should make the final determination whether a food offered for import appears to be adulterated—without judicial review."), *aff'd*, 405 F.2d 1189 (9th Cir. 1968); *Meserey v. United States*, 447 F. Supp. 548, 555 (D. Nev. 1977) ("[T]he determination to exclude an article from importation is committed to the discretion of [FDA]."); *The James J. Hill. Bowman v. Retzlaff,* 65 F. Supp. 265, 270 (D. Md. 1946) ("[I]t is clear that in the present case the statute makes no provision for judicial review and creates no personal federal rights as the basis for judicial review, so long as the Secretary acted within the scope of his authority under the Act.").

[13] Plaintiffs try to avoid this logical conclusion by asserting that the "'appearance' standard indicates that close questions must be resolved against the imported drug and in favor of destruction or exportation," Pls.' Mem. Supp. Summ. J. 21, but we are not aware of any authority supporting such a statement, including *Seabrook Int'l Foods, Inc.*, 501 F. Supp. at 1090–91, which plaintiffs cite.

Plaintiffs also cite a litany of cases in which courts have held that the word "shall" in other statutes—but not the FDCA—imposes a mandatory duty.  *See id.* at 22.

As a matter of statutory interpretation, plaintiffs' attempt to sever the "[i]f it appears" clause from the "then such article shall" clause does violence to the meaning of § 381(a).  The discretion afforded to the agency in the first clause (i.e., "If it appears from the examination of such samples or otherwise") reflects Congress' intent to afford the agency discretion in the second clause (i.e., "then such article shall be refused admission").  Parsing the statutory language as plaintiffs do violates the basic rule of statutory interpretation requiring each clause of a sentence to be read as significant and as a harmonious whole.  *Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quoting *Wash. Market Co. v. Hoffman*, 101 U.S. 112, 115–16 (1879)); *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.")

Even so, courts do not read "shall" as mandatory when such a reading impinges upon administrative enforcement discretion.  *See Wood v. Herman*, 104 F. Supp. 2d 43, 47 (D.D.C. 2000) ("While it is a recognized tenet of statutory construction that the word 'shall' is usually a command, this principle has not been applied in cases involving administrative enforcement decisions." (citation omitted)); *see also Dubois v. Thomas*, 820 F.2d 943, 946–47 (8th Cir. 1987) (finding that "shall" did not impose a mandatory duty to bring an enforcement action); *City of Seabrook v. Costle*, 659 F.2d 1371,1375 n.3 (5th Cir. 1981) ("[W]hen duties within the traditional realm of prosecutorial discretion are involved, the courts have not found th[e] maxim

-20-

[that the word 'shall' is normally interpreted to impose a mandatory duty] controlling."); *United States v. Clarke*, 628 F. Supp. 2d 1, 11 (D.D.C. 2009) ("[I]n *Heckler v. Chaney* . . . , the Supreme Court has instructed that when 'shall' is used in an enforcement provision, it should be construed to confer discretion on an agency . . . ."); *City of Yakima v. Surface Transp. Bd.*, 46 F. Supp. 2d 1092, 1100 (E.D. Wash. 1999) ("The EPA's duty to initiate an enforcement action against [defendant] to either investigate or compel compliance . . . is discretionary.").

Indeed, in *Heckler v. Chaney*, the Supreme Court refused to afford the word "shall" in the FDCA a mandatory meaning where that interpretation would have circumscribed the agency's discretion not to enforce particular provisions.  470 U.S. at 835.  The section on criminal sanctions interpreted in *Chaney* "states *baldly* that any person who violates the FDCA's substantive provisions 'shall be imprisoned . . . or fined.'"  *Id.* (quoting 21 U.S.C. § 333) (emphasis added).  The Supreme Court found no indication that the "shall" in the statute demonstrated Congress' intent to mandate criminal prosecution of every violator, and, thus, and refused to "attribute such a sweeping meaning to this language."  *Id.; see also United States v. Dotterweich*, 320 U.S. 277, 279 (1943) (holding that an administrative hearing is not a prerequisite to prosecution of a manufacturer for violating the FDCA even though 21 U.S.C. § 335 states that notice and a hearing "shall" be provided); *United States v. Morgan*, 222 U.S. 274, 280 (1911) (same under the relevant provision of the Pure Food and Drug Act of 1906, the predecessor to the FDCA); *cf. Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (describing the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands"); *Clarke*, 628 F. Supp. 2d at 11 (finding that a statute, 8 U.S.C. § 1451, using "shall" did not create a mandatory duty to institute proceedings to

revoke naturalization).

Consistent with *Chaney*, various courts interpreting the import provisions of the FDCA specifically have interpreted the "shall" in "shall be refused admission" to be discretionary.[14]  *See K & K Merch. Group v. Shalala*, Civ. No. 95-10082, 1996 WL 183023, at *8 (finding that the unreviewable "discretionary determination" to allow importation of noncompliant electronic systems is "more akin to an exercise of prosecutorial discretion than to a statutorily mandated exemption," even though the import provision, 21 U.S.C. § 360mm(a), states that any noncompliant electronic product "shall be refused admission into the United States"); *see also United States v. Food, 2,998 Cases*, 64 F.3d 984, 990 n.11 (5th Cir. 1995) (rejecting plaintiff's argument that "the express language of § 381 mandates that adulterated goods being imported or offered for import, as here, *shall* be refused admission"); *cf. Benten v. Kessler*, 799 F. Supp. 281, 291 (E.D.N.Y. 1992) (explaining that FDA's "exercise [of enforcement discretion under its personal use policy to grant or deny admission of imports of the abortion pill RU 486] is in large part unreviewable by the courts"), *injunction stayed pending appeal by* No. 92-6170, slip op. (2d Cir. July 15, 1992), *aff'd*, 505 U.S. 1084 (1992).

Because "shall" is generally permissive in the administrative enforcement context, and because of the discretionary language ("appears" and "otherwise") included within § 381(a), the import provision does not provide sufficient standards to rebut the presumption of

---

[14]  These courts have interpreted "shall" as permissive even where the very same statutory section of the FDCA used the word "may" as well.  *See, e.g., Chaney*, 470 U.S. at 835 ("shall" and "may" used throughout 21 U.S.C. §§ 333, 334); *United States v. Food, 2,998 Cases*, 64 F.3d at 987 n.11 ("shall" and "may" used throughout 21 U.S.C. § 381);  *K & K Merch. Group, Inc.*, 95 Civ. 10082 (RPP), 1996 WL 183023, at *8 ("shall" and  "may" used throughout 21 U.S.C. § 360mm).

unreviewability.

