**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Donald Edward BEATY, Daniel Wayne COOK, Eric J. KING, Brett Patrick PENSINGER, and Stephen Michael WEST, )))) | |
| Plaintiffs, ) | **Civil Action No. 1:11-cv-00289 (RJL)** |
| ) | **ECF Case** |
| v. ) | |
| ) | |
| FOOD AND DRUG ADMINISTRATION, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Kathleen SEBELIUS, and Margaret A. HAMBURG, M.D., )))) | |
| ) | |
| Defendants. ) | |

**REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION TO
DISMISS AND/OR FOR SUMMARY JUDGMENT**

*Of Counsel*
Jon M. Sands
Dale A. Baich
  OFFICE OF THE FEDERAL PUBLIC DEFENDER
    FOR THE DISTRICT OF ARIZONA
  850 West Adams Street, Suite 201
  Phoenix, Arizona 85007
  (602) 382-2816
  (602) 889-3960 (fax)
  dale_baich@fd.org

Bradford A. Berenson (DC Bar No. 441981)
Coleen Klasmeier (DC Bar No. 465050)
Eric A. Shumsky (DC Bar No. 477926)
Sean C. Griffin (DC Bar No. 499537)
  SIDLEY AUSTIN LLP
  1501 K Street, N.W.
  Washington, DC  20005
  (202) 736-8000
  (202) 736-8711 (fax)
  sgriffin@sidley.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.   SECTION 801(a)(3) OF THE FDCA COMMANDS FDA TO REFUSE
     ADMISSION TO FOREIGN DRUGS THAT APPEAR TO BE MISBRANDED
     OR UNAPPROVED NEW DRUGS. ..................................................................5

     A.   "Shall" Means "Shall" In The FDCA. .....................................................8

     B.   "Shall" Means "Shall" In The Administrative Enforcement Context. ..................11

     C.   A Mandatory Reading Of "Shall" Does No Violence To The Statute. ................15

     D.   Section 804 Supports A Mandatory Reading Of The Word "Shall" In
          Section 801(a). ........................................................................16

     E.   The Government's Permissive Interpretation Of "Shall" Is Entitled To No
          Deference. ..............................................................................18

     F.   A Mandatory Reading Of "Shall" Leads To No Absurd Result. ...........................20

          1.   Congress Intended For Imported Drugs To Be Regulated More
               Stringently Than Their Domestic Counterparts. ..........................................20

          2.   The Government Cannot Justify A Departure From The Plain
               Language of Section 801(a)(3) Simply By Pointing To Other
               Instances In Which FDA Has Ignored The Statutory Text. .......................21

          3.   Section 801(a) As Written Does Not Impose Undue Burdens On
               FDA. .....................................................................................23

II.  THIS COURT HAS JURISDICTION TO REVIEW FDA'S FAILURE TO
     COMPLY WITH SECTION 801(a)(3) OF THE FDCA. ...................................26

     A.   The *Heckler* Presumption Does Not Apply To FDA's Determinations
          Under Section 801(a)(3). ..............................................................26

     B.   If The *Heckler* Presumption Did Apply, It Is Rebutted. .......................29

III. PLAINTIFFS HAVE STANDING. ..........................................................32

     A.   Plaintiffs Have Shown Injury In Fact. ..............................................32

     B.   Plaintiffs' Injury Is Directly Traceable To FDA's Conduct. ...............37

IV.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT. ....................................38

    A.    Plaintiffs Are Entitled To Summary Judgment That FDA Acted Contrary
To Federal Law. .....................................................................................................39

    B.    Plaintiffs Are Entitled To Summary Judgment That FDA Acted Arbitrarily
And Capriciously By Departing From Its Existing Regulations And Past
Practices And By Undermining The Public Health. ...............................................39

        1.    FDA Acted Inconsistently With Its Existing Regulations And Past
Practices. ....................................................................................................40

        2.    The Government Has Not Provided A Reasoned Explanation For
FDA's Departure From Its Existing Regulations And Past
Practices. ....................................................................................................42

        3.    FDA's Actions Were Contrary To The Public Health.............................44

CONCLUSION...............................................................................................................46

# TABLE OF AUTHORITIES

Page(s)

CASES

Albuquerque Indian Rights v. Lujan,
930 F.2d 49 (D.C. Cir. 1991) ...................................................................................34

Allergan Inc. v. Shalala,
No. 94-1223, 1994 U.S. Dist. LEXIS 21716 (D.D.C. Nov. 10, 1994) ....................29

Ambruster v. Mellon,
41 F.2d 430 (D.C. Cir. 1930) ...................................................................................32

Arizona Pub. Serv. Co. v. EPA,
211 F.3d 1280 (D.C. Cir. 2000) ...............................................................................18

Arner Co. v. United States,
142 F.2d 730 (1st Cir. 1944) ....................................................................................34

* Ass'n of Civilian Technicians v. FLRA,
22 F.3d 1150 (D.C. Cir. 1994) ...................................................................................8

Baltimore Gas and Electric Co. v. FERC,
252 F.3d 456 (D.C. Cir. 2001) .................................................................................26

Barnhart v. Thomas,
540 U.S. 20 (2003) ...................................................................................................20

* Baur v. Veneman,
352 F.3d 625 (2d Cir. 2003) ........................................................................33, 34, 38

* Baze v. Rees,
553 U.S. 35 (2008) ...................................................................................................33

Bd. of Trs. of Univ. of Ill. v. United States,
289 U.S. 48 (1933) ...................................................................................................28

Beattie v. United States,
756 F.2d 91 (D.C. Cir. 1984) ...................................................................................37

* Beverly Health & Rehab. Servs. v. NLRB,
317 F.3d 316 (D.C. Cir. 2003) ...................................................................................7

Brewer v. Landrigan,
131 S. Ct. 445 (2010) ...............................................................................................36

* denotes chief authority

DC1 2025010v.1

*Brown v. Beck*,
No. 06-3018, 2006 U.S. Dist. LEXIS 60084 (E.D.N.C. Apr. 7, 2006) ..................................37

*Center for Auto Safety v. National Highway Traffic Safety Admin.*,
793 F.2d 1322 (D.C. Cir. 1986) ..................................................................................34

*Chevron U.S.A., Inc. v. NRDC*,
467 U.S. 837 (1984) ............................................................................................3

*Christensen v. Harris County*,
529 U.S. 576 (2000) ............................................................................................19

*Church of Scientology v. Richardson*,
437 F.2d 214 (9th Cir. 1971) ..............................................................................31

\* *Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ............................................................................................27

\* *City of Seabrook v. Costle*,
659 F.2d 1371 (5th Cir. 1981) ......................................................................15, 27

*City of Yakima v. Surface Transp. Bd.*,
46 F. Supp. 2d 1092 (E.D. Wash. 1999) ............................................................27

*Cmty. Nutrition Inst. v. Young*,
818 F.2d 943 (D.C. Cir. 1987) ............................................................................27

*Conn. Dep't of Children & Youth Servs. v. HHS*,
9 F.3d 981 (D.C. Cir. 1993) ................................................................................31

*Cook v. Brewer*,
No. 11-15303, 2011 U.S. App. LEXIS 5212 (9th Cir. Mar. 16, 2011) ...................36

*Cook v. Brewer*,
No. 11-15743, 2011 U.S. App. LEXIS 6753 (9th Cir. Apr. 1, 2011)......................36

\* *Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) ................................................................... *passim*

\* *Cutler v. Kennedy*,
475 F.Supp. 838 (D.D.C. 1979),
*overruled on other grounds in Chaney v. Heckler*,
718 F.2d 1174, 1188 n.35 (D.C. Cir. 1983)........................................................35

*Danvers Motor Co. v. Ford Motor Co.*,
432 F.3d 286 (3d Cir. 2005)...............................................................................34

*\* denotes chief authority*

– iv –

*Dubois v. Thomas,*
  820 F.2d 943 (8th Cir. 1987) ...........................................................................27

\* *Dunlop v. Bachowski,*
  421 U.S. 560 (1975)..........................................................................................11

\* *Ellis v. Chao,*
  336 F.3d 114 (2d Cir. 2003)..............................................................................12

\* *Engine Mfrs. Ass'n v. EPA,*
  88 F.3d 1075 (D.C. Cir. 1996)...........................................................................22

\* *FCC v. Fox Television Stations, Inc.,*
  129 S. Ct. 1800 (2009)......................................................................................40

\* *FEC v. Democratic Senatorial Campaign Comm.,*
  454 U.S. 27 (1981).............................................................................................40

*Florida Audubon Soc'y v. Bentsen,*
  54 F.3d 873 (D.C. Cir. 1995).............................................................................38

\* *Friends of the Earth v. EPA,*
  446 F.3d 140 (D.C. Cir. 2006)...........................................................................21

*Goodwin v. United States,*
  371 F. Supp. 433 (S.D. Cal. 1972).....................................................................31

\* *Heckler v. Chaney,*
  470 U.S. 821 (1985)..................................................................................... *passim*

*Hi-Tech Furnace Sys. v. FCC,*
  224 F.3d 781 (D.C. Cir. 2000)...........................................................................31

\* *Hinck v. United States,*
  550 U.S. 501 (2007)...........................................................................................30

*In re Canadian Imp. Antitrust Litig.,*
  470 F.3d 785 (8th Cir. 2006) .............................................................................45

*Int'l Ctr. for Tech. Assessment v. Thompson,*
  421 F. Supp. 2d 1 (D.D.C. 2006).......................................................................27

\* *Jama v. Immigration and Customs Enforcement,*
  543 U.S. 335 (2005).............................................................................................6

*Jerome Stevens Pharms. Inc. v. FDA,*
  402 F.3d 1249 (D.C. Cir. 2005).........................................................................27

*\* denotes chief authority*

*K&K Merch. Group v. Shalala,*
  Civ. No. 95-10082, 1996 U.S. Dist. LEXIS 4880 (S.D.N.Y. Apr. 17, 1996) ........................ 11

*L&M Industries v. Kenter,*
  458 F.2d 968 (2d Cir. 1972) .................................................................................................. 8

*Landstar Express Am., Inc. v. FMC,*
  569 F.3d 493 (D.C. Cir. 2009) ............................................................................................. 20

\* *Lincoln v. Vigil,*
  508 U.S. 182 (1993) .............................................................................................................. 26

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .............................................................................................................. 32

*MCI Tel. Corp. v. FCC,*
  917 F.2d 30 (D.C. Cir. 1990) ............................................................................................... 29

*Monsanto v. Geertson Seed Farms,*
  130 S. Ct. 2743 (2010) ......................................................................................................... 32

*Morales v. Hickman,*
  415 F. Supp. 2d 1037 (N.D. Cal. 2006) ............................................................................... 37

\* *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................................................ 40

\* *Mountain States Legal Found. v. Glickman,*
  92 F.3d 1228 (D.C. Cir. 1996) ........................................................................................ 32, 33

*Mylan Labs., Inc. v. Thompson,*
  389 F.3d 1272 (D.C. Cir. 2004) ........................................................................................... 19

\* *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
  551 U.S. 644 (2007) ................................................................................................................ 8

\* *NRDC v. EPA,*
  464 F.3d 1 (D.C. Cir. 2006) ............................................................................................. 32, 33

*Pisciotta v. Old Nat'l Bancorp,*
  499 F.3d 629 (7th Cir. 2007) ............................................................................................... 32

*Port of Seattle v. FERC,*
  499 F.3d 1016 (9th Cir. 2007) ............................................................................................. 29

*Public Citizen, Inc. v. Nat'l Hwy. Traffic Safety Admin.,*
  489 F.3d 1279 (D.C. Cir. 2007) ........................................................................................... 33

\* denotes chief authority

*Public Citizen, Inc. v. U.S. Dept. of Health and Human Servs.,*
   332 F.3d 654 (D.C. Cir. 2003) .......................................................................19

\* *Raymond Proffitt Found. v. U.S. Army Corps of Engineers,*
   343 F.3d 199 (3d Cir. 2003) ..........................................................................30

*Schering Corp. v. Heckler,*
   779 F.2d 683 (D.C. Cir. 1985) .......................................................................27

\* *Seabrook Int'l Foods, Inc. v. Harris,*
   501 F. Supp. 1086 (D.D.C. 1980),
   *aff'd sub nom., Cont'l Seafoods, Inc. v. Schweiker,*
   674 F.2d 38 (D.C. Cir. 1982) .............................................................21, 31, 44

*Shaffer v. Def. Intelligence Agency,*
   601 F. Supp. 2d 16 (D.D.C. 2009) ..................................................................37

*Silverman v. Foreman,*
   631 F.2d 969 (D.C. Cir. 1980) .......................................................................35

\* *Smoking Everywhere, Inc. v. FDA,*
   680 F. Supp. 2d 62 (D.D.C. 2010),
   *aff'd sub nom. Sottera v. FDA,* 627 F.3d 891 (D.C. Cir. 2010) ...............................31

\* *Stauber v. Shalala,*
   895 F.Supp. 1178 (D. Wisc. 1995) .............................................................35, 38