> **2.     Another import provision, 21 U.S.C. § 384(j), reveals Congress' intent to commit non-enforcement import decisions to FDA's discretion.**

Congress' intent to provide FDA with discretion not to refuse admission of unapproved new drugs is evident in its acquiescence in—and eventual ratification of—aspects of FDA's personal import policy.  For decades, Congress has been aware of and acquiesced in FDA's exercise of enforcement discretion not to refuse admission to imports of unapproved drugs for personal use.  *See, e.g.*, *RU 486: The Import Ban and its Effects on Medical Research:  Hearing before the Subcomm. on Regulation, Business Opportunities, and Energy*, 101st Cong., 2d Sess. 53, 175–77 (1990) (describing FDA's personal use importation policy since 1954); Letter from FDA Associate Commissioner for Legislative Affairs H.C. Cannon to Representative John Dingell (Aug. 19, 1988) (explaining that FDA's personnel may allow importation of unapproved drugs for personal use).[15]

In 2000 and again in 2003, Congress ratified FDA's exercise of enforcement discretion under the agency's personal use policy by enacting and amending 21 U.S.C. § 384.[16]  *See The Medicine Equity and Drug Safety Act of 2000*, Pub. L. No. 106-387, § 1(a), 114 Stat. 1549A-35

---

[15]  *See also* Peter S. Reichertz & Melinda S. Friend, *Hiding Behind Agency Discretion: The Food and Drug Administration's Personal Use Drug Importation Policy*, 9 Cornell J.L. & Pub. Pol'y 493, 498 n.25 (1999–2000) ("The personal use importation was put in writing as early as 1954, in the form of a directive to the Agency's district offices from FDA's Division of Field Operations."); RPM p. 9-13 (1989) ("FDA personnel may use their discretion to allow entry of shipments of violative FDA regulated products when the quantity and purpose are clearly for personal use, and the product does not present an unreasonable risk to the user.").

[16]  Congress also ratified FDA's 1954 personal import policy in Section 535 of the Homeland Security appropriation act for the fiscal year ending September 2007, by prohibiting CBP from using available funds to prevent an individual from importing a prescription drug from Canada for personal use. *See* Pub. L. No. 109-295, 120 Stat. 1355 (2006).

(adding § 384); The Medicare Prescription Drug, Improvement and Modernization Act of 2003,

Pub. L No. 111-383, 117 Stat. 2066, 2464 (replacing § 384).  In the current version of § 384(j),

Congress declared that FDA should "*focus enforcement* on cases in which the importation by an

individual poses a *significant threat* to public health" and "*exercise discretion* to *permit*

individuals to make such *importations*" in certain circumstances.  21 U.S.C. § 384(j)(1) (2006)

(emphases added).  In § 384(j)(2), Congress authorized FDA to grant "individuals, by regulation

or on a case-by-case basis, a *waiver* of the prohibition of importation of a prescription drug or

device or class of prescription drugs or devices, under such *conditions as [FDA] determines to

be appropriate*." *Id.* § 384(j)(2) (emphases added); *see also id.* § 384(j)(3) (authorizing FDA to

grant individuals a waiver to import prescription drugs from Canada under certain

circumstances).[17]

 Congress' intent to provide FDA with enforcement discretion not to refuse admission to

imports of unapproved drugs generally is implicit in its acquiescence in and eventual ratification

---

[17]  These provisions never took effect, however, because FDA never made the requisite
certification that their implementation would "pose no additional risk to the public's health and
safety" and would "result in a significant reduction in the cost of covered products to the
American consumer." 21 U.S.C. § 384(l)(1).  Instead, FDA reported to Congress that it did not
"have sufficient resources to ensure adequate inspection of current levels and categories of
personal shipments of prescription drugs entering the U.S."  2004 HHS Report XI.  Plaintiffs cite
to isolated statements in the 2004 HHS report to suggest that FDA interprets § 381(a) as
mandating refusal to imports without acknowledging that the HHS report related to the exercise
of the agency's enforcement discretion in the context of imports. *See* Compl. ¶¶ 3, 145; Pls.'
Mem. Supp. Summ. J. 27.  Moreover, FDA has made clear in other congressional reports that it
"may" refuse to admit violative articles. *See, e.g.*, U.S. Gov't Accountability Office, No. GAO-
06-175T, Prescription Drugs:  Enhanced Efforts and Better Agency Coordination Needed To
Address Illegal Importation 11 (2005) ("Under the [FDCA], FDA is responsible for ensuring the
safety, effectiveness, and quality of domestic and imported drugs and *may* refuse to admit into
the United States any drug that appears to be adulterated, misbranded, or unapproved for the U.S.
market as defined in the act." (emphasis added)).

of aspects of FDA's personal import policy.[18]  *Cf. United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979 (finding acquiescence in congressional inaction and pointing to congressional hearings as evidencing congressional awareness of FDA policy).  By declaring that FDA should assess which personal imports pose a "significant threat to public health" and "exercise discretion" accordingly, Congress endorsed the agency's broader policy of carrying out its public health mission through non-enforcement import decisions.  By authorizing FDA to grant waivers to individuals "under such conditions as [FDA] determines to be appropriate," Congress confirmed FDA's view since 1954 that the words "shall refuse admission" in § 381(a) are permissive, not mandatory.  And by allowing § 384(j) to take effect only if FDA certifies to Congress that its implementation would "pose no additional risk to the public's health and safety" and "result in a significant reduction in the cost of covered products to the American consumer," 21 U.S.C. § 384(l)(1), Congress appropriately deferred to FDA to weigh the advantages and disadvantages of refusing admission of unapproved drugs, including costs, agency resources, and risk assessments.

C.    **FDA Regulations Do Not Provide "Law To Apply" to FDA's Non-Enforcement Import Decisions.**

None of the regulations on which plaintiffs rely "so fetter[s] [the agency's] discretion" as to provide meaningful standards by which to judge FDA's non-enforcement import decisions. *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988) (per curiam).  The regulations cited by plaintiffs do not address enforcement or oblige the agency to refuse admission of all

---

[18]  The agency's current personal use importation policy is described in its RPM at pages 9-12 to 9-15, and differs from the waiver authority for importation by individuals described by Congress in 21 U.S.C. § 384(j).

imported articles that appear to violate the FDCA; rather, their purpose is to give content to various terms in § 381(a).  The first regulation, 21 C.F.R. § 314.410(a), states in relevant part: "A new drug may be imported into the United States if:  (i) It is the subject of an approved application under this part; or (ii) it complies with the regulations pertaining to investigational new drugs under part 312 . . . ."  This regulation advises the importer of which new drugs *may* be imported into the United States.  Nothing in the regulation proscribes FDA's discretion to admit an unapproved product, as the agency explained in the notice and comment rulemaking for this regulation.[19]