*Stobie Creek Invs., LLC v. United States,*
   82 Fed. Cl. 636 (Fed. Cl. 2008) .....................................................................20

*Sugarman v. Forbragd,*
   267 F. Supp. 817 (N.D. Cal. 1967),
   *aff'd,* 405 F.2d 1189 (9th Cir. 1968) ....................................................16, 21, 44

*Sugarman v. Forbragd,*
   405 F.2d 1189 (9th Cir. 1968) .......................................................................31

\* *TRW Inc. v. Andrews,*
   534 U.S. 19 (2001) .........................................................................................17

*United States v. Clarke,*
   628 F. Supp. 2d 1 (D.D.C. 2009) ............................................................14, 27, 28

*United States v. Dotterweich,*
   320 U.S. 277 (1943) ....................................................................................9, 10

*\* denotes chief authority*

\* *United States v. Eight Unlabeled Cases,*
     909 F. Supp. 129 (E.D.N.Y. 1995) ..........................................................................28

\* *United States v. Food, 2,998 Cases,*
     64 F.3d 984 (5th Cir. 1995) .............................................................................10, 27

*United States v. Genendo Pharm., N.V.,*
     485 F.3d 958 (7th Cir. 2007) ...............................................................................34

*United States v. Kent Food Corp.,*
     168 F.2d 632 (2d Cir. 1948)..................................................................................27

*United States v. Mead Corp.,*
     533 U.S. 218 (2001) ...............................................................................................19

*United States v. Morgan,*
     222 U.S. 274 (1911)............................................................................................9, 10

*United States v. Sullivan,*
     332 U.S. 689 (1948) ...............................................................................................21

\* *Vermont v. Leavitt,*
     405 F. Supp. 2d 466 (D. Vt. 2005).....................................................................17, 45

*Vill. of Barrington v. United States,*
     No. 09-1002, 2011 U.S. App. LEXIS 5014 (D.C. Cir. Mar. 15, 2011) ..................18

\* *Webster v. Doe,*
     486 U.S. 592 (1988)...............................................................................................12

*Wood v. U.S. Dept' of Labor,*
     275 F.3d 107 (D.C. Cir. 2001) .........................................................................15, 27

\* *Zivotofsky v. Sec. of State,*
     571 F.3d 1227 (D.C. Cir. 2009) ...............................................................................7


STATUTES

5 U.S.C. § 701(a)(2)........................................................................................13, 26, 31

5 U.S.C. § 706(2)(A).............................................................................................31, 39

21 U.S.C. § 321(p) ......................................................................................................34

21 U.S.C. § 332......................................................................................................16, 27, 28

*\* denotes chief authority*

21 U.S.C. § 333.................................................................................................13, 14

21 U.S.C. § 334.............................................................................................16, 27, 28

21 U.S.C. § 336.....................................................................................................13

21 U.S.C. § 355..................................................................................................9, 42

21 U.S.C. § 360mm(a)............................................................................................11

21 U.S.C. § 371(b)..................................................................................................17

\* 21 U.S.C. § 381 .................................................................................................. *passim*

21 U.S.C. § 384...................................................................................2, 16, 17, 18, 36

29 U.S.C. § 482(b)..................................................................................................11

29 U.S.C. § 660(c)(2)..............................................................................................15

42 U.S.C. § 7413(a)(2)............................................................................................15

Pub. L. No. 106-387, 114 Stat. 1549, 1549A-40 (2000).............................................22


REGULATIONS

21 C.F.R. § 10.85(k) ...............................................................................................19

\* 21 C.F.R. § 207.40(b) .........................................................................................40, 41

21 C.F.R. § 314.50..................................................................................................42

\* 21 C.F.R. § 314.410(a).........................................................................................40, 41


OTHER AUTHORITIES

Black's Law Dictionary 1375 (6th ed. 1990)..............................................................8

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2003)................20

Peter S. Reichertz & Melinda S. Friend, *Hiding Behind Agency Discretion*, 9 CORNELL J.L. & PUB. POL'Y 493 (1999–2000).......................................................................42

*\* denotes chief authority*

DC1 2025010v.1

Valerie Jensen, FDA, *An Overview of the FDA's Drug Shortage Program*, 30 P&T J. 174
(Mar. 2005) ........................................................................................................................23


UNITED STATES FOOD AND DRUG ADMINISTRATION WEBSITE MATERIALS

*Drug Shortages: Transcript*,
FDA, *available at* http://1.usa.gov/jmcW35 ........................................................23

*FAQs About Drug Shortages*,
FDA, *available at* http://1.usa.gov/1BNmS2 .......................................................23

FDA Budget Justification (2012), *available at* http://1.usa.gov/h5gSsF .....................................24

* HHS Report on Prescription Drug Importation (Dec. 2004), *available at*
http://bit.ly/gQWM8L ...............................................................................16, 18, 23

Ltr. from FDA to the New Hampshire Pharmacists Assoc., *available at*
http://bit.ly/h53dVW .................................................................................................42

*Safety of Prescription Drugs From Foreign Sources*,
Statement of William K. Hubbard, Associate Commissioner for Policy and Planning,
FDA, before the Subcommittee on Human Rights and Wellness, House Committee on
Government Reform (June 12, 2003) *available at* http://1.usa.gov/kMgZpa.........................35

*\* denotes chief authority*

Section 801 of the Federal Food, Drug, and Cosmetic Act ("FDCA") establishes a basic proposition:  If an imported drug appears to be misbranded or an unapproved new drug, then it "shall be refused admission."  21 U.S.C. § 381(a)(3) (emphasis added).  The government concedes, as it must, that the predicate condition was met here; FDA detained shipments of foreign thiopental, and determined not just that the shipments "appeared" to violate the FDCA, but that they actually did so.  The only question before the Court, then, is whether FDA had authority to let foreign thiopental enter the country, notwithstanding the statute's command that it "shall be refused admission."  It had no such authority.  The statutory phrase "shall be refused admission" is the language of command, and it mandates how FDA must act when the predicate condition is met.  Whatever discretion FDA may have to determine whether a given import appears to be misbranded or unapproved, once it has reached that conclusion—as it concededly did here—admission must be refused.  As our opening brief explains, FDA's decision to ignore the statutory command violated federal law, and also was arbitrary, capricious, and an abuse of discretion in light of FDA's existing regulations and past practices, and the public health.

The government's response consists in large part (if not entirely) of a counter-textual interpretation of Section 801.  Specifically, the government contends that the statutory phrase "shall be refused admission" must be read as a permissive grant of authority that vests FDA with unreviewable discretion to allow imported drugs into the country.  In the government's view, "shall" really means "may," even though the opposite meanings of these two common statutory terms are well known to congressional drafters.  As we have shown, it is a well-established rule of statutory interpretation that the word "shall" is to be read as a command—that is, the plain meaning of "shall" is "must."  Contrary to the government's assertions, this principle does not yield simply because the word "shall" appears in the FDCA or because a given case arises within

the context of administrative enforcement.  Rather, "shall" means "must" unless there exists

clear evidence that Congress intended for the word to be read counter to its established meaning.

    The government's efforts to conjure the requisite evidence of Congressional intent to use

"shall" in other than its normal way here are unavailing.  For instance, the government contends

that a mandatory reading of the phrase "shall be refused admission" would do violence to other

language in Section 801.  The government is mistaken:  A mandatory reading of that phrase is

fully consistent with the remainder of the statute.  In fact, a mandatory reading of the phrase

"shall be refused admission" is *compelled* by other aspects of Section 801.  Section 801(o) uses

the permissive phrase "may be refused admission" to describe the result that should obtain when

an importer is missing a required registration statement.  Congress's inclusion of permissive and

mandatory variants of the same language in Section 801 is clear evidence that Congress intended

for Section 801(a) to convey a command.

    The government also contends that Section 804 of the FDCA is evidence that Congress

intended for Section 801(a) to be read in a permissive manner.  This argument misunderstands

the significance of Section 804.  Section 804 vested FDA with authority to issue regulations

allowing pharmacists and wholesalers to import unapproved prescription drugs from Canada,

21 U.S.C. § 384(b), and to issue waivers from the "prohibition of importation of a prescription

drug" to individuals, 21 U.S.C. § 384(j)(2)(A).  These grants of authority—like the exceptions to

Section 801(a) found in Section 801(b) and Section 801(d)—are evidence that Congress intended

for Section 801(a) to be mandatory in all other cases.  In addition, the authority created by

Section 804 is not yet in effect and will not be until the Secretary of Health and Human Services

certifies that issuing such regulations and waivers would pose no additional risks to the public's

health and safety.  To date, the Secretary has refused to make the requisite certification, which

– 2 –

DC1 2025010v.1

means FDA has no authority to vary from the command of Section 801(a) unless one of the specifically enumerated exceptions contained in Section 801 applies.

The government's invocation of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) is also without merit.  *Chevron* deference is wholly unwarranted.  As discussed, the plain meaning of the word "shall" is "must," and the structure and history of Section 801 confirm that Congress intended for the plain meaning to control.  Because the statute is unambiguous, the government receives no deference.  Here, however, the government would receive no deference even if there were some ambiguity.  This is because the only agency "interpretation" cited by the government is a private email from a single agency employee to a single member of the press.  Such an informal communication is the antithesis of the sort of solemn agency proceeding or rulemaking entitled to deference under *Chevron*.

The government's final argument in favor of a permissive reading of the word "shall" is based on the often-argued but rarely successful doctrine of "absurd results."  None of the threatened outcomes imagined by the government is so patently absurd as to override the statutory text.  Indeed, the first allegedly "absurd" result identified by the government (different regulatory regimes for domestic and imported drugs) is Congress's *intended* result.  The second allegedly absurd result (the potential to invalidate FDA's personal use importation and drug shortage policies) is no reason to ignore the plain meaning of Section 801(a)—the government cannot justify a departure from the statutory text simply by pointing to other departures that have never been tested in court.  Moreover, the threat to FDA's personal use importation and drug shortage policies is imagined; both policies are entirely consistent with a mandatory reading of Section 801(a).  The last allegedly absurd result (the potential to create an undue administrative burden) is also imagined.  The government's undue burden argument is based on the erroneous

assertion that a mandatory reading of Section 801(a) would force FDA to physically examine *all* imported products under its jurisdiction (including such diverse products as food, cosmetics, animal feed, etc.).  However, the statutory language clearly distinguishes between those imports that the agency is *authorized* to examine and those imports that the agency is *obligated* to examine.  The latter category is narrow and is limited to drugs, devices and tobacco products that were manufactured or processed at unregistered foreign establishments, such as the foreign thiopental at issue here.

Once Section 801(a) is given its plain meaning, the government's principal challenge to this Court's jurisdiction falls easily by the wayside.  Even if the presumption against judicial review established by *Heckler v. Chaney*, 470 U.S. 821 (1985) were to apply—and it does not— the mandatory phrase "shall be refused admission" provides more than sufficient law to enable judicial review.  The government's other jurisdictional argument (that Plaintiffs lack standing to sue FDA) is makeweight.  Federal food and drug law is built around a fundamental presumption—which FDA itself repeatedly has endorsed, embraced and reiterated—that unapproved drugs like foreign thiopental are inherently unsafe.  That basic premise lies at the heart of the FDCA, and indeed of FDA's entire mission.  As this Court and others have held, the increased risks associated with products that violate the FDCA are judicially cognizable harms.  Moreover, the increased risks presented by foreign thiopental are uniquely *particularized* to these Plaintiffs (to whom the drug will be administered) and are uniquely *traceable* to FDA (who let the product into the country).  The *other* risks associated with lethal injection (e.g., the risk of improper administration) in no way mitigate the substantial risks posed simply by the fact that this foreign thiopental is unapproved by FDA, let alone relieve FDA of responsibility for having let the drug into the country.

On the merits, Plaintiffs are entitled to summary judgment.  There is no factual dispute.
So long as Section 801(a)(3) means what it says, FDA acted directly contrary to federal law and
Plaintiffs therefore are entitled to summary judgment on Count I of the complaint.  In addition,
allowing foreign thiopental to be imported into this country is directly contrary to FDA's
published regulations, a point the government does not contest.  That inconsistency likewise is a
violation of the APA.  Moreover, and despite the government's protestations to the contrary,
FDA's behavior is clearly inconsistent with the agency's established practices with respect to
foreign prescription drugs.  None of the purportedly "sound reasons" articulated in the email sent
to the Wall Street Journal, or those contained in the government's brief, can justify FDA's
arbitrary and capricious break from its own regulations and prior practices.  Indeed, the
government's opposition does not even address the threat to the public health created by opening
this country's borders to unapproved drugs.  For each of these reasons, Plaintiffs are entitled to
summary judgment that FDA acted arbitrarily, capriciously and in abuse of its discretion.

## I.  SECTION 801(a)(3) OF THE FDCA COMMANDS FDA TO REFUSE ADMISSION TO FOREIGN DRUGS THAT APPEAR TO BE MISBRANDED OR UNAPPROVED NEW DRUGS.