Similarly, the second regulation cited by plaintiffs, 21 C.F.R. § 207.40(b), *see* Compl. ¶ 149, merely describes which drugs may be refused admission because they are "misbranded," without proscribing FDA's discretion in making import decisions.  It states in relevant part: "No drug may be imported or offered for import into the United States unless it is listed as required in subpart C of this part and manufactured, propagated, compounded or processed at a registered foreign drug establishment."  This regulation clearly speaks to the importer (i.e., "No drug may be imported")— not FDA—and was not intended to cabin the agency's discretion not to refuse admission to misbranded drugs.[20]  Thus, FDA's regulations were not intended to and do not

---

[19]  In its rulemaking for § 314.410, the agency proposed promulgating its personal importation use policy in § 314.410(a)(3) because "this statement of policy represents a reasonable exercise of its enforcement discretion."  New Drug and Antibiotic Regulations, 47 Fed. Reg. 46,622, 46,642 (Oct. 19, 1982).  *See id.* at 46,663.  The agency ultimately decided to delete this provision from the final rule because it found that its "policy related to enforcement discretion is better stated in a compliance policy guide."  New Drug and Antibiotic Regulations, 50 Fed. Reg. 7452, 7488 (Feb. 22, 1985).  Regardless, the agency's intent to retain enforcement discretion upon promulgation of § 314.410 is apparent.

[20]  Moreover, these regulations should not be interpreted to "override the agency's express assertion of unreviewable discretion contained in [21 C.F.R. § 10.45(d)(2)]."  *Chaney*, 470 U.S.

restrict the agency's enforcement discretion and do not provide meaningful guidelines for judicial review of the exercise of that discretion.

## II.   PLAINTIFFS LACK STANDING TO CHALLENGE FDA'S RELEASE OF THIOPENTAL.

Plaintiffs's claims do not satisfy the legal requirements of Article III standing, and thus plaintiffs are not entitled to summary judgment in their favor and their claims must be dismissed for lack of subject matter jurisdiction.[21]  Plaintiffs fail to satisfy the causation prong of the standing inquiry because they cannot meet their burden of showing that any past instances of ineffective anesthesia are fairly traceable to the action or inaction of FDA regarding imports, and not the result of the independent action of some third party.  They also cannot establish the injury prong of the standing inquiry because they cannot meet their burden of showing that they are at risk of injury from any defects in imported thiopental.

### A.   <u>Plaintiffs Fail To Satisfy the Legal Requirements for Standing.</u>

The doctrine of standing flows from the Article III requirement that there be a live case or controversy at the time the court decides the case.  *See Allen v. Wright*, 468 U.S. 737, 750 (1984).  Plaintiffs bear the burden of establishing subject matter jurisdiction, including standing.  *Lujan v.*

_____

at 836; *see also* 21 C.F.R. § 10.45(d)(2) ("The Commissioner shall object to judicial review of a matter if:  (i) [t]he matter is committed by law to the discretion of the Commissioner, e.g., a decision to recommend . . . civil or criminal enforcement . . . .").

[21] Where subject matter jurisdiction is challenged under Fed. R. Civ. P. 12(b)(1), the Court may consider evidentiary material outside of the pleadings.  *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) ("Although 'the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) on the complaint standing alone,' 'where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  "[S]tanding cannot be inferred argumentatively from averments in the pleading," but, rather, plaintiffs "must allege . . . facts essential to show jurisdiction."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation marks omitted).  Further, "each [standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  That is, in *response* to a summary judgment motion, plaintiffs must present, "by affidavit or other evidence," "specific facts" that support their standing.  *Id.* (quotations marks omitted).  To *prevail* on its own summary judgment motion, plaintiffs' burden is even higher—they "must establish that there exists no genuine issue of material fact as to justiciability."  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999).

To establish constitutional standing, a plaintiff must satisfy three requirements.  First, a plaintiff must show an "injury-in-fact," which is defined as "an invasion of a legally protected interest which is (a) concrete and particularized [i.e., the injury must affect the plaintiff in a personal and individual way], and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 & n.1 (citations and quotation marks omitted).  Second, the plaintiff must demonstrate that the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result[] [of] the independent action of some third party not before the court."  *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).  Third, the injury must be redressable by the relief sought by the complaint, i.e., "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38).

-28-

**B.**     **Plaintiffs Fail To Satisfy the Causation Prong of the Standing Inquiry.**

Plaintiffs cannot establish a causal connection between FDA's conduct and any alleged injury because they have not shown that independent intervening causes are not responsible for the alleged "anesthesia awareness."  Plaintiffs cannot maintain standing to sue the government based on injuries caused by the conduct of third parties.  *See Lujan*, 504 U.S. at 560; *Simon*, 426 U.S. at 41-42.  Plaintiffs must show that it is "substantially probable" that defendants, and not "some absent third party," will cause their injury, and the "more attenuated or indirect the chain of causation between the government's conduct and the plaintiff's injury, the less likely the plaintiff will be able to establish a causal link sufficient for standing."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (quotation marks omitted).

Plaintiffs here advance a conjectural and attenuated theory that FDA's release of thiopental will cause future injuries because there have been reports of instances of "anesthesia awareness."  Compl. ¶ 129.  But plaintiffs do not attempt to establish a causal connection between FDA's release of the product and this alleged injury.  Plaintiffs make no attempt to rule out plausible intervening causes—in particular, the administration of the anesthetic by non-medical personnel.

In surgical and diagnostic procedures outside the lethal execution setting, anesthesiologists, who are trained and licensed medical professionals, generally administer thiopental.[22]  Anesthesiologists take a variety of steps to significantly decrease the risk of

---

[22]  *See* Miller's Anesthesia 1229, 1260 (Ronald D. Miller et al eds., 7th ed. 2010) (explaining the role of an anesthesiologist); Hospira's Label for Pentothal®, Thiopental Sodium for Injection, USP, Dosage and Administration ("Pentothal solutions should be administered only

awareness associated with anesthesia, including carefully assessing the dosage necessary to induce anesthesia in a particular patient, monitoring the patient, and adjusting the dose throughout the procedure.  *See* Miller's Anesthesia 733 (Ronald D. Miller et al eds., 7th ed. 2010) ("[T]here still is significant variability in the doses of thiopental required to induce anesthesia."); *id.* at 1260 (describing the physician as "constantly adjusting the administered dose to achieve the desired anesthetic depth"); *id.* at 1240 (noting the "[s]pecial care" necessary "to avoid incorrect drug administration").