Plaintiffs previously showed that Section 801(a)(3)—and particularly the mandatory
phrase "shall be refused admission"—requires FDA to deny entry to misbranded and unapproved
new drugs like the foreign thiopental at issue here.[1]  *See* Plaintiffs' Mem. in Support of Summary

---

[1] A new subsection (a)(4) was added to Section 801 (21 U.S.C. § 381(a)(4)) by the FDA Food
Safety Modernization Act of 2011.  This provision is not relevant to the issues here; it adds a
new and separate basis for refusing admission for imported food.  We bring this provision to the
Court's attention only because, as of the time this brief is being filed, not all of the publicly
available sources for the United States Code reflect this change, and so the numbering within
Section 801(a) is inconsistent across those sources.  For instance, Lexis only recently began to
include this provision; the version of the U.S. Code available online from the Government
Printing Office (www.gpoaccess.gov/uscode) still does not.

Judgment ("Mem.") at 21-27.  The government responds that Section 801(a)(3) should be read as permissive.  *See* Defendants' Mem. in Opp. to Summary Judgment ("Opp.") at 18-24, 42-47.

Before turning to certain aspects of the government's affirmative argument, however, it is critical to note the numerous things that the government does *not* say.  Perhaps most importantly, the government never once attempts to explain the oddity of interpreting the phrase "shall be refused admission" to mean "may be refused admission" when Congress actually used the phrase "may be refused admission" elsewhere in Section 801 itself.  *See* Mem. at 23-24.  The juxtaposition of those phrases in the same section of the same statute, and the basic canon of statutory interpretation that each word in a statute should be given meaning, require that the word "shall" be interpreted to mean what it says.  *Id.*

The government gives no answer to the use of the word "may" in Section 801(o) because there is none.  Taken together, Sections 801(a) and 801(o) provide that

| IF | THEN |
|---|---|
| an imported article appears to be misbranded, adulterated, or an unapproved new drug | "such article shall be refused admission" |
| an imported drug or device is missing a required registration statement | "the article may be refused admission" |

21 U.S.C. §§ 381(a), 381(o).  These provisions reflect the entirely sensible conclusion that serious violations of the FDCA present more of a threat than a missing registration statement. Congress addressed these differing threats differently—it dictated mandatory refusal in one case and discretionary refusal in the other.  The government's permissive reading of Section 801(a) would destroy the intentional distinction that Congress drew between these two sets of circumstances and should be rejected for this reason alone.  *See Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 346 (2005) (juxtaposing the permissive "may" with the mandatory "shall").  Where Congress juxtaposes mandatory and permissive language in the same

statute, the former provision "is as mandatory as a statute can be." *Zivotofsky v. Sec. of State*, 571 F.3d 1227, 1243-44 (D.C. Cir. 2009).[2]

The second telling omission in the government's submission is its failure to deal with the fact that the mandatory requirement embodied in "shall be refused admission" is qualified by carefully and expressly enumerated exceptions. The key statutory language is "shall be refused admission, *except as provided in subsection (b) of this section*." 21 U.S.C. § 381(a)(3) (emphasis added). As we explained, the existence of this specific exception further demonstrates that the term "shall" must be read as mandatory in order to give it effect. *See* Mem. at 26-27 & n.13. Furthermore—and the government does not address this either—Congress included a safe harbor: A drug *shall not* be excluded under Section 801(a)(3) if it will be further processed and re-exported out of the United States. *See* 21 U.S.C. § 381(d)(3)(A). As a further form of exception, the existence of the safe harbor by itself would confirm the mandatory nature of "shall," but this is all the more true because the safe harbor contains a discretionary exception: FDA "may" refuse admission notwithstanding the statutory safe harbor if FDA has credible evidence that the imported article would not in fact be further processed and then exported. *See* 21 U.S.C. § 381(d)(3)(B). These nuanced statutory provisions would be surplusage if, as the government contends, Section 801(a)(3) were permissive. *See Beverly Health & Rehab. Servs. v. NLRB*, 317 F.3d 316, 321 (D.C. Cir. 2003) (where Congress qualifies a command with a specific exception, the canons of "avoiding surplusage and *expressio unius* are at their zenith because they apply in tandem" (quotation marks omitted)).

---

[2] Defendants suggest, in a footnote, that three cases arising under the FDCA have given a permissive meaning to the word "shall" even when the word "may" appears in the same section of the statute. *See* Opp. at 22 n.14. This argument fails at its premise. As discussed below, none of those cases interpreted the word "shall" in a permissive fashion. *See infra* 10-11, 12-14.

In response, the government offers up a hodgepodge of reasons why Section 801(a) should be interpreted contrary to its plain meaning.  Opp. at 18-25, 42-47.  Singly and collectively, these arguments fail:  the text means just what it says.

### A.      "Shall" Means "Shall" In The FDCA.

"'As used in statutes . . . [the word "shall"] is generally imperative or mandatory.'"  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661-62 (2007) (quoting Black's Law Dictionary 1375 (6th ed. 1990)); *see* Mem. at 22-23 (citing further Supreme Court and D.C. Circuit authorities).  This case presents one of the most basic and common applications of this rule: a simple "if/then" proposition in which Congress specified that, *if* certain conditions are met, *then* a certain result *shall* follow.  *See, e.g.*, *Ass'n of Civilian Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) (instruction that agencies "shall approve" collective bargaining agreements "if the agreement is in accordance with" certain provisions of law is "a command that admits of no discretion on the part of the person instructed to carry out the directive").

The government responds that the FDCA is different; cases like *Defenders of Wildlife* and *Civilian Technicians* are but "a litany of cases in which courts have held that the word 'shall' in other statutes—but not the FDCA—imposes a mandatory duty."  Opp. at 19-20.  This is no response at all.  The FDCA is not immune from the interpretative lessons of the Supreme Court or the D.C. Circuit, and the word "shall" imposes a mandatory duty in the FDCA just as it does in any other statute.  For instance, in *L&M Industries v. Kenter*, the Second Circuit examined the following language from Section 801(a), i.e., the same section of the same statute at issue here:

> The Secretary of Treasury *shall deliver* [samples] to [FDA] . . . *giving notice* thereof to the owner or consignee, who may appear before [FDA] and have the right to introduce testimony.

458 F.2d 968, 970 (2d Cir. 1972) (quoting 21 U.S.C. § 381(a) (emphases added)).  The Second Circuit construed this to be a mandatory command that bound FDA, and it therefore reversed

FDA's action for failure to provide the requisite notice and opportunity to testify.  *Id.* at 971.

Notably, the government does not address *L&M Industries* or the other similar cases that we

have cited previously.  *See* Mem. at 25-26.

Elsewhere in its brief, the government itself cites *Cutler v. Hayes*.  Opp. at 15, 40 (citing

818 F.2d 879, 893-94 (D.C. Cir. 1987)).  In that case, however, the D.C. Circuit stated that

FDA's obligation under Section 505(e) of the FDCA is "an enforceable statutory directive."  818

F.2d at 893 n.116.  Relevant here, Section 505(e) states that FDA "*shall* . . . withdraw approval

of an application with respect to any drug . . . *if* [FDA] finds . . . that clinical or other experience,

tests, or scientific data show that such drug is unsafe."  21 U.S.C. § 355(e)(1) (emphases added).

Just as FDA is under an "enforceable statutory directive" to withdraw approval of a drug if the

agency has concluded that the drug is unsafe, so too is FDA subject to an enforceable directive to

refuse admission if the agency has concluded that a drug appears to be misbranded or an

unapproved new drug.

The government also invokes *United States v. Dotterweich*, 320 U.S. 277 (1943), and

*United States v. Morgan*, 222 U.S. 274, 280 (1911), to suggest that "shall" means "may" in the

FDCA.  Opp. at 21.  The lesson of *Morgan*, however, is simply that the Supreme Court will not

support a statutory interpretation that leads to a "repeal[] by implication."  Mem. at 22-23

(discussing 222 U.S. at 281-82).  *Morgan* refused to construe the process described by Sections 4

and 5 of the 1906 Pure Food and Drugs Act (notice, an administrative hearing, and a report from

the Secretary of Agriculture to the district attorney) as a prerequisite to criminal prosecution

because such a construction would limit the general authority of United States Attorneys to seek

indictments without conferring with the Department of Agriculture.  *See* 222 U.S. at 281.  But

significantly, the Court held that where the process in question was followed, "shall" was indeed

mandatory and was sufficient in those circumstances to compel a prosecution.  It held that the

Section 4 and 5 process "creat[ed] a condition *where the district attorney is compelled to*

*prosecute* without delay.  When he receives the Secretary's report, he is not to make another and

independent examination, but is *bound to accept the finding of the Department* that the goods are

adulterated or misbranded . . . ."  *Id.* (emphases added).  Nothing in *Morgan* suggests that "shall"

does not mean "shall;" indeed, *Morgan* shows that "shall" can constrain even the prosecutorial

discretion of a United States Attorney.  The Court simply construed the statute to allow the

United States Attorney to remain free to initiate prosecution in other circumstances as well.  In

other words, the Court declined to interpret "shall" to mean "only when."  *Dotterweich*, the other

case relied upon by the government, does not support its theory any better; that case relied

entirely on, and did not expand, the reasoning of *Morgan*.  320 U.S. at 278-79.

Next, the government argues that lower courts "specifically have interpreted the 'shall' in

'shall be refused admission' to be discretionary."  Opp. at 22.  For example, the government

suggests that the Fifth Circuit rejected an argument that FDA was obliged to refuse admission to

imported articles that violate the FDCA.  *See id.* (citing *United States v. Food, 2,998 Cases*, 64

F.3d 984, 990 n.11 (5th Cir. 1995)).  This is simply incorrect.  The Fifth Circuit held that, when

FDA concludes that food appears to be adulterated, FDA may opt for *judicial* condemnation

proceedings rather than the *administrative* process of Section 801(a), *see* 64 F.3d at 988, and

when it does so, Section 801(a) simply is "inoperative," *id.* at 990 n.11.  The court did not

remotely hold that FDA could treat Section 801(a) as hortatory and thereby allow offending

products to enter the United States.

Finally, the government suggests that the Southern District of New York has held that

FDA's import decisions are unreviewable because the phrase "shall be refused admission" is

akin to a statutory grant of prosecutorial discretion.  *See* Opp. at 22 (citing *K&K Merch. Group v. Shalala*, Civ. No. 95-10082, 1996 U.S. Dist. LEXIS 4880 (S.D.N.Y. Apr. 17, 1996).  However, *K&K Merchandise* did not purport to hold unreviewable FDA's decision to admit unlawful products into the country.  Rather, *K&K Merchandise* held that plaintiffs lacked standing to challenge FDA's decision to *exclude* certain imported electronics because they had "no legal right to import or sell" noncompliant products.  *See* 1996 U.S. Dist. LEXIS at *10.  And when the court did discuss the import provision at issue – 21 U.S.C. § 360mm(a) – the court recognized that the statute "directs" the government "to refuse admission in the United States of products found to be noncompliant . . . ."  *Id.* at *2-3.  The court nowhere suggested that the statutory phrase "shall be refused admission" does not mean what it says.

### B.     "Shall" Means "Shall" In The Administrative Enforcement Context.

More ambitious than its argument about "shall" in the FDCA in particular, the government broadly asserts that "'shall' means 'may' anywhere Congress uses it in relation to administrative enforcement.  Opp. at 22; *accord id.* at 20 ("courts do not read 'shall' as mandatory when such a reading impinges upon administrative enforcement discretion"); *id.* at 18 ("both Congress and the courts, including the *Chaney* Court, have indicated that 'shall' is not to be read as mandatory in the enforcement context").  As we explained in our opening motion (Mem. at 30), the Supreme Court's decision in *Dunlop v. Bachowski*, 421 U.S. 560 (1975) is directly to the contrary.  The statute at issue in *Dunlop* states that, *if* the Secretary of Labor finds "probable cause" to believe a violation of the Labor-Management Reporting and Disclosure Act has occurred, then the Secretary "*shall* . . . bring a civil action against the labor organization." 29 U.S.C. § 482(b) (emphasis added)).  Notwithstanding that this statute concerned an agency's enforcement authority, *Dunlop* held that it amounted to an enforceable congressional command. 421 U.S. at 568-69.  "Shall" means "shall" even in the administrative enforcement context.  *See*

– 11 –

*Ellis v. Chao*, 336 F.3d 114, 120 (2d Cir. 2003) ("The word 'shall' indicates that under certain conditions, the Secretary must initiate a civil action challenging a union election.").  Notably, the government's opposition does not address *Dunlop* at all.