Because the ethics rules for physicians, nurses, and emergency medical technicians prohibit their participation in executions, *see Baze v. Rees*, 553 U.S. 35, 64–67 (2008), persons other than these medical professionals administer thiopental for lethal injection.  There is no question that "[e]rrors in knowledge, judgment, vigilance, or technical expertise can lead to inadequate anesthetic delivery during any type of general anesthesia."  Miller's Anesthesia 1239; *see id.* at 733 (describing interpatient variability in the dose of thiopental needed to induce anesthesia); *id.* at 1239 ("Inadequate delivery of anesthesia to patients . . . is a common cause of awareness . . . ."); *id.* at 1240 ("During intravenous anesthesia, problems in every part of the system from the syringe driver to the site of intravenous access have been reported."); *Baze*, 553 U.S. at 53 ("It is uncontested that, failing a *proper dose* of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk [of injury]." (emphasis added)); Compl. ¶ 126 ("*proper administration*" of anesthetic is critical to effective

---

by intravenous injection and by individuals experienced in the conduct of intravenous anesthesia."); *cf.* Abbott's Label for Pentothal® (Sodium Thiopental, U.S.P.) Rectal Suspension, Precautions ("[A] person competent in anesthesia management should be in constant attendance when rectal Pentothal is used.").

administration of thiopental (emphasis added)); *id.* ¶ 127 (if anesthetic is "*properly administered*," the inmate should reach unconsciousness (emphasis added)).

Plaintiffs have not produced any evidence to show that it is substantially probable that any reported or alleged problems with anesthetization in the execution setting have been caused by FDA's decisions not to refuse admission to imports of thiopental as opposed to improper administration of anesthesia by persons who are not anesthesiologists or other possible causes of such problems. *See Baze*, 553 U.S. at 54 (describing death row inmates' contentions that thiopental will be improperly administered and an improper dosage will be delivered); *Morales v. Tilton*, 465 F. Supp. 2d 972, 979–980 (N.D. Cal. 2006) (finding that California's pre-2007 lethal injection protocol did not ensure that the execution team was properly trained and supervised and properly mixed, prepared, and administered thiopental). In short, "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak" to establish standing. *Allen*, 468 U.S. at 759. *See also Simon*, 426 U.S. at 41-42.

C. **Plaintiffs Fail To Satisfy the Injury Prong of the Standing Inquiry.**

Plaintiffs cannot meet their burden of showing "injury-in-fact" either. Plaintiffs base their standing—not on any present and known injuries—but on the speculative "risk" of future injury. *See* Compl. ¶ 17 ("Administering imported thiopental . . . greatly increases the risk that Plaintiffs will not be properly anesthetized."); *id.* ¶ 129 ("There is a very real risk that unapproved thiopental will not actually render a condemned prisoner unconscious."). Where standing is based on the "risk" of future injury, and not on any present and known injuries, the risk must be more than just "possible," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), or "hypothesized," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005).

Rather, standing based on "risk" of future injury requires "both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 513 F.3d 234, 237 (D.C. Cir. 2008); *see Ass'n of Am. Physicians & Surgs., Inc. v. FDA*, 539 F. Supp. 2d 4, 17 (D.D.C. 2008), *aff'd*, 358 F. App'x 179 (D.C. Cir. 2009), *cert. denied*, 79 U.S.L.W. 3434 (Jan. 24, 2011). Plaintiffs therefore must establish that the use of the thiopental at issue in this case substantially increases the risk that an individual plaintiff will not be properly anesthetized *and* that there is a substantial probability that the individual plaintiff will not be properly anesthetized.

Plaintiffs have not met their burden. They have not proffered any evidence that demonstrates the requisite level of probability of any product failure from the use of thiopental. Instead of providing concrete evidence tying the alleged risk of injury to the characteristics of thiopental itself, including the particular shipments of thiopental that are the subject of this case, plaintiffs' allegations are generalized, hypothetical, and speculative. *See* Compl. ¶ 127 ("*if* the anesthetic is ineffective, counterfeit, adulterated or subpotent" (emphasis added)); *id.* ¶ 130 ("As a matter of law, unapproved drugs . . . present increased risks of impurity or subpotency."). The only vaguely relevant evidence in the record on this point is a letter stating that there have been five adverse drug reaction reports in the United Kingdom concerning the inefficacy of thiopental during the past two years, two of which involved batches from Dream. *See* Pls.' SMF ¶ 81; Pls.' Mem. Supp. Summ. J. 40 n.18; *id.* Foa Decl. Ex. 3. Yet, plaintiffs have not produced those adverse drug reaction reports, and even if they had, there still may be no way of knowing the circumstances surrounding those reported adverse events. *See Cook v. Brewer*, ___ F.3d ___, No. 11-15743, 2011 WL 1213095, at *2 (9th Cir. Apr. 1, 2011) ("Cook [a plaintiff in this lawsuit] . .

. provides no information as to what the adverse reactions were, whether any of the . . . adverse reactions . . . is statistically or medically significant, or the nature or extent of the lack of efficacy.  Thus, the new allegations do not, by themselves state a facially plausible claim.").  Without such details, plaintiffs cannot show that any alleged ineffectiveness of the thiopental can fairly be attributed to a product failure and not to a host of other factors, such as the manner in which thiopental was administered, an interaction between drugs, or a specific patient's reaction to anesthesia.

Nor have plaintiffs established that imported thiopental substantially increases the risk that plaintiffs will be administered an ineffective anesthetic.  This is unsurprising considering the difficulty that death row inmates have had challenging the use of imported thiopental for capital punishment under the Eighth Amendment.  *See Brewer v. Landrigan*, 131 S. Ct. 445, 445 (2010) ("There is no evidence in the record to suggest that the drug [thiopental] obtained from a foreign source is unsafe."); *Cook v. Brewer*, No. 11-15303, 2011 WL 902111, at *3 (9th Cir. Mar. 16, 2011) ("Cook has not made a sufficient showing . . . that the sodium thiopental is either not what it purports to be, or it is otherwise adulterated.").

The small fraction of plaintiffs' allegations that actually do relate to the thiopental shipments at issue do not come close to meeting the requisite level of probability for standing based on risk of future injury.[23]  Plaintiffs contend that it is "highly unlikely" that the wholesaler

---

[23]  Most of plaintiffs' standing allegations relate to domestic thiopental, rely on presumptions and legal conclusions about foreign drugs rather than any concrete facts, and describe foreign products other than anesthetics used in other settings.  *See* Compl. ¶ 129 (thiopental "produced according to the United States standard" reportedly "associated with a higher rate of 'anesthesia awareness'" than other anesthesia drugs); *id.* ¶ 131 ("Unapproved foreign drugs are presumptively unsafe and ineffective." (emphases omitted)); *id.* ¶ 136 ("differences between British and United States standards for thiopental" render product

Dream conformed to FDA current good manufacturing practice ("GMP") regulations.  Compl.