The government's error ultimately stems from its misreading of *Heckler v. Chaney*, 470 U.S. 821 (1985).  *Heckler* holds as a matter of agency law—not as a question of statutory interpretation—that an agency's refusal to bring an administrative enforcement action is not subject to judicial review unless the statute provides "manageable standards" or "law to apply" against which to judge the agency's inaction.  470 U.S. at 830, 834; *cf. infra* at 26-27 (discussing *Heckler*).  The government would turn that rule into a separate canon of statutory interpretation that the word "shall" cannot have a "mandatory meaning" in the enforcement context.  Opp. at 21.  With this custom-tailored canon in place, the government argues, the word "shall" cannot provide law to apply within the meaning of *Heckler*.  *See* Opp. at 22-23 ("Because 'shall' is generally permissive in the administrative enforcement context . . . the import provision does not provide sufficient standards to rebut the presumption of unreviewability.").  The government has twisted *Heckler* into a Moebius strip:  The statute does not mean what it says because of *Heckler*, and *Heckler* does not mean what it says because of the statute.  According to the government, one need not ask whether a statute authorizing administrative enforcement provides "law to apply" under *Heckler,* because *Heckler* itself ordains that *any* command contained in the statute, regardless of its wording, must be read permissively so as to preclude judicial review.  That is not the law.  *See Heckler*, 470 U.S. at 832-33 ("[W]e emphasize that the decision is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."); *Webster v.*

– 12 –

*Doe*, 486 U.S. 592, 600 (1988) ("*Heckler* emphasized that § 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based.").

In any event, no categorical rule that "shall" must be read as "may" anywhere administrative enforcement is at issue can be derived from *Heckler,* because the statutory provisions at issue in *Heckler* were worlds apart from the sort of "if/then" proposition found in Section 801(a).  For example, *Heckler* sensibly concluded that the FDCA's condemnation provision, Section 304, is "framed in the permissive" because it states that offending articles "'shall be *liable to be* proceeded against.'"  470 U.S. at 835 (quoting 21 U.S.C. § 334(a)(1)) (emphasis added).  As a matter of plain meaning, the phrase "shall be liable to be proceeded against" means "eligible to be proceeded against" or "may be proceeded against."  That, of course, has the precise opposite meaning from the word "shall" standing alone and is plainly not what Section 801(a) provides.  This litigation would stand on very different ground if Section 801(a) provided only that offending imports were *liable to be* refused admission.

The government puts special reliance on *Heckler*'s discussion of the FDCA's criminal provision, Section 303, *see* Opp. at 14, 21, but this too is unavailing.  That provision states that "any person who violates [the FDCA] shall be imprisoned for not more than one year or fined not more than $1,000, or both."  *Heckler* concluded that this penalty provision did not speak to *when* FDA must refer a suspected violation to the United States Attorney or *when* the United States Attorney must seek an indictment.  *See* 470 U.S. at 835 (rejecting the argument that 21 U.S.C. § 333 "mandates criminal prosecution of every violator of the Act").  This is self-evidently correct.  Indeed, another section of the FDCA expressly forbids reading Section 303 in that manner.  *See* 21 U.S.C. § 336 (nothing in the statute shall be construed to require FDA to report minor violations of the FDCA to the United States Attorney).  But the fact that the FDCA

is silent as to when the government must prosecute violations of the FDCA does not mean that the *Heckler* court found the word "shall" in 21 U.S.C. § 333 to be lacking its usual mandatory meaning.  Even after *Heckler*, it remains the case that if a person is convicted of a violation of the FDCA, then that person *must* be sentenced in accordance with 21 U.S.C. § 333.

The government's error is well illustrated by its reliance on *United States v. Clarke*, 628 F. Supp. 2d 1 (D.D.C. 2009).  According to the government, *Clarke* confirms its reading of *Heckler* as establishing a new interpretive canon that "shall" means "may" where enforcement provisions are concerned.  Quoting *Clarke*, the government says that "'when 'shall' is used in an enforcement provision, it should be construed to confer discretion on an agency . . . .'"  Opp. at 21 (quoting 628 F. Supp. at 11) (ellipsis in the government's brief).  The reason the government is wrong about *Clarke* and about *Heckler* is hidden in those ellipsis marks at the end of the sentence.  The unabridged quotation from *Clarke* is "when 'shall' is used in an enforcement provision, it should be construed to confer discretion on an agency *unless the statute or regulations provide substantive standards that constrain the exercise of discretion*."  628 F. Supp. 2d at 11 (italicized language omitted from the government's brief).  That is exactly the case in Section 801.  *Clarke* does nothing more than to restate the well-known principle of *Heckler*, which asks whether the statute provides a manageable standard by which to judge the agency's inaction.

The other cases cited by the government also do not support a permissive interpretation of the word "shall."  *See* Opp. at 20-21.  Those cases are similar to ours only in that they also addressed statutes that set out conditional (i.e., if/then) propositions and used the word "shall" to describe the result that should occur when the predicate was met.  But those cases addressed the very different question of whether the predicate condition in fact had been met, not the result that

– 14 –

should follow when it is.  Thus, where the Occupational Safety and Health Act stated that *if* the Department of Labor "determines that [the Act has] been violated" *then* the Department "shall bring an action" against the employer, 29 U.S.C. § 660(c)(2), a plaintiff could not challenge the Department's refusal to file suit if the Department has not in fact found that a violation had occurred.  *Wood v. U.S. Dept' of Labor*, 275 F.3d 107, 110 (D.C. Cir. 2001).[3]  And where the Clean Air Act provided that *if* EPA "finds that violations . . . are so widespread that such violations appear to result from a failure of the State" *then* EPA "shall so notify the State," 42 U.S.C. § 7413(a)(2), a plaintiff could not bring a citizen suit to force EPA to make the predicate finding.  *City of Seabrook v. Costle*, 659 F.2d 1371, 1374 (5th Cir. 1981).  Here, the government admits that the predicate for action "clearly" has been met.  Opp. at 19.  The consequences that flow from that finding have been set forth expressly by Congress.

###  C.     A Mandatory Reading Of "Shall" Does No Violence To The Statute.

According to the government, the statutory phrase "*[i]f it appears* from the examination of such samples or otherwise," 21 U.S.C. § 381(a) (emphasis added), indicates that FDA has "broad discretion in determining whether an article appears to violate the FDCA."  Opp. at 18-19.  Given this, the government argues, a mandatory reading of the phrase "shall be refused admission" would "do violence" to that statutory discretion.  Opp. at 20.  This argument misapprehends the scope of FDA's discretion.

---

[3] In *Wood*, indeed, the D.C. Circuit specifically left open the possibility that judicial review would lie if the Department of Labor had determined that a violation had occurred but nevertheless refused to commence enforcement.  275 F.3d at 112 n.9.  The D.C. Circuit also refused to endorse the reasoning of the district court opinion cited by the government.  *Compare* 275 F.3d at 110 ("While we affirm the district court's dismissal . . . we do so on a different basis from the one used below."), *with* Opp. at 20 (citing *Wood v. Herman*, 104 F. Supp. 2d 43 (D.D.C. 2000)).

It is true that the predicate condition of Section 801(a) requires neither actual proof, nor an FDA determination, that an import *actually* violates the FDCA; it need only "appear" that there is a violation.  *See, e.g.*, *Sugarman v. Forbragd*, 267 F. Supp. 817, 824 (N.D. Cal. 1967) ("There is no requirement that the food actually be adulterated or that the Secretary find, as a fact, that the food is adulterated."), *aff'd*, 405 F.2d 1189 (9th Cir. 1968); *accord* HHS Report on Prescription Drug Importation, 30 (Dec. 2004), *available at* http://bit.ly/gQWM8L ("[R]efusal of admission does not have to meet the same evidentiary burden required to prevail in a civil action under [21 U.S.C. §§ 332, 334].") ("HHS Report").  But whatever deference may be implicit in the "appear[ance]" standard, that says nothing about what occurs *after* FDA has made this determination, much less whether there is also discretion in the latter half of the process.  There is no inconsistency—much less "violent" inconsistency—in Congress's decision to match a flexible standard at the predicate condition (the appearance of a violation) with an unforgiving and mandatory consequence when the predicate is met (refusal of admission).  In fact, the match makes perfect sense: the provisions work in tandem to ensure that the statutory mandate of exclusion is construed broadly to protect the public even from uncertain threats.  As the government has previously put it:  "The 'appearance' standard is the key to [Section 801(a)] because *it compels government investigators to refuse to admit suspect drugs into the U.S.*" HHS Report at 30 (emphasis added).

### D.   Section 804 Supports A Mandatory Reading Of The Word "Shall" In Section 801(a).

Next, the government asserts that Section 804 of the FDCA shows that Section 801(a)(3) must be read permissively.  Opp. at 23-25.  When it enacted Section 804, Congress vested FDA with authority to "promulgate regulations permitting pharmacists and wholesalers to import prescription drugs from Canada," 21 U.S.C. § 384(b), although only if sufficient "safeguards

[are] in place to ensure" that all such drugs are "safe and effective," *id.* § 384(c)(1).  And

Congress gave FDA authority to grant "individuals, by regulation or on a case-by-case basis, a

waiver of the prohibition of importation of a prescription drug."  *Id.* § 384(j)(2)(A).  These

provisions, says the government, "confirm[] FDA's view . . . that the words 'shall refuse

admission' in [Section 801(a)(3)] are permissive, not mandatory."  Opp. at 25.

      In fact, Section 804 proves precisely the opposite.  That Congress felt it necessary to

enact separate statutory language to give FDA permission to depart from the plain terms of

Section 801(a) is of a piece with the exceptions Congress thought it necessary to include within

Section 801 itself:  They show that FDA did not and does not have some broader power to depart

from the plain, mandatory terms of Section 801(a).  *See TRW Inc. v. Andrews*, 534 U.S. 19, 28

(2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition,

additional exceptions are not to be implied, in the absence of evidence of a contrary legislative

intent.").  If FDA had unfettered discretion under Section 801(a) to allow illegal imports to enter

the United States, then FDA would *already possess* the authority to issue rules allowing for the

importation of unapproved prescription drugs.  *See* 21 U.S.C. § 371(b) (delegating authority to

"prescribe regulations for the efficient enforcement of the provisions of section 381").  But that

is not the case.  As the government has recognized elsewhere, until Section 804 takes effect,

"FDA is not authorized to issue regulations permitting the importation of drugs from Canada,"

Griffin Decl. Exh. 2 at 4, because "permitting foreign drugs to be freely imported . . . [remains]

directly contrary to current law," *id.* at 10.  *Compare Vermont v. Leavitt*, 405 F. Supp. 2d 466,

479 (D. Vt. 2005) (any attempt by FDA to approve such a program would be "illegal").  Even

after the passage of Section 804, the government has recognized that Section 801(a)(3) "*requires*

FDA to refuse to admit into the U.S. any drug that appears to be misbranded."  HHS Report at 27 (emphasis added).

It is particularly surprising that the government chooses to rely on Section 804, given that that provision has not yet taken effect.  The reason it has not is telling.  As the government must admit, *see* Opp. at 24 n.17, Section 804 cannot take effect until the Secretary of Health and Human Services certifies to Congress that allowing unapproved prescription drugs to enter the United States "pose[s] no additional risk to the public's health and safety."  21 U.S.C. § 384(l)(1)(A).  To date, the Secretary has been unwilling or unable to so certify.  Yet allowing unapproved prescription drugs into the United States is exactly what FDA has done here even though the Secretary has refused to make the requisite certification.

**E.     The Government's Permissive Interpretation Of "Shall" Is Entitled To No Deference.**

The government asserts, *see* Opp. at 37-38, that its permissive reading of the phrase "shall be refused admission" merits *Chevron* deference.  This argument fails for at least two fundamental reasons.  First, the government receives *no* deference at the first step of the *Chevron* inquiry, which asks whether the statute is ambiguous—that is, whether Congress has spoken directly to the issue before the Court.  *See, e.g.*, *Vill. of Barrington v. United States*, No. 09-1002, 2011 U.S. App. LEXIS 5014, at *26 (D.C. Cir. Mar. 15, 2011).  This rule requires the court to employ "the traditional tools of statutory construction to determine whether a congressional act admits of plain meaning."  *Arizona Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1287 (D.C. Cir. 2000).  In this case, the meaning of Section 801(a)(3) is plain, for all of the reasons discussed

above and in our opening brief:  The text, structure and history of the statute all compel the conclusion that Section 801(a)(3) conveys an unambiguous Congressional command.[4]

Second, the government also is entitled to no discretion because of the gross informality of the agency pronouncement.  Not every statement by an agency is eligible for *Chevron* deference.  Rather, only when an agency has announced an interpretation that was the "product of a statutorily-created decision-making process" can it claim such deference.  *Public Citizen, Inc. v. U.S. Dept. of Health and Human Servs.*, 332 F.3d 654, 660 (D.C. Cir. 2003).  Thus, the archetypal interpretations meriting *Chevron* deference are those established through formal adjudications and notice-and-comment rulemaking.  *Id.*  In some cases, other less formal interpretations can be given deference—for instance, certain informal adjudications.  *E.g.*, *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) (granting *Chevron* deference to FDA letter decisions).  Courts routinely hold, however, that policy statements and internal enforcement guidelines are "undeserving of *Chevron* deference."  *Public Citizen*, 332 F.3d at 660 (citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001)).