¶ 134.  "Upon information and belief," Plaintiffs assert that Dream does not have a refrigerator

capable of storing thiopental.  *Id.*  However, there is no evidence in the record that refrigeration

of thiopental, especially in powder form for reconstitution, is necessary.  *See* Hospira's Label for

Pentothal®, Thiopental Sodium for Injection, USP, How Supplied ("Store at 20 to 25˚ C (68˚ to

77˚ F).");  *cf.* Abbott's Label for Pentothal® (Sodium Thiopental, U.S.P.) Rectal Suspension

("Store at controlled room temperature.").  Moreover, the California DOC's "lab-certified" and

"sufficiently potent" supply of thiopental from Dream was in powder form and stored at room

temperature.  Ryan Gabrielson, *State's Lethal Injection Drug Passes Lab Tests*, Cal. Watch, Apr.

11, 2011, http://californiawatch.org/dailyreport/states-lethal-injection-drug-passes-lab-tests-9687; *see id.*

(attached "Certificate of Analysis").

Plaintiffs further suggest that the thiopental manufacturer Sandoz GmBH, a generic drug

subsidiary of Novartis Group, is disreputable based on certain alleged instances of non-

compliance.  Compl. ¶ 135.  Many of these allegations lack factual support and others can be

considered only within a more complete regulatory context.  The Sandoz facility located in

Kundl, Austria, where the thiopental was allegedly manufactured, *see id.* ¶ 89, has been inspected

by FDA once in 2009 and once in 2010.  FDA did not observe any deficiencies during the 2009

inspection and, consequently, did not issue Form FDA 483.[24]  *See* AR 65.  The 2010 inspection

---

adulterated); id. ¶ 132 ("foreign products are often not just adulterated, but actually
counterfeit"); ¶ 133 ("In other settings . . . the dangers posed by foreign unapproved drugs are . . .
severe").

[24] FDA Form 483 is a notice provided to a firm's management at the close of an
inspection listing significant conditions that should be corrected to prevent violative products
from being shipped.  *See generally* Investigations Operations Manual, Ch. 5 - Establishment

was a full GMP inspection covering the manufacturing process for products shipped to the

United States.  *See* AR 66–69.  FDA did issue a Form FDA 483 at the close of the 2010

inspection, but several of the observations were corrected before the close of the inspection.  *See*

AR 70.  Moreover, the deficiencies and recommendations noted during the 2010 inspection were

neither unusual for a comprehensive GMP inspection of a large pharmaceutical manufacturer,

nor deemed sufficiently serious to warrant an untitled or warning letter.[25]  Thus, FDA has not

observed violations of regulatory significance during the period when the Austrian facility of

Sandoz would have shipped the thiopental at issue in this case.

In sum, plaintiffs have failed to meet their burden to establish "facts essential to show

jurisdiction," *FW/PBS, Inc.*, 493 U.S. at 231 (quotation marks omitted), including that FDA's

release of the imported thiopental led to a "a substantially increased risk of harm and a

substantial probability of harm with that increase taken into account," *Nat'l Highway Traffic*

*Safety Admin.*, 513 F.3d at 238, and that any such injury "fairly can be traced to the challenged

action of the defendant, and not injury that results from the independent action of some third

party not before the court," *Simon*, 426 U.S. at 41-42.

**III.   FDA'S DECISIONS NOT TO REFUSE ADMISSION OF THIOPENTAL DO NOT
VIOLATE THE APA.**

Alternatively, even if this Court were to determine that FDA's decisions not to refuse

_____

Inspections, http://www.fda.gov/downloads/ICECI/Inspections/IOM/UCM150576.pdf.

[25] A warning letter is correspondence that notifies regulated industry about violations of
regulatory significance ( i.e., those that may actually lead to an enforcement action if the
documented violations are not promptly and adequately corrected).  *See* RPM pp. 4-1 to 4-3.  An
untitled letter is an initial correspondence with regulated industry that cites violations that do not
meet the threshold of a warning letter.  *See id.* p. 4-26.

admission of thiopental are reviewable under the APA, FDA's decisions should be upheld

because they are in accordance with law, constitute agency action lawfully withheld, and are not

arbitrary, capricious, or an abuse of discretion.[26]  FDA's decision not to deny admission of

thiopental do not violate the FDCA or FDA's regulations.  Under the first prong of the *Chevron*

inquiry, § 381(a) and FDA's regulations do not *require* FDA to refuse admission of all violative

articles.  To the extent § 381(a) and the regulations are ambiguous, *see supra* Arg. Part I.C.1

(citing cases holding that "shall" is discretionary when used in the enforcement context), FDA's

permissible constructions are entitled to deference under the second prong of the *Chevron*

inquiry.  FDA's decisions not to refuse admission of thiopental are also reasonable in light of the

agency's public health mission, its enforcement priorities, and deference to law enforcement on

matters involving drugs for use in lethal injection.  In addition, plaintiffs' statutory interpretation

would lead to odd results, including providing the agency with enforcement discretion with

respect to domestic, but not imported, thiopental for use in capital punishment; vitiating FDA's

longstanding personal import and drug shortage policies; and imposing an impossible task on the

agency to enforce § 381(a) without the resources to do so.  Accordingly, FDA has not violated

---

[26]  Because review of agency action based on an administrative record is more akin to appellate court review than trial court review, it can be done on a motion under Rule 12(b)(6) instead of Rule 56.  *See Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)  ("[W]hen an agency action is challenged . . . [t]he entire case on review is a question of law, and only a question of law.  And because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage."); *see also James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions.").  Defendants have nevertheless moved for summary judgment on all of the claims under Rule 56, but the court need not rely on the administrative record nor reach Defendants' motion for summary judgment if it dismisses the case under Rules 12(b)(1) and/or 12(b)(6).

the APA.

**A.      FDA's Interpretations of § 381(a) and its Regulations Are Entitled To** ***Chevron* Deference.**

When the Court is reviewing an agency's construction of statutory provisions, such as 21 U.S.C. § 381(a), the two-step analysis of *Chevron* governs.  First, the Court must inquire "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842.  Formulated another way, the Court must initially decide "whether the statute unambiguously forbids the Agency's interpretation." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002).  Second, if Congress has not "directly addressed the precise question at issue," the Court may not "impose its own construction on the statute." *Chevron*, 467 U.S. at 843.  Rather, it must determine if the agency's interpretation "is based on a permissible construction of the statute." *Id*.