In this case, the only pronouncement is not even an *agency* pronouncement.  Rather, the government seeks *Chevron* deference for an email from an agency employee to a single member of the press—a reporter at the Wall Street Journal.  *See* FDA000036-37; *cf.* 21 C.F.R. § 10.85(k) (statements by FDA employees are not official pronouncements and do not bind the agency).  Needless to say, no court has ever granted *Chevron* deference to an interpretation announced in

---

[4] The government appears to suggest, Opp. at 38, that this case should be resolved at *Chevron* Step One in favor of the government.  This is surely incorrect.  The plain meaning of the word "shall" is "must"; the government cannot reasonably contend that the statutory phrase "shall be refused admission" is *unambiguously* permissive.

an informal press statement sent by email to a reporter, and the government cites no case suggesting that such deference could be appropriate.  The only case Plaintiffs are aware of that even discussed press statements under the *Chevron* rubric dismissed that possibility out of hand.  *See Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 671 (Fed. Cl. 2008) ("IRS notices are press releases stating the IRS's position on a particular issue and informing the public of its intentions; such notices do not constitute legal authority.  IRS notices are not promulgated pursuant to a notice-and-comment period, the process which gives regulations their legal authority and entitles them to *Chevron* deference").

### F.    A Mandatory Reading Of "Shall" Leads To No Absurd Result.

Finally, the government argues that reading Section 801(a) by its plain mandatory terms would create three absurd results.  *See* Opp. at 42-47.  This argument, the last refuge of the atextualist, places a heavy burden on the government to show that the statute's plain language would yield an outcome that "defies rationality."  *Landstar Express Am., Inc. v. FMC*, 569 F.3d 493, 498-99 (D.C. Cir. 2009).  If there exists "'a plausible reason why Congress' might have intended" those results, then statutory text must control.  *Id.* (quoting *Barnhart v. Thomas*, 540 U.S. 20, 28 (2003)); *accord* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2390 (2003) (the absurdity doctrine requires a showing that the plain language would result in "an outcome so contrary to perceived social values that Congress could not have 'intended' it").  The government does not remotely satisfy this exacting standard.

### 1.    Congress Intended For Imported Drugs To Be Regulated More Stringently Than Their Domestic Counterparts.

The first supposedly absurd result—that "FDA would have enforcement discretion to allow domestic products, but not foreign products, to be commercially distributed," Opp. at 43— is quickly dispatched.  Far from "absurd," it is utterly rational for FDA to have greater discretion

over domestic products than foreign drugs.  Section 801—tellingly entitled "Imports and Exports"—demonstrates that Congress intended to regulate foreign products more stringently than their domestic counterparts.  *See Seabrook Int'l Foods, Inc. v. Harris*, 501 F. Supp. 1086, 1092 (D.D.C. 1980) (noting "the long history of disparate treatment of imported goods"), *aff'd sub nom.*, *Cont'l Seafoods, Inc. v. Schweiker*, 674 F.2d 38 (D.C. Cir. 1982); *Sugarman*, 267 F. Supp. at 823 ("Congress has set up procedures with respect to *imports* which are strikingly different from procedures regulating products of *domestic origin*."  (emphases in the original)). Indeed, the second sentence of Section 801(a) – which obliges FDA to examine all drugs that come from unregistered foreign sources – was added to the FDCA in 1962 in direct response to a controversy in which an unapproved foreign drug found its way into domestic commerce to great detriment to the public health.  *See* Mem. at 6-7 & n.3.  An intended difference is something to be embraced, not avoided through the absurdity doctrine.  *See United States v. Sullivan*, 332 U.S. 689, 699 (1948) ("The [FDCA] is long and complicated.  Its numerous provisions treat the very different subjects of drugs, food and cosmetics alike in some respects, differently in others.  The differences are as important as the similarities, and cannot be ignored.").

> **2.     The Government Cannot Justify A Departure From The Plain Language of Section 801(a)(3) Simply By Pointing To Other Instances In Which FDA Has Ignored The Statutory Text.**

The second allegedly absurd result identified by the government is a perceived threat to FDA's personal use importation and drug shortage policies.  *See* Opp. at 43-44.  This perceived threat is not the sort of absurd result that would justify a departure from unambiguous statutory text.  Unfortunately, there is nothing absurd about the possibility that the FDA may have violated the statute in other contexts, and the government cannot defend FDA's decision to ignore the command of Section 801(a)(3) simply by noting that FDA also has done so in other circumstances.  *See, e.g.*, *Friends of the Earth v. EPA*, 446 F.3d 140, 146 (D.C. Cir. 2006) ("In

– 21 –

this circuit . . . agencies seeking to demonstrate absurdity have an exceptionally high burden:
. . . 'to avoid a literal interpretation . . ., [the agency] must show either that, as a matter of
historical fact, *Congress* did not mean what it appears to have said, or that, as a matter of logic
and statutory structure, it almost surely could not have meant it.'" (quoting *Engine Mfrs. Ass'n v.
EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996)) (emphasis added)).  Only the agency itself could
regard the possibility that another of its policies might be void as proof that the statute cannot
mean what the statute says.

In any event, the perceived threat is imagined.  FDA's personal use importation guidance
finds support in the statutory text.  Eleven years ago, Congress entered findings disapproving of
prior instances in which FDA had refused admission to personal imports of foreign medicines
without informing "the individual of the reasons underlying the decision to send the notice."  *See*
21 U.S.C. § 381, notes; Pub. L. No. 106-387, 114 Stat. 1549, 1549A-40 (2000).  To remedy this
problem, Congress dictated that FDA "*may not*" take action against personal imports of
prescription drugs unless FDA "has made a *determination*" that the drug "*is* in violation of" the
FDCA.  21 U.S.C. § 381(g)(1)(A)(i) (emphases added).

After this amendment, personal use shipments differ materially from commercial
shipments as a statutory matter.  As discussed above, a commercial shipment must be refused
admission if it even *appears* to violate the act.  *See supra* 16.  In contrast, FDA cannot take
action against a personal shipment unless the agency makes an administrative determination that
the shipment *actually* violates the law.  FDA's personal use policy thus distinguishes the
situations in which FDA must take action against individual importations in accordance with
21 U.S.C. § 381(g) and cases in which the much lower appearance standard "compels

government investigators to refuse to admit suspect drugs" in commercial shipments.
HHS Report at 30.

Likewise, FDA's drug shortage policy also has some basis in the statute.  Section 801(d)(2) allows FDA to authorize the otherwise illegal importation of foreign drugs that are "required for emergency medical care."  21 U.S.C. § 381(d)(2).  Many if not most "shortage" scenarios would fall within this express grant of authority.  Moreover, the shortage policy is fully consistent with the statutory goal of ensuring that only safe and effective drugs are imported into the United States.  FDA will only invoke this policy if a shortage involves a "medically necessary drug product," *FAQs About Drug Shortages*, FDA, *available at* http://1.usa.gov/1BNmS2, and if FDA can "ensure that the overseas product [is] safe and effective."  Valerie Jensen, FDA, *An Overview of the FDA's Drug Shortage Program*, 30 P&T J. 174, 175 (Mar. 2005); *Drug Shortages:  Transcript*, FDA, *available at* http://1.usa.gov/jmcW35 (FDA allows importation of drugs in shortage only when FDA is able to "identif[y] overseas [drugs] that meet FDA's safety, efficacy and quality standards").

### 3.     Section 801(a) As Written Does Not Impose Undue Burdens On FDA.

The final purportedly absurd outcome resulting from a mandatory reading of Section 801(a) is the assertedly "unbearable burden" that would exist if FDA were required "to refuse admission to the ever-growing number of imports of *all* violative articles, including foods, cosmetics, human drugs, biologics, animal food and feed, and devices." Opp. at 44  (emphasis in original).  This argument fails for several reasons.  First, it depends on a gross overstatement of what the FDCA requires.  Section 801(a) of the FDCA imposes no obligation on FDA to examine imported foods, cosmetics, biologics, animal food, or animal feed; the *obligation* to examine imported products is limited to the selected imports identified in the second sentence of Section 801(a)—namely, drugs, devices and tobacco products that were "manufactured,

prepared, propagated, compounded, or processed in an establishment" not registered with FDA.

21 U.S.C. § 381(a).[5]  Thus, the only burden attributable to Section 801(a) is the agency's duty to

(1) examine drugs, devices, and tobacco products that stem from unregistered sources, and

(2) refuse admission to those products (or any other imports that FDA might *choose* to examine)

*if* they appear to violate the FDCA as described in Section 801(a)(3) *and* cannot be rehabilitated

as described in Section 801(b) or Section 801(o) *and* do not qualify for the safe harbor of Section

801(d)(3)(A).  This is not an "undue" burden; it is the express will of Congress.[6]

Second, the government's argument misstates the relief sought by Plaintiffs.  Contrary to

what the government says, *see* Opp. at 45-46, Plaintiffs seek no sweeping changes to FDA's

prior practices.  Before the events that gave rise to this litigation, the ACS and OASIS systems

maintained by FDA and CBP (*see* Opp. at 3-4), were adequately identifying and interdicting

---

[5] The government's brief is salted with statements that ignore this aspect of the statute.  *See, e.g.*, Opp. at 42 (ascribing to Plaintiffs an assertion "that FDA is required to interdict *all* imports of products that appear to violate the FDCA" (emphasis in the original)); *id.* at 44 (asserting that the plain language of the statute would mean that FDA must refuse admission to "*all* violative articles, including foods, cosmetics, human drugs, biologics, animal food and feed, and devices" (emphasis in the original)); *id.* at 45 ("Physically examining and/or sampling all FDA-regulated products offered for import to determine whether they are subject to refusal would be impossible given agency resources"); *id.* at 47 (asserting that the statute "applies with equal force to [drugs], as well as foods, cosmetics, human drugs, biologics, animal food and feed, and devices").  Each of these statements ignores the fact that Section 801(a) clearly distinguishes among the various classes of products under FDA's jurisdiction.  The first sentence broadly describes the sorts of imported products that FDA is *authorized* to examine (all food, drugs, devices, tobacco products, and cosmetics) while the second sentence identifies the much narrower universe of imported products that FDA *must* examine (only those drugs, devices, and tobacco products that hail from unregistered foreign establishments).

[6] The figures proffered by the government are therefore similarly overblown.  The government asserts that 21 million import lines were submitted to FDA in 2010.  Opp. at 5, 44.  But more than half of those lines were imports of *foods* (9,737,919 lines) or *cosmetics* (1,883,221 lines). FDA Budget Justification, 383-84 (2012), *available at* http://1.usa.gov/h5gSsF.  The number of drugs offered for import into the United States during 2010 was much, much lower:  just 409,728 lines.  *Id.* at 385.  Presumably only a fraction of those lines came from unregistered foreign establishments.

DC1 2025010v.1

unapproved new drugs that hailed from unregistered establishments—as evidenced by the fact that the shipments of foreign thiopental at issue here were actually detained by FDA. *See, e.g.*, Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶¶ 35-37, 40-42. All Plaintiffs seek is a return to the *status quo* that existed before FDA went to great lengths to permit the importation of products that FDA's system properly had flagged for exclusion.

The government's argument rings particularly hollow given that FDA's decision to exempt foreign thiopental from the agency's normal procedures *increased* the burden on FDA's employees. To implement its new policy, FDA inserted new codes into OASIS to cause the system to "flag all shipments of [thiopental] as a priority review" and forward those shipments to FDA reviewers. FDA000054. Those reviewers are instructed *not* to follow their normal review process. *Id.* Instead, they must review additional documents from the import broker responsible for the shipment to determine if the drug "is destined for correctional facilities." *Id.* If not, then this review was for naught—the shipment is returned to the system to be reprocessed according to normal procedures. *Id.* If so, then the reviewer is instructed to (a) issue a "may proceed" notice with a special disclaimer; (b) take a screen shot of the notice and forward it to FDA headquarters; (c) send a letter to the correctional facility; and (d) preserve copies of all of the above materials as well as the original "entry documentation" in the district office files. *Id.* These steps, and the costs associated with them, were necessitated by FDA's decision to ignore the statute. The asserted burdens associated with Plaintiffs' interpretation of the statute are a chimera: they are no greater than the burdens FDA had assumed before changing its system to allow illegal importation of foreign thiopental. That change, not the heretofore accepted application of the statute, is what has created more work for the agency.

## II.   THIS COURT HAS JURISDICTION TO REVIEW FDA'S FAILURE TO COMPLY WITH SECTION 801(a)(3) OF THE FDCA.

The proper interpretation of Section 801(a)(3) informs not just Plaintiffs' primary claim for relief, *see* Mem. at 21, but also the government's principal response.  The government relies upon its permissive construction of Section 801(a)(3) to argue that its actions are entirely immune from judicial review.  *See* Opp. at 1-2, 11-27.  If the Court rejects this interpretation of the statute, then the jurisdictional challenge fails as well.[7]  *See* Mem. at 28-32.

In any event, the government's effort to evade judicial review fails at each step of the analysis.  First, judicial review presumptively exists, and the government's contrary arguments depend upon a basic misreading of *Heckler* and its progeny.  Second, even if the government were correct that a presumption against review applied (rather than the normal presumption in favor of judicial review), any such presumption is rebutted by the text of Section 801(a)(3).