*Chevron* deference "is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law.'" *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). "Delegation of such authority may be shown in a variety of ways . . . ." *Mead Corp*., 533 U.S. at 227.  With the FDCA, Congress has authorized and directed FDA to decide which drugs and devices may lawfully enter the marketplace, and which medical products may legally enter the United States. *See, e.g.*, 21 U.S.C. §§ 355, 360e, 381(a).  Further, the Supreme Court has explained that *Chevron* deference is appropriate when "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has

given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." *Barnhart*, 535 U.S. at 222. The D.C. Circuit has repeatedly given *Chevron* deference to FDA's interpretation of the FDCA, as well as the agency's own implementing regulations.[27]

The meaning of § 381(a) should be determined under the first step of *Chevron* because, as explained *supra* Part I.C, the language of 21 U.S.C. § 381(a), as well as 21 U.S.C. § 384(j), demonstrate Congress' intent to afford the agency discretion in making its admissibility determinations. Even if the Court were to proceed to the second step of the *Chevron* inquiry, FDA's constructions of § 381(a) and its regulations are unquestionably permissible.

### B.   FDA's Enforcement Discretion Policy as to Thiopental Is Reasonable.

FDA's decisions not to refuse admission of thiopental may be disturbed only if it is "agency action unlawfully withheld," 5 U.S.C. § 706(1), or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). This standard of review is highly deferential to the agency. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). The reviewing "court must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416. However, under this "narrow" scope of review, "[t]he court is not empowered to substitute

---

[27] *See, e.g., Novartis Pharm. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006) ("We have held on a number of occasions that FDA interpretations of the FDCA receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent with the regulations."); *Mylan Labs, Inc. v. Thompson*, 389 F.3d 1272, 1281 (D.C. Cir. 2004); *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319, 1320 (D.C. Cir. 1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

its judgment for that of the agency."  *Id.*

FDA articulated sound reasons for its policy of declining to interdict shipments of thiopental intended for use in capital punishment.  To conserve its limited enforcement resources, FDA rationally decided not to intervene in an area distant from its public health mission to protect the public from unsafe and ineffective drugs.  *See* 21 U.S.C. § 393 (defining FDA's public health mission).  In light of budget and personnel constraints and its extremely broad public health responsibilities,[28] FDA must prioritize some enforcement goals over others, and the agency has been sufficiently transparent about its public health priorities here.  FDA explained in its media statement that it considers "[r]eviewing substances imported or used for the purpose of state-authorized lethal injection . . . outside of [its] explicit public health role," and prioritizes its "enforcement resources to most effectively achieve [its] statutory mission[ ]" to protect the public health.  *See* AR 34–35.  Whether refusing imports for lethal injection should be a priority in accomplishing FDA's public health mission is quintessentially a policy determination reserved for the agency.  *See Chaney*, 470 U.S. at 831–32 ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."); *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990) ("[T]he federal judiciary is ill-equipped to conduct reviews of the [agency's] policy.").

Similarly, FDA's decision not to review imported lethal injection drugs for "identity, potency, safety, or effectiveness" is also logical in light of the agency's investigative priorities

---

[28] *See* U.S. Gov't Accountability Office, GAO/HRD-89-142, FDA Resources: Comprehensive Assessment of Staffing, Facilities, and Equipment Needed 8 (1989) ("FDA estimates that 25 cents of every dollar spent by consumers involves products regulated by the agency."); 2004 HHS Report 12 (describing the "risk-based approach" FDA employs "to provide the most protection given limited resources").

and public health mission.  *See* AR 34–35.  Plaintiffs allege that FDA has not "offered a

*sufficient* justification" for its decisions not to review imported thiopental for safety,

effectiveness, and quality.  Compl. ¶ 158 (emphasis added).[29]  Surely, however, FDA should be

able to assign investigation and enforcement of an unapproved drug designed to end human life

"to a lower priority than that accorded one concerned with identifying and eliminating threats to

human life." *Cutler v. Hayes*, 818 F.2d 879, 894 (D.C. Cir. 1987).

FDA's actions are also consistent with its long-standing policy of deferring "to law

enforcement in the use of substances for lethal injection."  AR 34–35.  Here, FDA is but one of

many federal and state agencies overseeing the importation and use of thiopental.  CBP is

responsible "for securing and facilitating trade and travel while enforcing hundreds of U.S.

regulations, including . . . drug laws."  U.S. Customs and Border Protection: Securing America's

Border, *About CBP*, http://www.cbp.gov/xp/cgov/about/ (last visited Apr. 16, 2011).  DEA, along with

State Controlled Substance Authorities, regulate thiopental as a schedule III controlled substance.

*See Drug Importation:  The Realities of Safety and Security, Hearing before the Senate Comm.*

*on Health, Education, Labor, and Pensions*, 109th Cong. 21 (2005).

Another agency's action regarding FDA-regulated products may obviate the need for

FDA to dedicate its limited resources to determining the admissibility of and/or initiating the

refusal process against such products.  *See* RPM p. 9-14 ("Drugs subject to [DEA] jurisdiction

---

[29]  Plaintiffs assert that thiopental is being used in lethal injection just as it is used in a
medical setting.  *See* Compl.¶ 158; Pls.' Mem. Supp. Summ. J. 2–3, 36.  Yet, there are
significant differences between using thiopental for a surgical or diagnostic procedure and for
capital punishment, including the dosage, administration, role of an anesthesiologist, duration of
the procedure, and concerns about emergence. *Compare, e.g.*, Miller's Anesthesia 733, 1229,
*with* Compl. ¶ 125 (citing lethal injection protocols for Arizona, California, and Tennesee).

should be returned to [CBP] for handling.").  For instance, newspaper accounts indicate that

DEA seized thiopental from the Georgia DOC "due to concerns about whether the state

improperly imported the drug from overseas," *see* Nathan Koppel, *Two States Turn Over*

*Execution Drug to U.S.*, Wall St. J., Apr. 2, 2011,

http://online.wsj.com/article/SB10001424052748703806304576236931802889492.html?mod=googlenews_wsj;

that the Tennessee and Kentucky DOCs turned over their supplies of thiopental to DEA as part of

an investigation into potential violations of the CSA committed by a domestic importer, *id.*; and

that the South Carolina DOC recently requested that DEA review its thiopental supply, Nathan

Koppel, *South Carolina Requests DEA Review of its Execution Drugs*, Wall St. J. Blogs, Apr. 15,

2011, http://blogs.wsj.com/law/2011/04/15/south-carolina-requests-dea-review-of-its-execution-drugs/.

 Nor does FDA's policy with respect to thiopental for lethal injection conflict with any

FDA's "established procedures" or "practices," as plaintiffs allege, *see* Compl. ¶¶ 156–57.  Quite

the opposite:  the only practices or procedures FDA has established with respect to thiopental

used for capital punishment pertain to domestic thiopental, and FDA is currently treating

imported thiopental similarly to the way it has treated domestic thiopental.  *See* AR 34–35

("FDA does not verify the identity, potency, safety, or effectiveness of substances imported for

[lethal injection].  FDA exercises similar enforcement discretion when these drugs are

manufactured and purchased within the United States."); *id.* ("FDA similarly defers to law

enforcement with respect to transport of these substances within the United States.").