### A.   The *Heckler* Presumption Does Not Apply To FDA's Determinations Under Section 801(a)(3).

Agency action is presumptively reviewable:  The APA embodies "a 'basic presumption of judicial review.'"  *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993).  Where the FDCA is silent about whether judicial review is available under a particular provision, it is presumed that "[a]gency action … [is] directly reviewable in a district court . . . ."  *Cutler v. Hayes*, 818 F.2d at 887 n.61.  The government does not mention, much less do business with, this bedrock principle of law.  The presumption in favor of judicial review of agency action becomes a presumption *against* review when the action is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  This exception is "a narrow one," *Heckler*, 470 U.S. at 838, and it applies only "in

---

[7] Defendants label this argument as one that arises under Federal Rule of Civil Procedure 12(b)(6).  *See* Opp. at 12 n.11.  However, *Heckler* goes to the court's subject matter jurisdiction, not the merits of a claim.  *See Baltimore Gas and Electric Co. v. FERC*, 252 F.3d 456, 462 (D.C. Cir. 2001) (where *Heckler* controls, the court "lack[s] jurisdiction").

those rare instances where statutes are drawn in such broad terms that in a given case there is *no law to apply*." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation omitted; emphasis added).

The government assumes that this case falls within this narrow exception because FDA decided "not to take enforcement action" with respect to foreign thiopental.  Opp. at 15; *see id.* at 15-16 (asserting, without citation, that decisions under Section 801(a)(3) are "directly analogous" to decisions under 21 U.S.C. §§ 332-334).  The government's assumption is mistaken, as FDA did not refuse to take "enforcement action" within the meaning of *Heckler*. *Heckler* found that FDA's refusal to commence a civil or criminal action in federal court was presumptively immune from judicial review.  470 U.S. at 832.[8]  In contrast, FDA's application of Section 801 does not involve a decision whether to initiate judicial proceedings in an attempt to penalize a potential violator; instead, the statute creates a "purely" administrative process that serves as "a quick and efficient means of protecting the American public."  *United States v. Food, 2,998 Cases*, 64 F.3d 984, 989 (5th Cir. 1995); *United States v. Kent Food Corp.*, 168 F.2d 632, 634 (2d Cir. 1948) (Section 801 is "a separate chapter of the [FDCA]" and "deals with a subject matter entirely apart from that of condemnation under [21 U.S.C. § 334]").  The "quick

---

[8] All the other cases cited by the government, *see* Opp. at 14-15, 20-21 also involved decisions not to commence judicial enforcement proceedings.  *See Jerome Stevens Pharms. Inc. v. FDA*, 402 F.3d 1249, 1257 (D.C. Cir. 2005) (FDA decision not to prosecute under 21 U.S.C. §§ 332-334); *Cutler v. Hayes*, 818 F.2d at 893 (same); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 950 (D.C. Cir. 1987) (same); *Schering Corp. v. Heckler*, 779 F.2d 683, 685-86 (D.C. Cir. 1985) (same); *Int'l Ctr. for Tech. Assessment v. Thompson*, 421 F. Supp. 2d 1, 6-7 (D.D.C. 2006) (same); *Wood*, 275 F.3d at 110 (Department of Labor decision not to file a civil enforcement action under OSHA); *Dubois v. Thomas*, 820 F.2d 943, 946-47 (8th Cir. 1987) (EPA decision not to file suit under the Federal Water Pollution Control Act); *City of Seabrook*, 659 F.2d at 1374 (EPA decision not to take action against Texas under the Clean Air Act); *City of Yakima v. Surface Transp. Bd.*, 46 F. Supp. 2d 1092, 1100 (E.D. Wash. 1999) (EPA decision not to commence suit under the Clean Air Act); *Clarke*, 628 F. Supp. 2d at 11 (prosecutor's decision not to commence citizenship revocation proceedings).

and efficient" process established by Section 801(a)(3) is entirely unlike the formal enforcement

proceedings in court authorized by 21 U.S.C. §§ 332-334 or similar statutes.  In the latter case,

the agency decides whether or not to initiate an affirmative enforcement action, whereas in the

former, when the foreign drugs arrive at a foreign port of entry, the agency must take some

action; the only question is whether it will admit or exclude the product in question.  Moreover,

the burden of proof that FDA assumes under Section 801(a) is extremely low, and requires no

agency determination that the product actually violated the FDCA.  *See supra* 16.  This contrasts

sharply with the stringent levels of proof the agency must adduce to obtain an injunction,

condemn private property, or prove a criminal violation of the law.  The fact that agency action

to exclude an offending import is required even when the agency cannot prove a violation of the

FDCA undercuts one of the key policies animating *Heckler*, which recognizes the sensitive

prosecutorial judgments involved in evaluating evidence against an applicable burden of proof.

*See Clarke*, 628 F. Supp. 2d at 11 (federal prosecutors must retain discretion to determine which

citizenship revocation cases will meet the burden of clear and convincing evidence).

A determination to exclude an imported drug also implicates very different interests than

a decision to bring an enforcement action under 21 U.S.C. §§ 332-334.  The latter, whether by

way of injunctive, condemnation, or criminal proceedings, will always intrude upon the property

and/or liberty interests of FDA's adversary.  A determination to exclude an imported drug

implicates no liberty interest.  *See Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 57

(1933) ("No one can be said to have a vested right to carry on foreign commerce with the United

States.").  It also does not extinguish the property interests of its owner, who may maintain those

interests simply by re-exporting the drug.  *See United States v. Eight Unlabeled Cases*, 909 F.

Supp. 129, 131 (E.D.N.Y. 1995) ("The parties agree that when the government acts under

– 28 –

[Section 801(a)] and refuses admission it 'shall' grant the importer 90 days in which to re-export the goods to its foreign supplier . . . .").

Finally, even if Section 801(a) determinations were analogous to enforcement decisions, the presumption against judicial review does not apply when, as here, the agency has commenced enforcement but failed to see its effort through.  *See Allergan Inc. v. Shalala*, No. 94-1223, 1994 U.S. Dist. LEXIS 21716, at *7 (D.D.C. Nov. 10, 1994) ("[B]efore the Court is not [FDA's] refusal to take enforcement action, but rather [FDA's] refusal to continue or complete such an action . . . .  Accordingly, [*Heckler*] does not control.").  In this case, FDA took steps to enforce Section 801(a) against foreign thiopental.  The agency detained the shipments for weeks and in some cases months, *see* SUMF ¶¶ 35-75, and it concluded that the predicate for action under Section 801(a) was met.  *Id.* ¶¶ 35-37, 40-42; Opp. at 19.  It simply refused to follow the next step mandated by Congress.  That sort of administrative failure is reviewable under the APA.  *See Port of Seattle v. FERC*, 499 F.3d 1016, 1027 (9th Cir. 2007) ("where FERC has made a determination to adjudicate a dispute or take steps towards enforcing a violation of the law, the outcome it chooses is subject to judicial review under the standards of review set forth in the [APA]"); *MCI Tel. Corp. v. FCC*, 917 F.2d 30, 41-42 (D.C. Cir. 1990) ("It is one thing for the FCC to decline to investigate . . . in the first place; that decision is entrusted to its unreviewable discretion.  It is quite another for it to note the importance of a question . . ., request and take evidence from the parties, and hold a hearing on the matter, and then at that point change its mind, wiping out the hearing as though it had never occurred . . . .").

### B.      If The *Heckler* Presumption Did Apply, It Is Rebutted.

Even if a presumption against review applied, it is rebutted here, and judicial review therefore is available in any event.  As Plaintiffs explained in their opening brief, the *Heckler* presumption is rebutted whenever there exists a manageable standard that enables judicial

review.  *See* Mem. at 28-32.  Such a standard exists when there is law establishing that the government's powers "should be used universally," or if the law provides a "basis for distinguishing between the instances in which [those powers] should and should not be [exercised]."  *Hinck v. United States*, 550 U.S. 501, 504 (2007) (quotation marks omitted).

Section 801(a)(3) provides the requisite standard.  The statute specifies that FDA must examine all drugs offered for importation into the United States that come from unregistered foreign establishments.  It further specifies that the appearance of a violation of the FDCA should distinguish the instances in which refusal of admission is required from those in which it is not.  Finally, the statute specifies that refusal "shall" apply universally to all offending imports.  Thus, Section 801(a) satisfies *both* prongs of the *Hinck* formulation; the law provides a clear basis for distinguishing when government power should be exercised and mandates categorical exclusion of foreign drugs in those circumstances when it should.  This is more than enough to enable judicial review.  *Cf. Cutler v. Hayes*, 818 F.2d at 893 n.116 (direction that FDA "shall" withdraw approval is an enforceable directive); *Raymond Proffitt Found. v. U.S. Army Corps of Engineers*, 343 F.3d 199, 206-07 (3d Cir. 2003) (statutory command that an agency "shall include environmental protection as one of [its] primary missions" provided sufficient law to apply to enable review).

The government's only response is that the phrase "shall be denied admission" must be read permissively.  *See* Opp. at 18-22.  The flaws in that argument have been discussed at length, *supra* Section I, and need not be repeated here.  What does bear repeating that is that the government has flatly ignored the second sentence of Section 801(a) and FDA's obligation to examine select drugs.  *See supra* n.5.  The fact that FDA was obliged to examine thiopental

(because it came from an unregistered foreign establishment) further distinguishes this case from *Heckler* and its progeny. *Compare supra* 14-15 & n. 3.

Moreover, the government also fails to acknowledge that the "appearance" standard of Section 801 has been held sufficient in itself to enable judicial review. The government notes that FDA has discretion and/or is owed some deference when it determines a drug appears (or does not appear) to violate the FDCA. *See* Opp. at 18-19 & n.12. That may be so. But the government cannot jump from that premise to the conclusion that FDA possesses *unreviewable* discretion or is entitled to *absolute* deference. *Cf. Conn. Dep't of Children & Youth Servs. v. HHS*, 9 F.3d 981, 985-86 (D.C. Cir. 1993) (level of deference "goes to the scope of review, not to whether judicial review is available at all"). Such a leap "confuses the narrow category of agency action wholly committed to agency discretion under APA § 701(a)(2), with the primary category of agency action that is subject to review for 'abuse of discretion' under APA § 706(2)(A)." *Hi-Tech Furnace Sys. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000). In fact, as courts have previously held, FDA's appearance determinations fall within the latter, primary category of reviewable decisions. *See Goodwin v. United States*, 371 F. Supp. 433, 436 (S.D. Cal. 1972) ("This Court has jurisdiction to review the issue of whether [FDA] acted arbitrarily or capriciously [under Section 801]." (citing *Sugarman v. Forbragd*, 405 F.2d 1189, 1190 (9th Cir. 1968))); *accord Church of Scientology v. Richardson*, 437 F.2d 214, 217 (9th Cir. 1971) (determinations under Section 801 are reviewable under arbitrary and capricious standard). Indeed, this Court has so held on two separate occasions. *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 69 n.8 (D.D.C. 2010) (jurisdiction to review order excluding electronic cigarettes), *aff'd sub nom. Sottera v. FDA*, 627 F.3d 891 (D.C. Cir. 2010); *Seabrook Int'l Foods*, 501 F. Supp. at 1090-91 ("The court has jurisdiction to review the FDA's decision [to exclude an

– 31 –

import].”); *accord Ambruster v. Mellon*, 41 F.2d 430, 432 (D.C. Cir. 1930) (decision to admit an

import under the 1906 Pure Food and Drugs Act reviewable for arbitrary and capricious

conduct).  For any of the above reasons, even if there were a presumption against judicial review

of Section 801(a) decisions—and there is not—it plainly is rebutted here.

## III.    PLAINTIFFS HAVE STANDING.

The government also attacks this Court's jurisdiction on the ground that Plaintiffs' lack

Article III standing to bring suit over FDA's misconduct.  *See* Opp. at 27-35.  To have standing,

a plaintiff must have suffered an injury that is "(a) concrete and particularized, and (b) actual or

imminent."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).  A

plaintiff also must show "a causal connection between the injury and the conduct complained

of," so that the injury is "fairly traceable" to the defendant's action.  *Id.*  The government argues

that Plaintiffs have not adequately shown injury or causation.  It is mistaken as to both.

### A.    Plaintiffs Have Shown Injury In Fact.

Plaintiffs' injury is the increased risk of harm posed by foreign thiopental—that is, the

increased risk that Plaintiffs will consciously experience suffocation and cardiac arrest while

paralyzed.  An increased risk of a future harm is a well-recognized category of injury for

standing purposes.  *See, e.g.*, *Monsanto v. Geertson Seed Farms*, 130 S. Ct. 2743, 2754-55

(2010) ("substantial risk" of contamination of conventional alfalfa from nearby genetically

modified alfalfa, which presented an associated risk of future economic harms, satisfied injury

requirement); *NRDC v. EPA*, 464 F.3d 1 (D.C. Cir. 2006) (increased risk of skin cancer);

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996) (increased risk of

forest fires due to Forest Service's selection of one logging plan over another); *Pisciotta v. Old

Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007) ("As many of our sister circuits have noted, the

– 32 –

injury-in-fact requirement can be satisfied by . . . an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced . . . ."); *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003) ("[T]he courts of appeals have generally recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes.").