 To create the appearance of conflicting "established procedures" and "practices,"

plaintiffs compare apples and oranges.  Plaintiffs contend that FDA acts irrationally by treating

state efforts to import thiopental for capital punishment differently from state efforts to import

lower cost prescription drugs from Canada.  *See* Pls.' SMF ¶¶ 21–34; *id.* Pls. Mem. Supp. Summ.

J. 8–11, 37–39.  This argument is a non-sequitur because the two situations are entirely

dissimilar.  The Canadian prescription drugs decisions involve FDA's *enforcement* of § 381(a) to

protect the *general consuming public* from the serious risks imposed by the institution of state

*programs* allowing the illegal importation of prescription drugs, and the agency's concomitant

decision not to exercise enforcement discretion based on the *cost* of FDA-approved prescription

drugs.[30]  *See, e.g.*, *Vermont v. Leavitt*, 405 F. Supp. 2d 466, 471 (D. Vt. 2005); 2004 HHS Report

8 ("[S]afety should not be sacrificed for affordability.").  In sharp distinction, the capital

punishment import decisions involve FDA's *non-enforcement* of § 381(a) based on the low

enforcement priority assigned to review of drugs to be used *for death* of a *limited number of*

*individuals* and the agency's deference to law enforcement on matters involving drugs used for

lethal injection.  The former decisions hardly establish "practices" that render the latter decisions

unreasonable, much less arbitrary.

C.     **Plaintiffs' Interpretation of § 381(a) Leads To Odd Results.**

Plaintiffs' assertion that FDA is required to interdict *all* imports of products that appear to

violate the FDCA into the United States would lead to odd results, which Congress could not

---

[30]  The Canadian import decisions are also distinct from the thiopental import decisions in
that, unlike here, the states asked FDA to characterize the state-instituted programs as *lawful* by
regulation or guidance and to *commit* to exercise its enforcement discretion—acts which FDA
believed would violate the FDCA and impose serious risks to the public health.  *See Vermont v.*
*Leavitt*, 405 F. Supp. 2d at 471 ("Vermont requested the FDA [1] to 'issue regulations or
otherwise [2] commit to exercise its enforcement discretion to allow the [Vermont State
Employee Medical Benefit Plan] to establish a program for the orderly individual importation of
prescription medications [or] . . . . [3] "'issue guidance that such a program would be lawful
under the statutes and regulations enforced by the Commissioner of Food and Drugs.'").

have intended.  *See, e.g.*, *United States v. Granderson*, 511 U.S. 39, 47 n.5 (1994) (dismissing an

interpretation said to lead to an absurd result); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S.

440, 454 (1989) ("Where the literal reading of a statutory term would 'compel an odd result,' we

must search for other evidence of congressional intent to lend the term its proper scope."

(quoting *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509 (1989)).

The first odd result is that FDA would have enforcement discretion to allow domestic

products, but not foreign products, to be commercially distributed.  As applied here, FDA would

no longer be able to apply its policy regarding drugs for lethal injection even-handedly; rather,

FDA would be required to refuse admission of foreign drugs for lethal injection, despite not

taking comparable enforcement action against domestic drugs for lethal injection.  *See* AR 34–35

("FDA exercises similar enforcement discretion when these drugs are manufactured and

purchased within the United States."); *id.* ("Again, FDA similarly defers to law enforcement with

respect to transport of these substances within the United States.").  Congress could not have

intended § 381(a) to compel FDA to make an across-the-board distinction in enforcement which

favors domestic drugs for lethal injection over foreign drugs for lethal injection.

The second odd result is the demise of FDA's longstanding personal import and drug

shortage policies.  For personal importations, FDA personnel may use their enforcement

discretion not to refuse entry of shipments of violative FDA-regulated products when the

quantity and purpose are clearly for personal use, and the product does not present an

unreasonable risk to the user.  *See* RPM 9-12 to 9-15.  Under its drug shortage program, FDA

personnel may exercise enforcement discretion not to refuse admission to imports of a medically

necessary drug when its shortage has a significant effect on public health.[31]  Adopting plaintiffs'

interpretation of § 381(a) would deny the agency enforcement discretion not to refuse admission

to imports for personal use despite congressional endorsement, *see supra* Arg. Part I.C.2, and in

drug shortage situations that create a public health risk.

      The final odd result would be the unbearable burden imposed on the agency to refuse

admission to the ever-growing number of imports of *all* violative articles, including foods,

cosmetics, human drugs, biologics, animal food and feed, and devices.  *Compare* Gary J.

Dykstra, *Electronic Processing of Import Entries*, 49 Food & Drug L.J. 425, 426 (1994) (1.6

million import lines entering the United States in 1992), *with* 2012 FDA Budget Justification

383–88,

http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Reports/BudgetReports/UCM243370.pdf (last

visited Apr. 16, 2011) (21.1 million import lines in 2010).  For decades, FDA has reported to

Congress that it is unable to refuse admission to imports of *all* violative products and, as a result,

--------------------------------------------------

    [31] *See* FAQs About Drug Shortages,
http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm (last visited Apr. 16, 2011) ("FDA
can utilize regulatory enforcement discretion for temporary importation of a non-U.S. product, in
rare instances."); Center for Drug Evaluation and Research, Manual of Policies and Procedures
("MaPP"), Drug Shortage Program, *available at*
http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/ManualofPoliciesProcedures/UCM079936.pdf
(last visited Apr. 16, 2011) ("The Office of Compliance will . . . [i]nitiate, facilitate, and monitor
importation plans when deemed necessary and assist with importation procedures related to drug
shortages."); Valerie Jensen, et al, *FDA's Role in Responding To Drug Shortages*, 59 Am. J.
Health Sys. Pharm. 1423, 1425 (2002), *available at*
http://www.fda.gov/downloads/Drugs/DrugSafety/DrugShortages/UCM134461.pdf (last visited Apr. 16, 2011)
(citing a "recent example of importation as a means to minimize a shortage [of] involved
naloxone hydrochloride injection").

the agency employs a risk-based approach at the border.[32]   Despite longstanding congressional

awareness, FDA's budget has not increased so that it could even come close to refusing

admission to all imports violative of the FDCA.  *See* 2012 FDA Budget Justification 494–95

(reporting that only about 7% of FDA's budget is devoted to regulatory and compliance activities

relating to imports, and only about 1% to human drugs specifically).