Increased risk of harm suffices as injury in fact when there is a substantial *relative* increase in the risk that threatened injury will come to pass, as well as a substantial *overall* risk of the threatened injury. *Public Citizen, Inc. v. Nat'l Hwy. Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007). There are no "hard-and-fast numerical rules" about what constitutes a substantial risk of harm. *Id.* at 1296. Critically, the "more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing." *Mountain States*, 92 F.3d at 1234. Thus, where the threatened injury is "severe," a "relatively modest increment[] in risk should qualify for standing." *Id.* at 1235. *Cf. Baur*, 352 F.3d at 637 (despite no reported case of mad cow disease in the United States, the agency's failure to screen downed cattle meat under the FDCA increased the risk of mad cow disease, and standing was established based on "even a moderate increase in the risk of disease").

Here, the increased risk posed by foreign thiopental fits easily within these precedents. The threatened harm—conscious suffocation and cardiac arrest—is assuredly severe. *Compare Mountain States*, 92 F.3d 1228, 1234 (harm to "aesthetic and environmental interests"). Indeed, the threatened harm is sufficiently ghastly to amount to cruel and unusual punishment. *See Baze v. Rees*, 553 U.S. 35, 44, 53 (2008). Given the severity of the ultimately threatened harm, Plaintiffs need only show a "modest" relative increase in risk and a "modest" risk that the ultimate harm will occur. *Compare NRDC*, 464 F.3d 1 (1:200,000 lifetime risk of developing

nonfatal skin cancer was sufficient risk of harm to confer standing); *cf. Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 54 (D.C. Cir. 1991) ("'[i]t is settled law that standing may be grounded on a mere 'trifle'" (quoting *Center for Auto Safety v. National Highway Traffic Safety Admin.*, 793 F.2d 1322, 1334 (D.C. Cir. 1986))); *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.) ("Injury-in-fact is not Mount Everest. The contours of the injury-in fact requirement, while not precisely defined, are very generous, requiring only that claimant allege some specific, identifiable trifle of injury." (internal citations and quotation marks omitted)).

Plaintiffs have made the requisite showing. The use of a foreign, unapproved, and misbranded drug presents a higher risk than an FDA-approved, domestic alternative; indeed, this is true as a matter of law. The notion that unapproved new drugs present comparatively greater risks than drugs that have been pre-cleared for safety and effectiveness is one of the foundational principles of food and drug law in this country. *See* 21 U.S.C. § 321(p) (the term "new drug" includes any drug that is not "*generally recognized, among experts qualified by scientific training and experience . . . as safe and effective*" (emphasis added)); *see also United States v. Genendo Pharm., N.V.*, 485 F.3d 958, 965 (7th Cir. 2007) (affirming an injunction against the importation of foreign prescription drugs and adopting a narrow construction of an exemption from all the labeling and packaging requirements in the FDCA because the FDCA "exists to protect aspects of the 'lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection'" (quoting *Arner Co. v. United States*, 142 F.2d 730, 736 (1st Cir. 1944)). Statutory presumptions of risk suffice to establish injury under Article III. *See Baur*, 352 F.3d at 634 ("In the specific context of food and drug safety suits, however, we conclude that [enhanced risk is] cognizable for standing purposes, where the plaintiff alleges

exposure to potentially harmful products."); *Silverman v. Foreman*, 631 F.2d 969, 974 n.12

(D.C. Cir. 1980) (plaintiffs had standing to sue to have nitrates declared a food additive subject

to FDA regulation; such additives are "presumed unsafe until proven otherwise").  This is

because the FDCA "creates legal rights or interests for consumers, 'the invasion of which creates

standing, even though no injury would exist without the statute.'"  *Stauber v. Shalala*, 895

F.Supp. 1178, 1187 (D. Wisc. 1995) (quoting *Cutler v. Kennedy*, 475 F.Supp. 838, 848 (D.D.C.

1979), *overruled on other grounds in Chaney v. Heckler*, 718 F.2d 1174, 1188 n.35 (D.C. Cir.

1983)).  Thus, when "FDA has failed to follow the dictates of the act," the "increased risk of

potential harm . . . is an injury-in-fact for standing purposes."  *Id.* at 1188.

     The government's contrary argument, *see* Opp. at 32-33 & n.23, asks this Court to reach

a conclusion that is directly contrary to the foundational principle just discussed.  Indeed, the

argument is diametrically opposed to FDA's own regulatory position regarding foreign

unapproved drugs.  As the agency previously has explained:

> FDA has long taken the position that *consumers are exposed to a number of risks*
> *when they purchase drugs from foreign sources* . . . .  These outlets may dispense
> expired, subpotent, contaminated or counterfeit product, the wrong or a
> contraindicated product, an incorrect dose, or medication unaccompanied by
> adequate directions for use. . . .  The drugs may not have been packaged and
> stored under appropriate conditions to avoid degradation.  There is no assurance
> that these products were manufactured under current good manufacturing practice
> (cGMP) standards. . . .
>
> Patients are also *at risk because there is no certainty about what they are getting*
> *when they purchase some of these drugs*.  Although some patients may receive
> genuine product, others may unknowingly buy counterfeit copies that contain
> inert ingredients, legitimate drugs that are outdated and have been diverted to
> illegitimate resellers, or dangerous sub-potent or super-potent products that were
> improperly manufactured.

*Safety of Prescription Drugs From Foreign Sources*, Statement of William K. Hubbard,

Associate Commissioner for Policy and Planning, FDA, before the Subcommittee on Human

Rights and Wellness, House Committee on Government Reform (June 12, 2003) (emphasis

– 35 –

added), *available at* http://1.usa.gov/kMgZpa.  Indeed, as noted above, *see supra* at 18, the

Secretary of Health and Human Services has thus far refused to make the certification

contemplated by Section 804 of the FDCA that foreign drugs "pose no additional risk to the

public's health and safety."  21 U.S.C. § 384(l)(1)(A).  The government cannot seriously contend

that foreign unapproved drugs like thiopental are indistinguishable from their FDA-approved

counterparts and create no additional risk to patients to whom they might be administered.  The

fact that it has been driven to do so here is but further proof of the arbitrary nature of FDA's

actions in this case.

The government also seeks to rebut the statutory presumptions regarding misbranded and

unapproved new drugs by quibbling with certain of the allegations in Plaintiffs' Complaint

regarding the potential adulteration of foreign thiopental.  Opp. at 32-33 (citing Compl. ¶¶ 127,

130).  This is irrelevant.  Plaintiffs have not moved for summary judgment on the grounds that

foreign thiopental is adulterated.  Rather, Plaintiffs moved for summary judgment based on

FDA's own determination that foreign thiopental is a misbranded and unapproved new drug,

propositions that the government does not contest.  *See* Opp. at 19.

Finally, the government's assertion that Plaintiffs have not adequately alleged an Eighth

Amendment violation, *see* Opp. at 32-33 (citing *Brewer v. Landrigan*, 131 S. Ct. 445 (2010);

*Cook v. Brewer*, No. 11-15743, 2011 U.S. App. LEXIS 6753 (9th Cir. Apr. 1, 2011); *Cook v.

Brewer*, No. 11-15303, 2011 U.S. App. LEXIS 5212 (9th Cir. Mar. 16, 2011)), is also wholly

beside the point.  That there was insufficient proof in those cases to establish cruel and unusual

punishment does not remotely establish that there is no increased risk of harm sufficient to

establish standing for purposes of bringing an action under the APA to put a halt to illegal

conduct by FDA.  And, of course, establishing standing does not in any event turn on proving the

merits of a claim, constitutional or otherwise. *See Shaffer v. Def. Intelligence Agency*, 601 F.

Supp. 2d 16, 23 (D.D.C. 2009) ("Injury in fact . . . need not be capable of sustaining a valid

cause of action." (quotation marks omitted)).

**B.      Plaintiffs' Injury Is Directly Traceable To FDA's Conduct.**

The government also suggests that there is no causal connection between FDA's decision

to admit foreign thiopental and Plaintiffs' stated injury. *See* Opp. at 29-31.  Specifically, they

argue that Plaintiffs "have not shown that independent intervening causes are not responsible for

[any] alleged 'anesthesia awareness.'" *Id.* at 29.  This is an unserious argument.  That the

government can hypothesize other factors that might cause risk (such as here, the asserted risk of

improper administration due to untrained personnel) does not foreclose the existence of *other*

risks, such as those that FDA itself has caused (here, the risk that the foreign drug will be

harmful or ineffective).  It is black-letter law that multiple causes can exist for a given harm,

which is not a barrier to *liability*, let alone standing.  *See, e.g.*, *Beattie v. United States*, 756 F.2d

91, 136 (D.C. Cir. 1984) (Wald, J., concurring) ("Under well-established principles of proximate

cause, when there are multiple acts or omissions, liability attaches to each act or omission which

is a substantial factor in causing the harm, not just the most proximate or last act or omission."

(citing, *inter alia*, Restatement (Second) of Torts § 442 B (1965)).  The existence of other

potential flaws in the lethal injection process simply underscores the need to ensure that states

conducting executions only use anesthetics that have been proven safe and effective.

More importantly, the government's traceability argument mistakes the nature of

Plaintiffs' claims.  Plaintiffs' asserted injury is not the reality of anesthesia awareness (although

anesthesia awareness is all too real a phenomenon, *see, e.g.*, *Morales v. Hickman*, 415 F. Supp.

2d 1037, 1045 (N.D. Cal. 2006); *Brown v. Beck*, No. 06-3018, 2006 U.S. Dist. LEXIS 60084, at

*16-18 (E.D.N.C. Apr. 7, 2006)).  Rather, as set forth above, Plaintiffs' stated asserted injury is

the relatively higher risk that they will suffer pain, including as a result of anesthesia awareness, if foreign thiopental is used in place of an FDA-approved anesthetic.  In short, the government has "confuse[d] the anticipated consequences of the agency action with the injury plaintiffs actually claim."  *Stauber*, 895 F.Supp. at 1187 (quoting *Florida Audubon Soc'y v. Bentsen*, 54 F.3d 873, 879 (D.C. Cir. 1995)).  The causal link between the challenged agency action (admitting the foreign drug into the United States) and the injury that Plaintiffs seek to redress (increased risks associated with administration of the foreign, unapproved drug) is straightforward.  Had FDA complied with Section 801, the illegal drug would not be in the country.  *Cf. Baur*, 352 F.3d at 640 (where injury was increased risk of mad cow disease because of USDA's failure to exclude downed cattle meat from the market, the injury "arises directly from USDA's regulatory policy").

## IV.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT.

There is no factual dispute in this case.  The government admits that FDA examined numerous shipments of foreign thiopental, most of which were detained for weeks or months.  Defendants Statement of Facts ("DSF") ¶¶ 1-4, 6-7, 17-19; *accord* SUMF ¶¶ 35-75; Mem. at 11-15.  The government also does not deny that the shipments appeared to violate the FDCA.  *See* SUMF ¶¶ 10-20, 77-83; Mem. at 18-20.  Indeed, the government admits that foreign thiopental "clearly" appeared to be an unapproved new drug.  Opp. at 19.  In light of the undisputed record, Plaintiffs are entitled to summary judgment declaring that (a) FDA violated the APA by acting contrary to federal law (Count I of the Complaint), and (b) FDA violated the APA by acting in an arbitrary and capricious manner (Count III of the Complaint).

DC1 2025010v.1

**A.    Plaintiffs Are Entitled To Summary Judgment That FDA Acted Contrary To Federal Law.**

For all of the reasons discussed above, *see supra* at 5-25, and in our opening brief, *see* Mem. at 22-27, this Court should find that Section 801(a)(3) means what it says. According to the plain language of the statute, FDA was obliged to refuse admission to foreign thiopental. Its admitted decision to do the opposite was contrary to law. *See* 5 U.S.C. § 706(2)(A). These actions, contrary to law, establish Plaintiffs' entitlement to summary judgment on Count I of their complaint.

In addition, the government's opposition papers confirm a separate and distinct violation of law that independently merits summary judgment on Count I. Specifically, the government has admitted that FDA issued directions to its entry reviewers instructing them not to examine *any* shipment of foreign thiopental, even if the drug comes from an unregistered foreign source. *See* DSF ¶ 17 (citing FDA000051-57); *cf.* Mem. at 24 n.11 (noting the possibility that such instructions had been issued). FDA's instructions cannot be reconciled with the statutory mandate that FDA *shall* examine all imported drugs that were "manufactured, prepared, propagated, compounded, or processed" at unregistered foreign establishments. *See* 21 U.S.C. § 381(a). For this reason too, Plaintiffs are entitled to summary judgment on Count I because FDA acted contrary to law.