Under plaintiffs' interpretation of § 381(a), FDA would be tasked first with determining

whether all articles offered for import or imported into the United States are subject to refusal

because they "appear[ ] from an examination of sample or otherwise" to be violative of the

FDCA.  21 U.S.C. § 381(a).  *See* Pls.' Mot. Summ. J. ¶ 17 ("Defendants were required to sample

and inspect the shipments of foreign thiopental pursuant to 21 U.S.C. § 381(a)."); Pls. Mem.

Supp. Summ. J. 7 ("[Section 381(a)] was amended to impose mandatory border screening

obligations on FDA.").  Physically examining and or/sampling all FDA-regulated products

offered for import to determine whether they are subject to refusal would be impossible given

agency resources.  *See* 2012 FDA Budget Justification 383–388 (reporting that only 1% of all

---

[32]   *See, e.g.*, Comptroller General of the United States, FDA's Program for Regulating Imported Products Needs Improving, H.R. Doc. No. 77-72, at ii (1977) ("Because of the [FDA's] limited coverage of imported products, additional surveillance measures are needed . . . ."); *id.* at 27 ("[R]esource limitations prevent [FDA] from giving sufficient inspection coverage to import products to insure that all violative products are identified and appropriate regulatory action taken."); *Safety of Imported Foods: Hearing Before the Permanent Subcomm. on Investigations, Senate Comm. on Gov't Affairs*, 105th Cong. (1998) (statement of William B. Schultz, Deputy Commissioner for Policy, FDA), *available at* http://www.fda.gov/NewsEvents/Testimony/ucm115099.htm (last visited Apr. 16, 2011) ("Since resources are limited, FDA sets its priorities by focusing on risk . . . ."); U.S. Gov't Accountability Office, GAO-09-873, Food Safety 3 (2009) ("We focused primarily on FDA because it regulates roughly 80 percent of the food supply and because of our longstanding concerns regarding the agency's need to better leverage its limited resources.").

imports, and 2% of human drug imports, entering the United States in 2010 were physically examined by FDA).[33]

Next under plaintiffs' interpretation, FDA would be required to expend considerable resources in the refusal of admission process.  Before any imported item is refused, the current law requires FDA to notify the owner or consignee that the item has been detained because it appears to be non-compliant and to provide the product's owner or consignee the opportunity for a hearing.  *See* 21 U.S.C. § 381(a); 21 C.F.R. § 1.94.  At the hearing, the importer may present evidence of admissibility of the article or propose a manner in which the article may be brought into compliance with the FDCA.  *See* RPM p. 9-8.  If FDA refuses admission of a particular shipment, the owner/consignee may seek reconsideration of the decision.  *See* 21 C.F.R. §§ 10.33, 10.75.  If, however, the product is ultimately refused, then the item can be exported or destroyed under CBP's or other approved supervision.  *See* 21 U.S.C. § 381(a).

To avoid the absurd implications of their statutory interpretation, plaintiffs suggest that § 381(a) requires FDA to refuse admission only to a subset of FDA-regulated products, i.e., drugs, that "automatically" appear to FDA to be a violative product under § 381(a).  *See* Compl. ¶ 73 ("FDA's computerized screening system should *automatically* deny admission of any article

---

[33] *See also Safety of FDA-Regulated Products:  Before the House Comm. on Energy and Commerce, Subcomm. on Oversight and Investigations,* 110th Cong. (2007) (statement of David W.K. Acheson, Assistant Commissioner Food Protection, FDA), *available at* http://www.fda.gov/NewsEvents/Testimony/ucm109691.htm (last visited Apr. 16, 2011) ("FDA is not able to physically inspect a large percentage of import entries . . . ."); 2004 HHS Report 54 ("We find that there are not sufficient resources available to ensure adequate inspection of current levels of prescription drugs entering the U.S. for personal importation."); FDA's Compliance Policy Guide 110.900, Imported Products, http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm073836.htm ("Although the agency attempts to sample or examine as many potentially violative products as possible, it is inevitable that some violative foreign products enter into United States commerce.").

that is identified as an unapproved new drug, as an unlisted *drug*, or as a *drug* that originates

from an unregistered source." (emphases added)).  Yet, § 381 applies with equal force to other

violative drugs, as well as foods, cosmetics, human drugs, biologics, animal food and feed, and

devices.  Neither the statute nor the case law supports a mandatory admission refusal requirement

for unapproved new drugs and only unapproved new drugs.[34]

In addition, plaintiffs' suggestion that the predicate determination to a refusal decision is

automated largely underestimates the role of entry reviewers and other components of FDA.  In

reality, it is a rare circumstance indeed where FDA detains a product based solely on information

available in its OASIS database.  More typically, FDA requests additional information from the

importer, physically examines the products, and/or analyzes samples, and the detention decision

is a collaborative endeavor among various components of the agency.  *See generally* RPM Ch. 9.

Because of all of these resource considerations, FDA sets its enforcement priorities by focusing

on risk and does not always initiate the refusal process even when supported by the evidence.

---

[34]   Moreover, the agency does not have the resources to refuse admission to even this self-serving subset of products identified by plaintiffs.  *See Importation of Prescription Drugs: Before the Senate Comm. on the Judiciary*, 108th Cong. (2004) (statement of Mr. William Hubbard, Associate Commissioner for Policy and Planning, FDA), *available at* http://www.fda.gov/NewsEvents/Testimony/ucm113655.htm (last visited on Apr. 16, 2011) ("FDA is doing its best to use its limited international authorities to stop the increasing flow of violative drugs into this country, but the task is daunting."); 2004 HHS Report VIII ("[R]eview of imported drugs [for approval] is limited by the amount of resources available, given the substantial amount of legal and illegal prescription drugs that are imported daily.").

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss and/or for summary judgment should be granted, and plaintiffs' motion for partial summary judgment should be denied,

Respectfully submitted,

TONY WEST
Assistant Attorney General

MAAME EWUSI-MENSAH FRIMPONG
Acting Deputy Assistant Attorney General

EUGENE M. THIROLF
Director

/s/_____
GERALD C. KELL (DC Bar No. 929125)

Of Counsel:                                  Senior Trial Counsel
                                             Office of Consumer Litigation
WILLIAM B. SCHULTZ                           P.O. Box 386
Acting General Counsel                       Washington, D.C.  20044
                                             (202) 514-1586
RALPH S. TYLER                               (202) 514-8742 (fax)
Associate General Counsel                    gerald.kell@usdoj.gov

ERIC M. BLUMBERG
Deputy Associate General Counsel

JULIE A. DOHM
Assistant Chief Counsel
Department of Health and
 Human Services
Office of the General Counsel
Food and Drug Division
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002