**B.    Plaintiffs Are Entitled To Summary Judgment That FDA Acted Arbitrarily And Capriciously By Departing From Its Existing Regulations And Past Practices And By Undermining The Public Health.**

Separate and apart from of the statutory violations just discussed, Plaintiffs are also entitled to summary judgment on Count III of their Complaint because FDA acted arbitrarily, capriciously, and in abuse of its discretion. Agencies act arbitrarily and capriciously if they "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books,"

– 39 –

*FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009), if they vary from a "settled course of behavior," *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983), or if they act in a way that "frustrate[s] the policy that Congress sought to implement," *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981).  In this case, FDA has done all three.  As Plaintiffs previously showed, FDA acted inconsistently with its own regulations, *see* Mem. at 33-36, FDA acted inconsistently with its longstanding practices, *id.* at 37-39, and FDA acted in a manner that threatens the public health, *id.* at 39-41.

The government resists the conclusion that FDA acted arbitrarily and capriciously.  It claims that there is no inconsistency between FDA's actions in this case and FDA's past practices, Opp. at 41-42, and asserts that FDA articulated "sound reasons" for admitting foreign thiopental into the United States, *id.* at 39-41.  Neither suggestion has merit.

1.   **FDA Acted Inconsistently With Its Existing Regulations And Past Practices.**

FDA's handling of foreign thiopental was contrary to at least two distinct FDA regulations.  First, 21 C.F.R. § 207.40(b) flatly states that "*No drug* may be imported or offered for import into the United States unless it is listed [with FDA]" (emphasis added).  Second, 21 C.F.R. § 314.410(a) states that new drugs may be imported only if the drug is covered by an approved application or complies with the regulations pertaining to investigational new drugs ("INDs").  Foreign thiopental not listed with the agency, is not covered by an approved application, and does not comply with FDA's IND rules.  It follows that the importation of thiopental is unlawful under FDA's own regulations.  Critically, neither the government's brief

– 40 –

nor the email sent to the Wall Street Journal even attempts to address the inconsistency between FDA's treatment of foreign thiopental and these regulations.[9]

FDA's handling of foreign thiopental also cannot be reconciled with the agency's prior efforts to keep state and local governments from importing unapproved prescription drugs. *See* Mem. at 37-39. The government, however, would have this Court find no inconsistency between forbidding California Medicaid from importing Canadian medicine for use by elderly state residents and permitting the California Department of Rehabilitation and Correction ("CDRC") to import thiopental from Britain for use as an anesthetic in medically unsupervised executions. *See* Opp. at 41-42 ("apples and oranges"). But in the end, even the government must admit the inconsistency. In its effort to distinguish the Canadian import decisions, the government argues that the States had "asked FDA to characterize the state-instituted programs as *lawful* . . . and to *commit* to exercise its enforcement discretion." Opp. at 42 n.30 (emphases in the original). Such acts, the government must concede, "would [have] violate[d] the FDCA." *Id.* But that is precisely what FDA has done here. FDA has *committed* not to enforce the law against foreign thiopental, *see* FDA000036, and it has modified its procedures to reflect that commitment, *see* FDA000054. FDA has also allowed the States to characterize their behavior as *lawful*. *See, e.g.*, FDA000025-26; Exhibit 57 to the Second Declaration of Sean C. Griffin ("Second Griffin Decl."). These characterizations and commitments would have violated the FDCA with respect to Canadian imports, and they must be violations of the FDCA with respect to drugs from the United Kingdom as well.

---

[9] The email never even mentions these regulations. *See* FDA000036-37. The government only discusses these regulations in the context of *Heckler*. *See* Opp. at 25-27. The government does not even begin to explain how foreign thiopental could be imported consistently with either 21 C.F.R. § 207.40(b) or 21 C.F.R. § 314.410(a).

If further evidence of the inconsistency were necessary, that evidence is found in the government's suggestion that foreign thiopental should be considered safe and effective because certain press reports indicate that the CDRC had the product it purchased "lab-certified" as "sufficiently potent." Opp. at 34. This is a simply stunning reversal of position. Lab certification can test for the presence of an active ingredient, but such testing cannot remotely meet the statutory and regulatory burdens involved in establishing that a new drug is safe and effective within the meaning of the FDCA. *See* 21 U.S.C. § 355(d) (defining substantial evidence); 21 C.F.R. § 314.50 (requirements for FDA approval of a new drug application). Thus, when New Hampshire sought to institute a program whereby its state police would lab certify the quality of non FDA-approved prescription drugs imported from Canada, FDA stated that such testing was unacceptable because "chemical analysis that detects the presence of an active ingredient may not reveal if a foreign drug is expired, contaminated, was stored under adverse or inappropriate conditions, or is counterfeit." Ltr. from FDA to the New Hampshire Pharmacists Assoc., *available at* http://bit.ly/h53dVW. FDA quashed a similar proposal by Virginia in 1990 for similar reasons. *See* Peter S. Reichertz & Melinda S. Friend, *Hiding Behind Agency Discretion*, 9 CORNELL J.L. & PUB. POL'Y 493, 503-04 (1999–2000). Only bare administrative fiat can explain the inconsistency.

### 2.    The Government Has Not Provided A Reasoned Explanation For FDA's Departure From Its Existing Regulations And Past Practices.

The government proffers several excuses for FDA's decision to admit foreign thiopental drug into the country. *See* Opp. at 39-41. It is difficult to imagine *any* explanation that could justify the naked inconsistencies just discussed, and none of the government's rationalizations even comes close.

First, the government asserts that its decision to admit foreign thiopental is justified by concerns about limited administrative resources.  Opp. at 39.  As discussed above, however, the government's argument misstates the burden imposed by Section 801(a).  *See supra* 23-24 & n.5-6.  And, where the only marginal burden was self-inflicted by FDA based on its decision to exempt foreign thiopental from its existing procedures, *see supra* at 25, it cannot be heard to argue the contrary.

Second, the government argues that it was not arbitrary or capricious to turn a blind eye to illicit foreign thiopental because thiopental is "designed to end human life."  Opp. at 40.  This contention is false.  Even when used as part of a three-drug lethal-injection protocol, thiopental is not used to kill; it is used to induce general anesthesia to relieve the pain that would otherwise be associated with the killing.  Mem. at 35-36.[10]

Third, the government suggests that it may not need to comply with the statute because certain actions by the federal Drug Enforcement Administration ("DEA") "may obviate the need" for FDA to enforce Section 801(a).  Opp. at 40-41.  As a threshold matter, passing the buck is neither a canon of statutory construction nor a valid principle of administrative law— unsurprisingly, FDA cites no case to support this argument—and FDA cannot "defer" to other law enforcement agencies to enforce a statutory responsibility imposed on it by Congress.  DEA has not remotely cleaned up all of the mess created by FDA's misconduct, and the government does not contend that it has.  *See* Opp. 10-11 & n.9; *id.* at 41.  Moreover, even DEA itself took

---

[10] The government's reliance on *Cutler v. Hayes* is misplaced.  Opp. at 40.  *Cutler* allowed FDA to delay its review of the effectiveness of over-the-counter drugs that were approved for safety or generally recognized as safe.  *See* 818 F.2d at 892-94.  Thus, the interest at stake was that of protecting consumers from the expense of taking an ineffective, but harmless, medication.  *Id.* at 893-94.  That economic interest was rationally "a lower priority" than safety.  *Id.*  In this case, the safety of the foreign drug remains a primary concern.

– 43 –

no action until after this suit had been filed and after attorneys representing other inmates notified DEA of independent violations of the Controlled Substances Act.[11]  *See* Second Griffin Decl. Exh. 58.

Finally, the government asserts that FDA did not act arbitrarily or capriciously because the agency acted consistently by treating "*imported* thiopental similarly to the way it has treated *domestic* thiopental."  Opp. at 41 (emphases added).  This is precisely the problem.  As courts have held, "Congress has set up procedures with respect to *imports* which are strikingly different from procedures regulating products of *domestic origin*."  *Sugarman*, 267 F. Supp. at 823 (emphases in the original); *see Seabrook Int'l*, 501 F. Supp. at 1092 (noting "the long history of disparate treatment of imported goods").  The government's attempt to create a false equivalency between foreign thiopental and its extinct domestic counterpart ignores the fundamental distinction that Congress drew between imported and domestic drugs.  *See supra* at 20-21.

### 3.     FDA's Actions Were Contrary To The Public Health.

Finally, the government fails to address the risk of diversion that FDA created when it allowed foreign thiopental to enter the country.  *See* Mem. at 39-41.  Plaintiffs identified at least one illicit sale (or, more accurately, bartering) of foreign thiopental involving California and Arizona.  *See* SUMF ¶¶ 56-62.  Recent events have confirmed further diversions.  First, the government's own filings reveal that at least one shipment of foreign thiopental was received by a private pharmacy in Georgia.  *See* DSF ¶ 4 (citing FDA00005-07).  FDA has no way of

---

[11] For reasons known only to the government, DEA has taken no action against the California Department of Rehabilitation and Correction, which continues to posses foreign thiopental and which continues to adhere to a three-drug lethal injection protocol using thiopental.  The situation in Arizona is less clear.  According to recent court filings, DEA asked Arizona not to use foreign thiopental in conjunction with the May 25th execution of Plaintiff Donald Edward Beaty, but DEA has not seized the drug.  *See* Second Griffin Decl. Exh. 60.  It appears that Arizona complied with the request, and employed a three-drug protocol in which FDA-approved pentobarbital (Nembutal) was substituted for thiopental.  *See id.*

knowing what this private actor may have done with the drug.  Second, the Alabama Department of Corrections recently revealed that it had purchased some of the foreign thiopental that the Tennessee Department of Corrections had imported.  *See* Second Griffin Decl. Exh. 61.  This revelation led to yet another seizure by DEA.  *See* Second Griffin Decl. Exh. 62.  Third, and most troubling, a firm in California called Priority Pharmaceuticals, Inc. ("Priority") has correctly identified an opportunity to profit from the shenanigans undertaken by state departments of corrections and enabled by FDA.  Specifically, Priority attempted to become the exclusive distributor for an Indian manufacturer of thiopental, in the hopes of importing the drug through the loophole created by FDA, and selling the drug to prisons throughout the United States.  *See* Exhibit 9 to the Second Declaration of Maya V. Foa.  It failed only because the Indian firm ultimately rebuffed Priority, expressing an ethical objection to selling unregistered products in a regulated market.  *See id.*

These experiences demonstrate precisely why Congress enacted a "closed system" in which every new drug in the United States must be pre-approved by FDA.  *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 790 (8th Cir. 2006) (quoting *Vermont v. Leavitt*, 405 F. Supp. at 472).  When cracks appear in that system, someone will seek to exploit the opening for personal gain.  Here, FDA's decision to throw open the doors with respect to foreign thiopental has already drawn interest from the unscrupulous.  FDA has nowhere explained how its decision could possibly be reconciled with its previous consistent determination to maintain that closed system to eliminate such diversion prospects.  This Court should hold FDA's decision unlawful, and restore the closed system established by Congress.

– 45 –

## CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' motion and supporting papers, this Court should (1) grant Plaintiffs' Motion for Summary Judgment and Declaratory Relief; (2) deny Defendants' Cross-Motion; and (3) enter summary judgment in favor of Plaintiffs and against Defendants on Counts I and III of Plaintiffs' Complaint.

Respectfully submitted,

_____/s/ Bradford A. Berenson_____

| | |
|---|---|
| *Of Counsel* | Bradford A. Berenson (DC Bar No. 441981) |
| Jon M. Sands | Coleen Klasmeier (DC Bar No. 465050) |
| Dale A. Baich | Eric A. Shumsky (DC Bar No. 477926) |
| OFFICE OF THE FEDERAL PUBLIC DEFENDER | Sean C. Griffin (DC Bar No. 499537) |
| FOR THE DISTRICT OF ARIZONA | SIDLEY AUSTIN LLP |
| 850 West Adams Street, Suite 201 | 1501 K Street, N.W. |
| Phoenix, Arizona 85007 | Washington, DC 20005 |
| (602) 382-2816 | (202) 736-8000 |
| (602) 889-3960 (fax) | (202) 736-8711 (fax) |
| dale_baich@fd.org | sgriffin@sidley.com |

*Attorneys for Plaintiffs*

DATED: June 3, 2011

DC1 2025010v.1

## CERTIFICATE OF SERVICE

I, Sean C. Griffin, certify that on the 3rd day of June, 2011, I caused a true and correct copy of Plaintiffs' Reply Memorandum of Points and Authorities in further support of Plaintiffs' Motion for Summary Judgment and Declaratory Relief and Opposition to Defendants' Cross-Motion to Dismiss and/or for Summary Judgment, and all supporting materials, to be served on all counsel of record in this litigation by causing the same to be filed through the Court's CM/ECF system.  In addition, I caused a true and correct copy of the foregoing to be served on the following counsel at the following email addresses:

| | |
|---|---|
| Gerald Kell | Gerald.Kell@usdoj.gov; |
| Eric Blumberg | Eric.Blumberg@fda.hhs.gov; |
| Karen Schifter | Karen.Schifter@fda.hhs.gov; |
| Julie Dohm | Julie.Dohm@fda.hhs.gov; and |
| Michael Stern | Michael.Stern@fda.hhs.gov. |

_____/s/ Sean C. Griffin_____
*Attorney for Plaintiffs*