# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

DONALD EDWARD BEATY,　　　　　　)
*et al.*,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　　　Civil Action No. 11-0289 (RJL)
　　　　　　　　　　　　　　　　　)
FOOD & DRUG ADMINISTRATION,　　)
*et. al.*,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　)
_____)

## REPLY IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Of Counsel:

WILLIAM B. SCHULTZ
Acting General Counsel

RALPH S. TYLER
Associate General Counsel, Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

MICHAEL K. STERN
Associate Chief Counsel

JULIE A. DOHM
Assistant Chief Counsel
U.S. Department of Health & Human Services
Office of the General Counsel
White Oak 31 Room 4525
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

TONY WEST
Assistant Attorney General

MAAME EWUSI-MENSAH FRIMPONG
Acting Deputy Assistant Attorney General

KENNETH JOST
Acting Director, Office of Consumer
Protection Litigation

GERALD C. KELL
Senior Trial Counsel
Office of Consumer Protection Litigation
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Tel: (202) 514-1586
Fax: (202) 514-8742
gerald.kell@usdoj.gov

## SUMMARY

This case is not sustainable because plaintiffs lack standing and have failed to state a cognizable claim. Plaintiffs lack standing because they have not established, as they must, that FDA's import decisions caused a substantially increased risk of harm to plaintiffs that has a substantial probability of occurring. Plaintiffs fail to state a claim under the Administrative Procedure Act ("APA") because the challenged decisions are committed to the agency's discretion and unreviewable. Even if the decisions were reviewable, they are reasonable and must be upheld. Judgment, consequently, should be granted for FDA.[1]

This Court lacks subject-matter jurisdiction because plaintiffs fail to make the required showing of "specific facts" needed to establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs assert no more than a speculative increase in risk, rather than the constitutionally required minimum of concrete, particularized and imminent injury-in-fact, *see id.* at 560. They also fail to demonstrate that their claimed injury is traceable to FDA's action as distinguished from "the independent action of some third party not before the court," *id.* at 560, in this case, the improper administration of anesthesia by persons who are not anesthesiologists.

Plaintiffs' APA claim fails because they challenge the very type of non-enforcement decision that the Supreme Court held in *Heckler v. Chaney*, 470 U.S. 821 (1985) to be presumptively unreviewable, and plaintiffs fail to overcome that presumption.[2] Plaintiffs attempt

---

[1] In this memorandum, "FDA" refers to all Defendants, individually or collectively.

[2] *Chaney* requires that the complaint be dismissed for failure to state a claim under the APA, rather than for lack of subject-matter jurisdiction, as plaintiffs contend, *see* Reply in Further Supp. of Pls' Mot. for Summ. J. and Opp. to Defs' Cross-Mot. to Dismiss and/or for Summ. J. ("Pls' Reply Mem."), at 26 n.7. *See Oryszak v. Sullivan*, 576 F.3d 522, 525 n.2 (D.C. Cir. 2009) (clarifying that the APA limitation of judicial review to "agency action . . . committed to agency discretion by law," *see* 5 U.S.C. § 701(a)(2), "goes not to whether the court has jurisdiction but to whether the plaintiff has a cause of action."); *see also Amador County v.*

to limit the scope of *Chaney's* holding to "a decision whether to initiate judicial proceedings in an attempt to penalize a potential violator," Pls' Reply Mem., at 27, but there is no authority for that novel argument.  On the contrary, courts have routinely applied *Chaney* in a wide variety of contexts in addition to initiation of judicial proceedings to punish a violator.  Moreover, plaintiffs' assertion that *Chaney* does not apply to an enforcement action that an agency has commenced but abandoned (Pls' Reply Mem., at 29) is unavailing here because FDA did not initiate any enforcement action.

Plaintiffs cannot overcome the *Chaney* non-reviewability presumption.  They argue that in 21 U.S.C. § 381(a), the language "shall be refused admission" is unequivocally mandatory and thus enables judicial review by providing "guidelines for the agency to follow in exercising its enforcement powers."  *Chaney*, 470 U.S. at 832-33.  But courts uniformly have held that "shall be refused admission" in Section 381(a) and other nearly identical statutes is not mandatory, consistent with Supreme Court and appellate authority on the proper construction of the word "shall" when associated with enforcement discretion.  *Chaney* thus bars judicial review here because the language of 21 U.S.C. § 381(a) does not provide "guidelines for the agency to follow in exercising its enforcement powers."  *Id.*

Even if the Court were to review FDA's exercise of enforcement discretion, plaintiffs'

---

*Salazar*, 640 F.3d 373, 380 (D.C. Cir. 2011) (citing *Oryszak* for the principle that Section 701(a)(2) is not jurisdictional).  Nevertheless, as FDA noted in its opening brief, although standing "would normally be considered a threshold question that must be resolved in [plaintiffs'] favor before proceeding to the merits," the Court is permitted to dismiss for failure to state a claim as a threshold matter "when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998) (quotation marks and citation omitted).

action still should be dismissed because the agency's conduct is not contrary to law, arbitrary, or capricious.  Instead, FDA's non-enforcement decision is the reasonable result of FDA's "complicated balancing of a number of factors which are peculiarly within its expertise," including "whether agency resources are best spent on this violation or another, . . . whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all."  *Chaney*, 470 U.S. at 831.

For these reasons, and for the reasons set forth in FDA's opening brief, the Court should dismiss plaintiffs' complaint in its entirety and/or grant FDA's motion for summary judgment.

## ARGUMENT

### I.    Plaintiffs lack standing.

Plaintiffs have failed to meet their burden to establish standing at the level required at the summary judgment stage.  In their opposition brief, plaintiffs continue to rely on speculation and conjecture instead of specific facts supported by evidence.  Plaintiffs' efforts fall well short of the requirement that they present, "by affidavit or other evidence," "specific facts" to establish standing.  *Lujan*, 504 U.S. at 561.  Nor have plaintiffs met their even higher burden to establish that there "exists no genuine issue of material fact" as to standing before the Court can reach their arguments for judgment in their favor on the merits.  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999).

### A.    Plaintiffs have not demonstrated injury-in-fact.

The parties essentially agree that the applicable legal test for demonstrating the injury-in-fact standing requirement was established by the D.C. Circuit in *Pub. Citizen, Inc. v.*

*Nat'l Highway Traffic Safety Admin.* ("*Public Citizen v. NHTSA*"), 513 F.3d 234, 237 (D.C. Cir. 2008) (reaffirming standard described in earlier opinion in same case, *Pub. Citizen v. NHTSA*, 489 F.3d 1279, 1295 (D.C. Cir. 2007)).  *See* Pls' Reply Mem., at 33; Defs' Mem. in Supp. of Mot. to Dismiss and/or for Summ. J. and in Opp. to Pls' Mot. for Summ. J. ("Defs' Opening Mem."), at 32.  Plaintiffs seek to show that they are at risk of future harm.  The relevant test for standing based on "risk" of future injury, as established by the D.C. Circuit, requires "both (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account."  *Pub. Citizen v. NHTSA*, 513 F.3d at 237 (emphasis in the original).  As the D.C. Circuit explained, "standing . . . is 'substantially more difficult to establish'" where the "'asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*.'"  *Id*. at 237 (quoting earlier opinion).  Allowing "remote and speculative claims of possible future harm" based on "a fractional chance of benefit from alternative action" "would expand the proper – and properly limited – constitutional role of the Judicial Branch beyond deciding actual cases or controversies."  *Id*.

Plaintiffs have not met the requirements for standing based on risk of future injury.  In their complaint, plaintiffs advance a conjectural and attenuated theory that FDA's release of thiopental will cause future injuries because there have been reports of instances of "anesthesia awareness."  Compl. ¶ 129.  Applying the *Public Citizen v. NHTSA* test to this allegation, plaintiffs must establish that the use of the thiopental at issue in this case:  (a) substantially increases the risk that one or more of the named plaintiffs will not be properly anesthetized, *and* (b) results in a substantial probability that the named plaintiff(s) will not be properly anesthetized.  FDA's opening brief established that plaintiffs' efforts to meet this standard fall

4

woefully short.  *See* Defs' Opening Mem., at 32-35.  Plaintiffs have not proffered any evidence that demonstrates the requisite level of probability of any product failure resulting from the use of imported thiopental.

Indeed, the likelihood of any future injury to plaintiffs from the imported thiopental that is the subject of the complaint diminishes with the passage of time, as reflected in the developments since FDA filed its brief on April 20, 2011.  The United States Drug Enforcement Administration has seized, or has had turned over to it, certain shipments of thiopental, including shipments held by Tennessee and Arizona (states where many of the plaintiffs are incarcerated), for failure to properly register the importation of a controlled substance.[3]  Many states have announced that they will no longer use thiopental in death penalty administration and have either substituted pentobarbital in a three-drug protocol or are using only pentobarbital.[4]  On May 22, 2011, plaintiff Donald Edward Beaty was executed using a new three-drug protocol, with pentobarbital replacing thiopental.[5]  Meanwhile, California (where the remaining plaintiffs are incarcerated) has announced that it will not schedule any executions this year, continuing a

---

[3] *See* http://www.businessweek.com/ap/financialnews/D9NAMPVG0.htm; http://www.businessweek.com/ap/financialnews/D9NAMPVG0.htm.  Defendants do not vouch for the accuracy of these news reports or any other such reports referenced in this memorandum. Neither, by referencing such reports, do defendants intend to confirm, deny, or otherwise comment upon the existence or non-existence of any investigation.

[4] *See* http://www.wsws.org/articles/2011/may2011/exec-m20.shtml (Alabama, Mississippi, and Ohio); http://www.nbcwashington.com/news/politics/DC-Virginia-Using-New-Drug-for-Lethal-Injections-121520134.html (Virginia); http://www.usatoday.com/news/nation/2011-05-20-georgia-execution-drug-shortage_n.htm (Georgia switched to pentobarbital after DEA seized its supply of thiopental).

[5] *See* http://www.azcentral.com/arizonarepublic/local/articles/2011/06/30/20110630arizona-lethal-injection-drug-illegally-obtained.html.

suspension that has been in place since 2006.[6]  Thus, it appears highly unlikely that any of the

plaintiffs will be executed using the imported shipments of thiopental, and, based on plaintiffs'

meager showing, even less likely that even if imported thiopental were used, it would result in

anesthesia awareness.  As these developments reflect, plaintiffs have not shown an imminent

particularized injury required under the standing doctrine "to reduce the possibility that a court

might unconstitutionally render an advisory opinion by 'deciding a case in which no injury would

have occurred at all.'"  *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996)

(quoting *Lujan*, 504 U.S. at 564 n.2).  Plaintiffs' claim of "risk of injury" rests on speculation and

unsupported conjecture, not facts.

     Rather than attempt to bolster the weak factual basis for their standing claim, plaintiffs

now claim that FDA misunderstood their claim.  Pls' Reply Mem., at 37-38.  Plaintiffs now

assert that they are not claiming "the reality of anesthesia awareness," but instead the "relatively

higher risk that they will suffer pain" if imported thiopental is used instead of an FDA-approved

anesthetic.  *Id.* at 38.  This recent "clarification" does not help their case, however, because

plaintiffs' standing theory is unsupported by credible evidence and does not establish "a

substantial probability of harm" as required by *Public Citizen v. NHTSA*, 513 F.3d at 237.

     Plaintiffs assert that, because the FDCA is intended to protect the public health through

the drug approval process, they may rely on a "[s]tatutory presumption of risk" to establish injury

without any factual showing of likely injury.  Pls' Reply Mem., at 34.  Plaintiffs assert that an

unapproved drug from a foreign source is *riskier* that an approved drug from an domestic source

"as a matter of law" because the FDCA is intended to protect public health through the drug

---

[6]*See* http://www.latimes.com/news/local/la-me-0504-executions-20110504,0,7815958.story.

approval system, and that "greater risk" establishes injury-in-fact.  *Id*. at 34.  Plaintiffs are wrong.

They are not entitled, particularly on summary judgment, to replace the requirements of a

"concrete and particularized" "actual or imminent" injury, *Lujan*, 504 U.S. at 560, with a

"[s]tatutory presumption of risk," Pls' Reply Mem., at 34.  Indeed, in *Public Citizen v. NHTSA*,

the D.C. Circuit explicitly "reject[ed]" the viability of any theory of injury based merely on "'a

greater risk' rather than 'an actual incidence' of harm."  489 F.3d at 1297.  The court explained

that, for purposes of standing, "the mere increased risk of some event occurring is utterly abstract

– not concrete, direct, real, and palpable."  *Id*.   The court continued, that if increased risk by

itself were deemed sufficient for injury-in-fact, "possible future injuries, whether or not they are

imminent, would magically become concrete, particularized, and actual injuries merely because

they *could* occur.  That makes no sense, except as a creative way to end-run the Supreme Court's

standing precedents. We decline to circumvent well-established standing law in this fashion."  *Id*.

at 1298.

    The cases upon which plaintiffs rely either do not support their argument, or they are

incompatible with the governing holdings of the Supreme Court and D.C. Circuit.  Plaintiffs rely

on the Second Circuit's decision in *Baur v. Veneman* in which the court stated that, at the motion

to dismiss stage of proceedings, allegations of exposure to potentially harmful products stated a

standing injury in the context of a suit based on a public health statute.  352 F.3d 625, 634 (2d

Cir. 2003).  Whether or not this part of the holding accurately states the law in this Circuit,[7] the

---

[7]In 2006, the D.C. Circuit stated that it had not fully resolved the question whether standing can be established through an enhanced risk claim, and cited *Baur* as representing one side of a conflict among circuits.  *See Va. State Corp. Comm'n v. FERC*, 468 F.3d 845, 848 (D.C. Cir. 2006).  The D.C. Circuit then developed its own test in 2007 and 2008 in the *Public Citizen, Inc. v. NHTSA* cases.

court's later discussion *supports FDA's position* on standing.  The court explained that its recognition that a plaintiff could establish standing through an enhanced risk claim was a "threshold determination."  *Id.* at 636.  Even at the pleading stage, the plaintiff was required to allege "a direct risk of harm which rises above mere conjecture" and a "credible threat of harm." *Id.* at 636-37; *see also Korsinsky v. EPA*, 05 Civ.  859, 2005 U.S. Dist. LEXIS 21778, at *7-8 (S.D.N.Y. Sept. 28, 2005) (plaintiff's increased risk allegations fail to meet standard articulated in *Baur v. Veneman* because they are "hypothetical and conjectural [rather] than . . . actual or imminent").  The court further explained that at the summary judgment stage, plaintiff would be expected to "present a full factual record to meet their burden of establishing standing," such as "specific statistical evidence of enhanced risk."  *Baur*, 352 F.3d at 642.  Plaintiffs (at the summary judgment stage) have failed to satisfy the standard in *Baur* because they have not established a credible threat of harm that rises above mere conjecture, and have not even attempted to present any factual record such as statistical evidence of enhanced risk.

Plaintiffs also rely on *Stauber v. Shalala*, 895 F. Supp. 1178 (W.D. Wis. 1995).  The court there determined that because the FDCA is a public health and safety statute, FDA's failure to follow the requirements of that act increased the risk of potential harm to consumers. *Id.* at 1187-88.  Even after recognizing that "[a]t the summary judgment stage, standing requires 'a factual showing of perceptible harm,'" *id.* at 1187 (citing *Lujan*, 504 U.S. at 566), the court held that the allegation that FDA violated the FDCA, by itself, would be sufficient to satisfy the requirements for standing on summary judgment.  *Id.* at 1187-88.

*Stauber* is incompatible with *Public Citizen v. NHTSA* and is contrary to the law in this Circuit.  *Public Citizen v. NHTSA* also involved a public safety statute: "Federal highway safety

laws aim to 'reduce traffic accidents and deaths and injuries' to persons 'resulting from traffic accidents.'" *Public Citizen v. NHTSA*, 489 F.3d at 1284 (quoting 49 U.S.C. § 30101).  But the court did not permit Public Citizen to rely on a mere allegation that NHTSA had violated a law designed to protect public safety.  In the first D.C. Circuit decision in the case, the court directed Public Citizen to file documentary evidence to establish the requirements of the court's standing test "sufficient to take a suit out of the category of the hypothetical."  *Id*. at 1296-97  (internal quotation omitted).  After Public Citizen submitted an affidavit from a statistician that the court found insufficient, the court dismissed Public Citizen's petition for failing to meet its burden to demonstrate injury-in-fact.  513 F.3d at 241.[8]

  **B.**  **Plaintiffs have not established a substantial probability that FDA's actions will cause them injury.**

   Plaintiffs also fail to establish the causal connection between FDA's release of thiopental and the alleged injury by ruling out plausible intervening causes such as the administration of the anesthesia by non-medical personnel.  *See* Defs' Opening Mem., at 29-31.  To have standing, plaintiffs must demonstrate that their injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result[] [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).

   FDA's opening brief explained that, in surgical and diagnostic procedures outside the

---

  [8]Plaintiffs also cite *Pub. Citizen v. Foreman*, 631 F.2d 969, 974 n.12 (D.C. Cir. 1980) in support of their statutory presumption argument, Pls' Reply Mem., at 34-35, but the court there found that economic injury provided injury-in-fact.  To the extent that that cryptic standing discussion could be construed as supporting plaintiffs' "statutory presumption" theory, it is inconsistent with the more recent and controlling decisions in *Pub. Citizen v. NHTSA*.

lethal execution setting, trained and licensed anesthesiologists generally administer thiopental, and take a variety of steps to significantly decrease the risk of anesthesia awareness. Defs' Opening Mem., at 29-30. For lethal injections, however, medical professionals do not administer thiopental. *Id.* at 30 (citing *Baze v. Rees*, 553 U.S. 35, 64-67 (2008)); *see also* State of California San Quentin Operational Procedure No. 0-770: Execution by Lethal Injection, at 7-13 (describing required qualifications and training for lethal injection team members).[9] Plaintiffs have not produced any evidence to show that it is substantially probable that any reported or alleged problems with anesthetization in the execution setting have been caused by FDA's decisions not to refuse admission to imports of thiopental as opposed to improper administration of anesthesia by persons who are not anesthesiologists. Plaintiffs attempt to brush aside FDA's causation argument as "unserious." Pls' Reply Mem., at 37. They instead urge the Court to apply "black letter law" for proximate cause in tort law. *Id.* But that is not the correct standard for standing, and plaintiffs cite no case analyzing standing using their tort theory. *See* Pls' Reply Mem., at 37 (citing Judge Wald's concurring opinion in a Federal Tort Claims Act case, *Beattie v. United States*, 756 F.2d 91, 136 (D.C. Cir. 1984)).[10] Instead, the standing causation prong "examines whether it is <u>substantially probable</u> . . . that the challenged <u>acts of the defendant, not of some absent third party</u>" caused the injury. *Fla. Audubon Soc'*y, 94 F.3d at 663 (emphasis added). The fact that FDA has the authority to refuse to admit foreign thiopental into the United States

---

[9]*Available at* http://www.cdcr.ca.gov/News/2007_Press_Releases/docs/RevisedProtocol.pdf.

[10]The Supreme Court recently observed that "proximate cause" is "a term notoriously confusing" given "the lack of consensus on any one definition." *CSX Transp., Inc. v. McBride*, – S.Ct. –, N. 10-235, 2011 WL 2472795, at *10 (June 23, 2011).

and did not exercise that authority, is not in itself sufficient to show that FDA's conduct has caused or will cause plaintiffs' injury.

Plaintiffs also suggest that FDA is the "but for" cause of any injury because, if FDA had refused to admit the shipments into the United States, the "illegal drug would not be in the country." Pls' Reply Mem., at 38. But, if the cause of any future injury were the improper administration of anesthesia – an explanation not rebutted by plaintiffs – and not the product itself, FDA's import decision would be immaterial to the alleged injury. Plaintiffs have not shown that it is substantially probable that FDA's decision will cause them injury, rather than their injury being caused by "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560; *Florida Audubon Soc'y*, 94 F.3d at 663-64.

## II.   *Heckler v. Chaney* bars judicial review of FDA's decision not to refuse admission to thiopental imports.

### A.   FDA's decision not to enforce Section 381(a) as to imported thiopental is presumed to be unreviewable.

The proper starting point for the Court's analysis of an agency non-enforcement decision is *Heckler v. Chaney* – not plaintiffs' generic statutory construction maxims, *see* Pls' Reply Mem., at 8. *Chaney* holds that "an agency's decision not to take enforcement action should be presumed immune from judicial review under [5 U.S.C.] § 701(a)(2)." *Chaney*, 470 U.S. at 832 (emphasis added); *see* Defs' Opening Mem., at 13-17.

Plaintiffs first seek to avoid *Chaney*'s presumption of non-reviewability by asserting that it applies only to "a decision whether to initiate judicial proceedings in an attempt to penalize a potential violator." Pls' Reply Mem., at 27. Plaintiffs' novel suggestion finds no support in *Chaney*, nor do they cite any case that has applied such a limitation. On the contrary, both before

11

and since *Chaney*, courts repeatedly have declined to review agency non-enforcement decisions that do not involve "whether to initiate judicial proceedings . . . [against] a potential violator," Pls' Reply Mem., at 27, as the cases cited in the footnote below demonstrate.[11]

Plaintiffs' second argument to skirt the *Chaney* presumption is equally unfounded.  They assert that "even if Section [381(a)] determinations were analogous to enforcement decisions," the *Chaney* non-reviewability presumption "does not apply when, as here, the agency has commenced enforcement but failed to see its effort through."  Pls' Reply Mem., at 29.  Plaintiffs cite *Allergan, Inc. v. Shalala*, Civ. No. 94-1223 (HHG), 1994 U.S. Dist. LEXIS 21716 (D.D.C. Nov. 10, 1994), in which the court declined to apply the *Chaney* presumption where FDA had

---

[11]*See, e.g.*, *Balt. Gas and Elec. Co. v. FERC*, 252 F.3d 456, 458 (D.C. Cir. 2001) (agency's decision to settle enforcement action "falls squarely within the *Chaney* presumption")*; California v. United States*, 104 F.3d 1086, 1094 (9th Cir. 1997) (declining to review the Attorney General's failure to take into custody any alien convicted of an aggravated felony upon release of the alien from state custody or supervision); *Coker v. Sullivan*, 902 F.2d 84, 88-89 (D.C. Cir. 1990) (declining to review agency's failure to monitor and withhold funding from state aid programs); *Dubois v. Thomas*, 820 F.2d 943, 948-51 (8th Cir. 1987) (declining to review EPA's failure to either issue a compliance order (*i.e.* an administrative action) or commence a civil action)); *Falkowski v. EEOC*, 764 F.2d 907, 911 (D.C. Cir. 1985) (declining to review the Department of Justice's denial of an EEOC employee's request for counsel); *City of Seabrook v. Costle*, 659 F.2d 1371, 1375 (5th Cir. 1981) (declining to review EPA's failure to provide notifications specified in the Clean Air Act); *Kixmiller v. SEC*, 492 F.2d 641, 645 (D.C. Cir. 1974) ("[A]n agency's decision to refrain from an investigation . . . is generally unreviewable"); *K&K Merch. Group, Inc. v. Shalala*, No. 95 CIV. 10082 (RPP), 1996 WL 183023, at *8 (S.D.N.Y. Apr. 17, 1996) (recognizing that FDA's decision not to refuse admission to imported articles was unreviewable under *Chaney*).  More broadly, courts have found agency decisions "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2), and thus unreviewable, in a variety of contexts.  *See, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 191-93 (1993) (decision to discontinue allotment of program funds); *Webster v. Doe*, 486 U.S. 592, 599-601 (1988) (decisions regarding employee termination); *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 280-82 (1987) (agency refusal to reconsider its decision); *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 405-06 (D.C. Cir. 1990) (decision to close military bases)*; Dina v. Attorney Gen.*, 793 F.2d 473, 476 (2d Cir. 1986) (decision regarding waiver of residency requirement related to immigration status).

issued Warning Letters that the court found to be "definitive steps taken toward procuring compliance with the FD&C Act." *Id*. at *7.   The Warning Letters stated that the recipients "were in 'serious violation' of the FD&C Act because they were selling unapproved new drugs . . . and that failure to comply with FDA regulations could result in either seizure of the products and/or injunction." *Id*. at *2.   The court declined to apply the *Chaney* presumption upon concluding that "before the Court is not an agency's refusal to take enforcement action, but rather an agency's refusal to continue or complete such an action, and indeed to proceed against some but not other similarly situated entities." *Id*. at *7.

Assuming, without conceding, that *Allergan* is a correct reading of *Chaney*, it does not help plaintiffs in this case.   Here, FDA has taken no definitive steps to secure compliance. Indeed, plaintiffs' complaint is that FDA refused to take such a step.   *See* Pls' Mem. in Supp. of Mot. for Summ. J. and Decl. Relief ("Pls' Opening Mem."), at 2 ("Defendants . . . were required to refuse admission of foreign thiopental into the United States . . . . Instead, they did precisely the opposite.").   Nor has FDA initiated a step that it refused to continue or complete.   Again, plaintiffs' argument is that FDA finally (and wrongly) decided not to stop importation.   *Id*.   FDA issued no Warning Letter and took no other enforcement action.

Plaintiffs' cases involving judicial review of agency adjudications are misplaced, *see* Pls' Reply Mem., at 29.   Plaintiffs cite, for example, *MCI Telecomms. Corp. v. FCC*, 917 F.2d 30, 41-42 (D.C. Cir. 1990), which held that in an FCC adjudication of tariffs, the agency was required to "reach the issues it designated for investigation unless it provides an adequate explanation for not doing so."   Plaintiffs also cite *Port of Seattle v. FERC*, 499 F.3d 1016, 1027 (9th Cir. 2007), in which the Federal Energy Regulatory Commission argued that the agency's decision following

an adjudication was unreviewable under *Chaney*, but the Ninth Circuit disagreed, holding that the record of the adjudication provided a sufficient basis for judicial review.  Neither case is on point:  no agency adjudication is at issue here, and plaintiffs do not claim that an FDA decision following a hearing failed to address issues that were presented at the hearing.

      **B.**      **Plaintiffs fail to rebut the *Chaney* presumption of non-reviewability.**

*Chaney* presumes that an agency's non-enforcement decision is unreviewable because "a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Chaney*, 470 U.S. at 830.  That presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  *Id*. at 832-33.

Section 381(a) does not, contrary to plaintiffs' assertions, provide sufficient "guidelines" to rebut the *Chaney* non-reviewability presumption.  *See* Reply Mem., at 30.  Section 381(a) is not the mechanical "if/then proposition" that plaintiffs claim, *see* Pls' Reply Mem., at 13, and therefore cannot provide the "meaningful standard against which to judge the agency's exercise of discretion" that is needed to rebut the *Chaney* presumption of non-reviewability.  Courts repeatedly have recognized that the "shall be refused admission" language in Section 381(a), and similar language in other statutes, is not mandatory and does not bar agencies from exercising enforcement discretion.  *See* Defs' Opening Mem., at 18-23 (citing cases).

For example, in *United States v. Food, 2,998 Cases*, 64 F.3d 984 (5th Cir. 1995), the Fifth Circuit rejected the mandatory reading of "shall be refused admission" that plaintiffs claim is "*compelled*" by the words of the statute alone.  Pls' Reply Mem., at 2.  There, FDA had detained two shipments of mushrooms pursuant to Section 381(a).  *2,998 Cases*, 64 F.3d at 986-

14

87.  Upon finding staphylocal enterotoxin contamination in mushrooms from the same source,

FDA decided to seek seizure and condemnation of the shipments under 21 U.S.C. § 334(a),

rather than allow re-export of the goods under Section 381(a).  *Id.* at 987.  In arguing that FDA

had improperly denied the opportunity to re-export, the importer made the same argument that

plaintiffs now advance: "the express language of § 381 mandates that adulterated goods being

imported or offered for import . . . *shall* be refused admission.  Once admission is refused, [the

importer] argues, § 381 grants the importer an unqualified right to reexport the goods within

ninety days of this refusal."  *Id.* at 990 n.11 (emphasis in original).  The Fifth Circuit rejected the

importer's argument that Section 381's terms are mandatory, holding that FDA had the option to

forgo refusal of admission under Section 381 and initiate a seizure and condemnation action

instead, under Section 334.  *Id.* at 992-93.  The Fifth Circuit thus held that in Section 381(a),

"shall be refused admission" is not mandatory.

Likewise, the Southern District of New York also rejected plaintiffs' mandatory

interpretation of "shall be refused admission" in *K&K Merch. Group, Inc. v. Shalala*, 1996 WL

183023 (S.D.N.Y. Apr. 17, 1996).  That case involved 21 U.S.C. § 360mm(a), a provision of the

Act that is directly analogous to 21 U.S.C. § 381(a).  *Id.* at *1.  Like Section 381(a), Section

360mm(a) provides that certain imported goods, electronic devices that fail to comply with FDA-

prescribed performance standards, "shall be refused admission."  21 U.S.C. § 360mm(a).  In

*K&K*, an importer of "multisystem" television sets challenged FDA's application of certain

performance standards to such products, in a departure from the agency's prior policy of allowing

the import of some multi-systems for ultimate export.  *Id.* at *1-3.  The court dismissed

plaintiff's claims for lack of standing.  *Id.* at *7-8.  In its discussion, the court observed that

FDA's prior policy of allowing such imports, rather than refusing admission under Section

360mm(a), constituted an exercise of FDA's enforcement discretion that *Chaney* rendered

unreviewable:

> The fact that FDA allowed these multisystems to be imported and sold in the
> United States . . . [was] merely a discretionary determination that FDA's duty to
> enforce federal performance standards for radiation under § 360kk(a)(1) would
> not be enforced against products that are not dangerous to the public health.  In
> this respect, the Compliance Program is more akin to an exercise of prosecutorial
> discretion than to a statutorily mandated exemption.  Agency prosecutorial
> discretion is generally considered 'committed to agency discretion by law' under
> the [APA] and, therefore, beyond the scope of judicial review.  *See Heckler v.
> Chaney*, 470 U.S. 821, 831 (1985).

*Id*. at *8.[12]

The district court in the Eastern District of Pennsylvania also held that FDA's decision to

refuse admission under 21 U.S.C. § 381(a) was an exercise of discretion, rather than a statutory

obligation.  *Balmaceda v. United States*, 815 F. Supp. 823, 827 (E.D. Pa. 1992) (dismissing a

Federal Tort Claims Act suit under the discretionary function exception).  The court reasoned,

"[FDA] had the discretion to test the fruit and determine whether the fruit was adulterated.  It

also had the discretion to refuse entry into the United States . . . . All the acts involved judgment

and choice and were grounded in policy."  *Id*. (emphasis added).

Indeed, the FDCA is not the only statute for which courts have found that "shall" is not

mandatory in the context of administrative enforcement of "the sort of 'if/then' proposition found

in Section [381](a)," Pls' Reply Mem., at 13.  For example, the court in *United States v. Shelton

Wholesale, Inc.*, No. 96-6131-CV-SJ-6, 97-6021-CV-SJ-4-6, 1998 WL 251273, at *6 (W.D. Mo.

---

[12]The above-quoted passage contradicts plaintiffs' assertion that "the [*K&K*] court
nowhere suggested that the statutory phrase 'shall be refused admission' does not mean what it
says."  Pls' Reply Mem., at 11.

Apr. 28, 1998), found that the Consumer Product Safety Commission ("CPSC") properly could exercise enforcement discretion to refuse admission under a provision of the Federal Hazardous Substances Act ("FHSA") that mirrors 21 U.S.C. § 381(a) (including the "shall be refused admission" language).[13]   There, the CPSC had not refused admission to certain products as to which the agency later sought injunctive relief. *Shelton*, 1998 WL 251273, at *6. The defendant argued that because the CPSC had not refused admission to those products, they were "obviously not banned hazardous substances." *Id*. The *Shelton* court disagreed, holding that the CPSC's decision not to refuse admission was an exercise of enforcement discretion that did not bar any subsequent enforcement action. The court concluded that "[a] certain amount of agency discretion in handling what it determines to constitute 'minor' or less serious violations seems both necessary and appropriate, and is not at odds with the Congressional policies underlying the FHSA." *Id*. The court thus necessarily recognized that "shall be refused admission" was not mandatory in a provision virtually identical to Section 381(a).

Courts have held that "shall" is not mandatory in cases where agencies have exercised enforcement discretion. The statute at issue in *Dubois v. Thomas*, 820 F.2d 943 (8th Cir. 1987), provides that upon finding a violation of a statutory permit requirement, EPA "shall issue an

---

[13]The statute at issue in *Shelton*, 15 U.S.C. § 1273(a), provides in relevant part as follows:

> The Secretary of the Treasury shall deliver to the [CPSC], upon its request, samples of hazardous substances which are being imported or offered for import into the United States . . . If it appears from the examination of such samples or otherwise that such hazardous substance is a misbranded hazardous substance or banned hazardous substance ..., then such hazardous substance shall be refused admission, except as provided in subsection (b) of this section.

15 U.S.C. § 1273(a) (emphasis added).

order requiring such person to comply with such section . . ., or he [the EPA Administrator] shall bring a civil action in accordance with subsection (b) of this section." *Id.* at 946 (quoting 33 U.S.C. § 1319(a)(3)).  The Eighth Circuit held "inescapable" the conclusion "that the duties imposed by the statute must be viewed as discretionary" under *Chaney*, granting deference to EPA's interpretation of the statute under *Chevron*, 467 U.S. 837.  *See Dubois*, 820 F.2d at 946-51.

The Fifth Circuit found that "shall" is not mandatory in the administrative enforcement context in *City of Seabrook v. Costle*, 659 F.2d 1371 (5th Cir. 1981).  The court held that the Clean Air Act , which provides that upon finding violations, the EPA Administrator "shall... notify the person in violation of the plan and the State in which the plan applies" or "shall notify the State," did not impose mandatory duties on the agency.  *Id.* at 1373-75 (quoting 42 U.S.C. § 7413).  *See also United States v. Clarke*, 628 F. Supp. 2d 1, 10 (D.D.C. 2009) (holding that language in 8 U.S.C. § 1451(a) providing that "[i]t shall be the duty of the United States attorneys . . . to institute [citizenship revocation] proceedings" does not impose a mandatory duty).

The consensus among the Courts of Appeals and district courts that "shall" is not mandatory in the context of enforcement discretion is consistent with the Supreme Court's guidance.  In *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748 (2005), the Court held that a person who had obtained a restraining order lacked a due process right to have the police enforce that order when they have probable cause to believe it has been violated.  The restraining order used the word "shall" in directing law enforcement officials as follows:

You <u>shall</u> use every reasonable means to enforce this restraining order.  You <u>shall</u>

18

arrest, or, if an arrest would be impractical under the circumstances, seek a
warrant for the arrest of the restrained person when you have information
amounting to probable cause that the restrained person has violated or attempted
to violate any provision of this order . . . .

*Id.* at 752 (emphasis added).

In holding that enforcement of the restraining order was not mandatory, the Court relied

upon "[a] well-established tradition of police discretion [that] has long coexisted with apparently

mandatory arrest statutes." *Id.* at 760. The Court recognized "[t]he deep-rooted nature of law-

enforcement discretion, even in the presence of seemingly mandatory legislative commands." *Id.*

at 761. *See also City of Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999) (the interpretation that

an ordinance "affords the police no discretion, since it speaks with the mandatory 'shall' . . . flies

in the face of common sense that all police officers must use some discretion in deciding when

and where to enforce city ordinances.").

Given the history of enforcement discretion that the Supreme Court recognized in *Chaney*

and *Town of Castle Rock*, facially mandatory language like "shall be refused admission" is not

sufficient to overcome the *Chaney* presumption against judicial review. *Cf. Town of Castle*

*Rock*, 545 U.S. at 761 ("Against that backdrop, a true mandate of police action would require

some stronger indication from the Colorado Legislature than 'shall use every reasonable means to

enforce a restraining order' (or even 'shall arrest . . . or . . . seek a warrant')).") Like a police

officer's or prosecutor's decision not to enforce a statute, FDA's administrative enforcement

decisions cannot be reduced to an "if/then proposition," as plaintiffs claim. In deciding whether

to enforce Section 381(a), FDA conducts a "complicated balancing of a number of factors which

are peculiarly within its expertise." *Chaney*, 470 U.S. at 831. *Chaney* recognized those factors:

19

"assess[ing] whether a violation has occurred," which may involve technical and scientific issues

within FDA's expertise, "whether agency resources are best spent on this violation or another,

whether the agency is likely to succeed if it acts, whether the particular enforcement action

requested best fits within the agency's overall policies, and, indeed, whether the agency has

enough resources to undertake the action at all."  *Id.*

Section 381(a) thus provides insufficient guidance for the Court to assess FDA's decision

to refuse admission to one product that appears to be in violation of the Act, but not refuse

admission to another product that also appears to be in violation of the Act.  *See Clarke v.

Holder*, No. 09-0753 (JDB), 2011 WL 1045543, at *6 (D.D.C. Mar. 23, 2011) (holding that 8

U.S.C. § 1451 fails to rebut the *Chaney* non-reviewability presumption where it "offers no

guidelines for assessing when the United States should pursue one denaturalization matter over

another.").[14]

In reciting the mantra that "shall means shall," plaintiffs rely upon generic statutory

interpretation cases that have nothing to do with an agency's decision not to take enforcement

action and thus are not relevant here.[15]  Plaintiffs also seek to infer Congress's original intent as

---

[14]*Clarke* also rebuts plaintiffs' argument that the existence of exceptions to Section 381(a) precludes a finding that FDA has enforcement discretion.  *See* Pls' Reply Mem., at 7.  *Clarke* held that even where a statute includes exceptions, the relevant inquiry is whether those exceptions provide the needed guidance as to when to pursue one enforcement case instead of another.  *Clarke,* 2011 WL 1045543, at *6 ("The rationale behind the *Heckler v. Chaney* presumption of unreviewability is fully applicable in the absence of such guidelines.").  Plaintiffs identify no exception to Section 381(a) that provides such guidance.  *See* Pls' Reply Mem., at 7.

[15]*See* Pls' Reply Mem., at 7-9 (citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661-62 (2007) (interpreting a statute requiring EPA approval of an application to transfer permitting power under the Clean Water Act to state authorities); *Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 321 (D.C. Cir. 2003) (interpreting a National Labor Relations Act provision requiring advance notice of a strike); *Ass'n of Civilian*

to the meaning of "shall be refused admission" in Section 381(a) (enacted in 1938) from the

presence of "may be refused admission" in Section 381(o) (enacted in 2002).[16]  *See* Pls' Reply

Mem., at 6; Food, Drug, and Cosmetic Act, ch. 675, sec. 801, Pub. L. No. 75-717, 52 Stat. 1040,

1058 (1938); Pub. Health Sec. & Bioterrorism Preparedness & Response Act of 2002, Pub. L.

No. 107-188, § 321(b)(1), 116 Stat. 594, 676 (2002).  But the intent of the 1938 Congress as to

whether "shall be refused admission" is mandatory cannot reasonably be inferred from the

language of a statute enacted 64 years later.  *See Erlenbaugh v. United States*, 409 U.S. 239, 243-

44 (1972) (the principle that "a legislative body generally uses a particular word with a consistent

meaning in a given context . . . makes the most sense when the statutes were enacted by the same

legislative body at the same time."); *United States v. Sw. Cable Co.*, 392 U.S. 157, 170 (1968)

("[T]he views of one Congress as to the construction of a statute adopted many years before by

another Congress have very little, if any, significance.") (internal quotation marks omitted);

*European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 136 (2d Cir. 2004) ("[E]xpressions of

legislative intent made years after the statute's initial enactment are entitled to limited weight

under any circumstances . . ."), *vacated and remanded on other grounds*, 544 U.S. 1012 (2005),

---

*Technicians v. Fed. Labor Relations Auth.*, 22 F.3d 1150, 1152-53 (D.C. Cir. 1994) (interpreting
a statute requiring agency approval of a collective bargaining agreement); *L&M Indus., Inc. v.
Kenter*, 458 F.2d 968, 971 (2d Cir. 1972) (interpreting the requirement in Section 381(a) and a
corresponding regulation that FDA provide the owner or consignee with written notice of the
reasons why an article may be subject to refusal of admission).

[16]The "shall" language in Section 381(a) in fact derives from the Act's predecessor
statutes.  *See* Drug Importation Act of 1848, ch. 70, sec. 3, 9 Stat. 237, 238 (1848) (providing
that articles that are "found, in the opinion of the examiner, to be . . . adulterated . . . shall not
pass the custom-house"); Pure Food and Drug Act of 1906, ch. 3915, sec. 11, 34 Stat. 768, 772
(1906) (providing that articles of food and drug that "appear . . . adulterated or misbranded . . .
shall be refused admission").

reinstated, 424 F.3d 175 (2d Cir. 2005); *Mattox v. FTC*, 752 F.2d 116, 122 (5th Cir.1985)

(refusing to apply an identical interpretation to two statutory provisions enacted 62 years apart).

Finally, plaintiffs rely upon a flawed analogy of Section 381(a) to the statute at issue in

*Dunlop v. Bachowski*, 421 U.S. 560 (1975), which *Chaney* cited as a statute that "quite clearly

withdrew discretion from the agency and provided guidelines for exercise of its enforcement

power."  *Chaney*, 470 U.S. at 834; *see* Pls' Reply Mem., at 11.  The relevant provision of the

Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 482,

establishes a procedure for a member of a labor organization to file a complaint with the

Secretary of Labor challenging a union election, and further provides that:

> The Secretary shall investigate such complaint and, <u>if he finds probable cause to
> believe that a violation of this subchapter has occurred and has not been remedied,
> he shall . . bring a civil action against the labor organization</u> . . . to set aside the
> invalid election, if any, and to direct the conduct of an election or hearing and vote
> upon the removal of officers under the supervision of the Secretary . . . .

29 U.S.C. § 482(b) (emphasis added); *see Dunlop*, 421 U.S. at 563 n.2.

This LMRDA provision differs from Section 801(a) in two material ways.  First, the

LMRDA requires a strict threshold determination that weeds out frivolous, unsupported, and

weakly supported claims:  the Department of Labor ("DOL") must file a civil action only if it

finds "<u>probable cause</u> to believe that a violation . . . has occurred and has not been remedied," in

the conduct of a union election.  29 U.S.C. § 482(b) (emphasis added).  Second, the DOL's

compliance with that provision is readily reviewable because the trigger for the requirement that

the DOL file suit is the agency's finding of probable cause, rather than the actual existence of

probable cause.  The LMRDA's combination of a judicially familiar evidentiary threshold for

filing suit with a readily reviewable standard for determining whether the trigger has been

satisfied, supports *Chaney*'s conclusion that the statutory language "quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." *Chaney*, 470 U.S. at 834.

Section 381(a) presents precisely the opposite situation:  the "if" clause may be satisfied upon a less rigorous showing than "probable cause," and the trigger is more challenging for courts to review than the corresponding LMRDA provision.  In place of a "probable cause" standard, Section 381(a) provides that an imported article "shall be refused admission," except as provided in Section 381(b), "[i]f it appears from the examination of such samples or otherwise that":

> (1) such article has been manufactured, processed, or packed under insanitary conditions or, in the case of a device, the methods used in, or the facilities or controls used for, the manufacture, packing, storage, or installation of the device do not conform to the requirements of section 360j(f) of this title, or
>
> (2) such article is forbidden or restricted in sale in the country in which it was produced or from which it was exported, or
>
> (3) such article is adulterated, misbranded, or in violation of section 355 of this title, or prohibited from introduction or delivery for introduction into interstate commerce under section 331 (ll) of this title, or
>
> (4) the recordkeeping requirements under section 2223 of this title . . . have not been complied with regarding such article . . .

21 U.S.C. § 381(a) (emphasis added).

Because Section 381(a)'s "appearance" standard may be satisfied on less evidence than the LMRDA's "probable cause" standard, it is more likely that FDA will need enforcement discretion to prevent its resources from being taxed by a mandatory reading of "shall be refused admission."  Unlike the LMRDA, therefore, the language of Section 381(a) provides no indication that Congress intended to "clearly withdr[a]w discretion from the agency." *Chaney*,

470 U.S. at 834.[17]  Nor does Section 381(a) indicate an intent to deny FDA enforcement

discretion only in cases where, as here, it is undisputed that the "appearance" standard is

satisfied.  Even in such cases, the "appearance" standard will have been satisfied more readily

and more frequently than the LMRDA's stricter "probable cause" standard, requiring FDA to

undergo a  "complicated balancing of a number of factors," *see Chaney*, 470 U.S. at 831, in

deciding how to allocate its limited enforcement resources.

      Moreover, the Supreme Court's 2005 decision in *Town of Castle Rock* calls into question

whether the LMRDA remains an example of a statute that "quite clearly withdrew discretion

from the agency and provided guidelines for the exercise of its enforcement power."  *Chaney*,

470 U.S. at 834.  The *Dunlop* and *Chaney* Courts' conclusion that the LMRDA's terms are

mandatory appears inconsistent with *Castle Rock*'s holding that "[a]gainst th[e] backdrop" of a

long-established history of enforcement discretion, a "true [legislative] mandate . . . would

require some stronger indication from the [legislature] than 'shall . . .'"  *Town of Castle Rock*,

545 U.S. at 761; *see also Clarke*, 628 F. Supp. 2d at 11 (citing *Town of Castle Rock*).

      Indeed, courts rarely apply *Dunlop* to statutes other than the LMRDA in finding the

---

[17]In addition, a mandatory reading of the LMRDA imposes fewer demands on agency
resources than a mandatory reading of Section 381(a).  In 2010, the Department of Labor
("DOL") conducted 145 election investigations, obtained 23 voluntary compliance agreements,
and filed 8 lawsuits pursuant to the LMRDA provision at issue in *Dunlop*.  *See* Office of Labor-
Management Standards, 2010 Annual Report, available at
http://www.dol.gov/olms/regs/compliance/highlights_10.htm.  By contrast, 21.1 million lines of products
within FDA's jurisdiction were offered for import that year.  *See* Defs' Opening Mem., at 44.
The massive and growing number of imports requires FDA to prioritize its limited resources by
exercising enforcement discretion as to admissibility decisions.  *See generally* Pathway to Global
Product Safety and Quality, at 1 ("FDA-regulated products account for about 10% of all imports
into the U.S., arriving from more than 300,000 facilities in 150 different countries.  The growth
in imports has been rapid—and promises to accelerate."), *available at*
http://www.fda.gov/downloads/AboutFDA/CentersOffices/OC/GlobalProductPathway/UCM259845.pdf.

*Chaney* non-reviewability presumption to be overcome, and apparently have not done so in nearly 15 years.  Moreover, as discussed above, courts have applied the *Chaney* non-reviewability presumption to facially mandatory statutory provisions.  *See, e.g.*, *Dubois*, 820 F.2d at 950-51; *Clarke*, 2011 WL 1045543, at *6-8; *K&K*, 1996 WL 183023, at *8.

As evidence that FDA's exercise of enforcement discretion under Section 381(a) is consistent with legislative intent, FDA explained that the enactment of 21 U.S.C. § 384 in 2000 and subsequent amendment of that provision in 2003, "ratified FDA's exercise of enforcement discretion under the agency's personal use policy."  Defs' Opening Mem., at 23.  Plaintiffs contend that the enactment of Section 384 instead "show[s] that FDA did not and does not have some broader power to depart from the plain, mandatory terms of Section [381](a)," because Section 384 would not have been necessary if FDA in fact had enforcement discretion.  Pls' Reply Mem., at 17.

The legislative history is fatal to plaintiffs' argument that Section 384 establishes FDA's lack of enforcement discretion.  *Congress fully recognized FDA's pre-existing enforcement discretion under Section 381(a) when it enacted Section 384*.  Over more than a decade prior to the 2003 enactment of Section 384, members of Congress referred to FDA's enforcement discretion under Section 381(a).  During the 1992 debate about whether to lift an import alert for the drug RU-486, Senator Cranston described FDA's policy "for many years" of exercising enforcement discretion under Section 381(a) for personal imports:

> Strictly interpreted, the Federal Food, Drug and Cosmetic Act prohibits the importation and distribution in interstate commerce of drugs that have not been approved by the FDA.  However, for many years, the FDA has exercised its enforcement discretion to allow the importation of small amounts of such drugs

25

> <u>for personal use</u> provided they do not pose unreasonable or significant safety risks
> and are not intended for resale or commercial distribution.

138 Cong. Rec.  3,517, 3,601 (1992) (statement of Sen. Cranston) (emphasis added).

Similarly, during the debate on the 2003 bill that became Section 384, Senator Kyl

explained FDA's existing practice of exercising enforcement discretion under Section 381(a) as

to personal imports:

> FDA has a written policy under which it permits an individual to import a small
> quantity of a prescription drug for personal use, but only if the drug is not
> available in the United States.  This policy is intended to allow seriously ill
> patients to obtain unapproved drugs to treat potentially life-threatening and similar
> conditions for which adequate treatment is unavailable in the United States . . .
> <u>[E]ven importation within the four corners of this policy remains technically</u>
> <u>illegal; the policy represents only a reasonable and limited exercise of FDA's</u>
> <u>enforcement discretion</u> in the interest of individual patient treatment.

149 Cong. Rec.  31,121, 31,212 (2003) (statement of Sen. Kyl) (emphasis added).

Congress thus recognized FDA's pre-existing enforcement discretion, and enacted

Section 384(j)(1) ("Declarations") to guide FDA's exercise of such discretion in the context of

personal imports.  The purpose of Section 384(j)(2) ("Waiver authority") and (j)(3) ("Drugs

imported from Canada") is to make legal (through waivers) certain importation activity that

previously was technically illegal, but subject to FDA's enforcement discretion.  The enactment

of Section 384 therefore does not, as plaintiffs argue, show that FDA previously lacked

enforcement discretion; on the contrary, it ratifies the existence of FDA's enforcement discretion.

*See, e.g., Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 849 (D.C. Cir. 2008) (holding that

the Deficit Reduction Act clarified existing Medicaid statute and ratified agency policies

regarding discretionary authority that the agency "always had"); *cf. Takazato v. Fed. Maritime

Comm'n*, 633 F.2d 1276, 1281 (9th Cir. 1980) (an agency's request for clarifying legislation

26

"was not an acknowledgment . . . that the [agency] lacked . . . power under the existing statute," and "[w]e draw no inferences from Congress's failure to enact it").

## III.   FDA's exercise of enforcement discretion did not violate the APA.

### A.   FDA's interpretations of the Act and agency regulations are entitled to deference.

Even if plaintiffs' claims were actionable, plaintiffs have failed to show that they are entitled to judgment on the merits – that FDA's actions were arbitrary and capricious or contrary to law.  *See* 5 U.S.C. § 706.  As FDA's opening brief established, to the extent there is any ambiguity in the express language of the statute, FDA's interpretations of the governing statute and its own regulations are entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

Plaintiffs argue that FDA's exercise of enforcement discretion is not entitled to *Chevron* deference because the agency's statement regarding that exercise of enforcement discretion was "gross[ly] informal[]."  Pls' Reply Mem., at 19.  As the Supreme Court has held, however, "the fact that the Agency . . . reached its interpretation through means less formal than 'notice and comment' rulemaking . . . does not automatically deprive that interpretation of the [*Chevron*] deference otherwise its due."  *Barnhart v. Walton*, 535 U.S. 212, 221 (2002).[18]

---

[18]*See also Apotex, Inc. v. FDA*, No. 06-5060, 2007 U.S. App. LEXIS 4270 (D.C. Cir. Feb. 23, 2007) ("the district judge's opinion, which grants Chevron deference to the FDA's statutory interpretation of 21 U.S.C. § 355(j)(5)(B)(iv) embodied in FDA approval letters (i.e., informal adjudications), is supported by the Supreme Court's post-*Mead* decision in *Barnhart v. Walton*, 535 U.S. 212, 222, 122 S. Ct. 1265, 152 L. Ed. 2d 330 (2002), as well as our own decision in *Mylan Laboratories, Inc. v. Thompson*, 363 U.S. App. D.C. 440, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004)"); *Mylan*, 389 F.3d at 1279-80.

Even if *Chevron* deference were not to apply here, FDA's exercise of enforcement discretion would be entitled to deference under the rule set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), as "a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Id.* at 140*; see also United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (describing "*Skidmore*'s holding that an agency's interpretation may merit some deference <u>whatever its form</u>, given the 'specialized experience and broader investigations and information' available to the agency . . . and given the value of uniformity in its administrative and judicial understandings of what a national law requires" (emphasis added)).[19]

**B.      FDA's exercise of enforcement discretion was not arbitrary and capricious.**

**1.      FDA's non-enforcement decision reflects a reasonable prioritization of the agency's limited resources.**

FDA's opening brief set forth the reasons why FDA's exercise of enforcement discretion is reasonable and not arbitrary and capricious, as plaintiffs contend.  *See* Defs' Opening Mem., at 39-42.[20]  As *Chaney* recognized, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and therefore must assess factors that include "whether agency resources are best spent on this violation or another . . . whether the particular enforcement action requested best fits within the agency's overall policies, and, indeed,

---

[19]Likewise, FDA's interpretation of its own regulations is entitled to "substantial deference," and must be upheld unless it is "plainly erroneous or inconsistent with the regulation."  *Air Transp. Ass'n of Am., Inc. v. FAA*, 291 F.3d 49, 53 (D.C. Cir. 2002) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

[20]Plaintiffs also argue that FDA acted "not in accordance with law," *see* 5 U.S.C. § 706(2)(A), an argument that relies upon their mandatory interpretation of "shall."  *See* Pls' Reply Mem., at 39.  Plaintiffs' argument lacks merit because, as discussed above, their mandatory interpretation of "shall" is inconsistent with judicial precedent and the well-established history of enforcement discretion.  *See supra*, at Section II.B.

whether the agency has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831.  Here, FDA chose to conserve its limited enforcement resources for activities related more closely to FDA's core public health mission.  Defs' Opening Mem. at 39-40.  As FDA's statement explained, the agency considers "[r]eviewing substances imported or used for the purpose of state-authorized lethal injection . . . outside of [its] explicit public health role," and prioritizes its "enforcement resources to most effectively achieve [its] statutory mission[]" to protect the public health.  AR 34-35.  Indeed, *Chaney* found it "implausible . . . that the FDA is required to exercise its enforcement power to ensure that the States only use drugs that are 'safe and effective' for human execution."  *Chaney*, 470 U.S. at 827.

Plaintiffs claim that FDA's exercise of enforcement discretion "cannot be reconciled with the agency's prior efforts to keep state and local governments from importing unapproved prescription drugs."  Pls' Reply Mem., at 41.  Plaintiffs thus ask the Court to equate a handful of thiopental imports used by correctional institutions for lethal injection with the mass importation of an indefinite number and type of prescription drugs from Canada for public distribution.  *Id.*, at 41-42, 45.  As FDA explained in its opening brief, the two situations present starkly different considerations.  In the Canadian import scenario, states would import prescription drugs from Canada in large volumes, bypassing the drug approval process set forth in the FDCA.  The volume of such imports presents a much greater threat to the integrity of the statutory drug approval process and the public health than the few thiopental imports at issue here.  *See* Defs' Opening Mem., at 42.  The dissimilar nature of the facts underscores the importance for FDA to have enforcement discretion in applying the same statute to cases that present such a significant difference in relative risk to the public health.

29

Plaintiffs also contend that FDA acted inconsistently with two regulations, 21 C.F.R. §§ 207.40(b) and 314.410(a), which set forth certain conditions under which an importer may, or may not, import drug products into the United States.[21]  *See* Pls' Reply Mem., at 41 n.9.  But, as FDA explained in its opening brief, both regulations describe the permissible conduct of importers, rather than the agency; the regulations set forth the conditions under which a drug may be "imported" and/or "offered for import," neither of which purports to proscribe FDA decisionmaking.  Neither regulation bars FDA from exercising enforcement discretion.  *See* Pls' Opening Mem., at 26-27.  Indeed, the preamble to final rule Section 314.410 expresses FDA's intent to retain enforcement discretion to admit an unapproved product.  *See* Pls' Opening Mem., at 26 n.19 (citing New Drug and Antibiotic Regulations, 50 Fed. Reg. 7,452, 7,488 (Feb. 22, 1985)).

> **2.**     **The absence of enforcement discretion would yield results that Congress could not have intended.**

---

[21] 21 C.F.R. § 207.40(b) reads, in relevant part, as follows:

> No drug may be imported or offered for import into the United States unless it is listed as required in subpart C of this part and manufactured, prepared, propagated, compounded, or processed at a registered foreign drug establishment . . . .

21 C.F.R. § 314.410(a) reads, in relevant part, as follows:

> (1) A new drug may be imported into the United States if: (i) It is the subject of an approved application under this part; or (ii) it complies with the regulations pertaining to investigational new drugs under Part 312; and it complies with the general regulations pertaining to imports under Subpart E of Part 1 . . . .

FDA's interpretation of Section 381(a) is reasonable in light of the adverse public health effects that would result should this Court prohibit enforcement discretion under that statute – results that Congress could not have intended.  *See Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 146 (D.C. Cir. 2006) ("[T]o avoid a literal interpretation . . . [the agency] must show . . . that, as a matter of logic and statutory structure, [Congress] almost surely could not have meant it." (quotation omitted)).  One such unintended effect would be the threat to the viability of FDA's drug shortage policy, under which the agency may exercise its discretion not to refuse admission to a medically necessary drug when its shortage has a significant effect on public health.  *See* Defs' Opening Mem., at 43-44.  Drug shortages may result from manufacturing and quality problems, delays, and product discontinuations.[22]  Drug shortages also may occur in a large-scale public health emergency, such as an influenza pandemic or some other chemical, biological, radiological or nuclear threat.[23]  FDA's ability to exercise enforcement discretion under Section 381(a) is an essential tool for FDA to obtain medically necessary drugs from abroad during such emergencies.  Contrary to plaintiffs' assertion, *see* Pls' Reply Mem., at 23, Section 381(d)(2) does not authorize all imports to alleviate a shortage of medically necessary drugs.  That provision only permits the re-importation of a drug "required for emergency medical care" when the drug was manufactured in the United States and then exported.  21 U.S.C. § 381(d)(2).  Plaintiffs' "shall means shall" reading would tie FDA's hands in responding to a

---

[22]*See* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/default.htm.

[23]*See* Drug Shortage Manual of Policies and Procedures, at 2, 4-5, *available at* http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/ManualofPoliciesProcedures/UCM079936.pdf; *see generally* Medical Countermeasures Initiative, *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/ScienceBoardtotheFoodandDrug Administration/UCM233216.pdf.

public health emergency by barring the agency from allowing the importation of medically necessary products manufactured overseas if FDA-approved supplies are exhausted – a result that Congress could not have intended.

In addition, without any ability to exercise enforcement discretion, FDA would be required to initiate the detention and hearing procedure for all products that appear to be in violation of the Act or otherwise subject to refusal of admission under Section 381(a) – not just drugs from unregistered foreign sources, as plaintiffs suggest.  *See* Pls' Reply Mem., at 24-25 ("[a]ll Plaintiffs seek is a return to the *status quo* [*ante*]").  The third sentence of Section 381(a) is not limited to drugs from unregistered foreign establishments in providing that FDA "shall . . . refuse[] admission" to imported articles of any type that "appear" to fit the descriptions set forth in subsections (1) through (4).  21 U.S.C. § 381(a).

The burden of initiating that procedure for all such products would far exceed the agency's limited resources.  For human drugs alone, FDA made over 400,000 decisions on import lines in fiscal year 2010, and expects to make nearly 550,000 such decisions in fiscal year 2012.[24]  For foods, FDA made over 9.7 million such decisions on import lines in fiscal year 2010, and anticipates making over 11 million such decisions in fiscal year 2012.[25]  In the absence of enforcement discretion, FDA would be required to refuse admission to all such imported articles that "appear" to fit within the criteria set forth in 21 U.S.C. §§ 381(a)(1)-(4), regardless of whether a violation may be minor, technical, or without public health consequence.  Each

---

[24]*See* 2012 FDA Budget Justification, at 385, *available at* http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Reports/BudgetReports/UCM243370.pdf.

[25]*Id.* at 383.

decision to refuse admission would require FDA to detain the article and provide an opportunity for a hearing.  *See* Defs' Opening Mem., at 46-47 (discussing FDA's detention and hearing procedure).  The burden associated with the detention-and-hearing procedure for a vast number of imports would far outweigh any burden associated with the administrative tasks required to process a thiopental import under the agency's present procedure:  reviewing documents provided by the import broker and, in the event that the shipment is destined for a correctional facility, (1) issuing a "may proceed" notice and sending a screen shot to FDA headquarters, (2) sending a letter to the correctional facility, and (3) preserving documents.  Pls' Reply Mem., at 25 (discussing FDA's procedure for processing thiopental imports).

Finally, plaintiffs resort to hyperbole in warning that FDA's exercise of enforcement discretion would allow the "unscrupulous" to "profit from the shenanigans undertaken by state departments of corrections and enabled by FDA."  Pls' Reply Mem., at 45.  Plaintiffs identify no credible threat to the public health presented by FDA's decision not to refuse admission to a very limited number of thiopental imports *en route* to state departments of corrections.  FDA reasonably exercised enforcement discretion here.

<u>**CONCLUSION**</u>

For the foregoing reasons and for the reasons set forth in FDA's opening memorandum, FDA's motion to dismiss and/or for summary judgment should be granted, and plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

Of Counsel:                                              TONY WEST
                                                         Assistant Attorney General

WILLIAM B. SCHULTZ
Acting General Counsel                                   MAAME EWUSI-MENSAH FRIMPONG
                                                         Acting Deputy Assistant Attorney General

RALPH S. TYLER
Associate General Counsel, Food and Drug Division        KENNETH JOST
                                                         Acting Director, Office of Consumer
                                                         Protection Litigation
ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation
                                                         ___/s/_____
MICHAEL K. STERN                                         GERALD C. KELL (DC Bar No. 929125)
Associate Chief Counsel                                  Senior Trial Counsel
                                                         Office of Consumer Protection Litigation
JULIE A. DOHM                                            U.S. Department of Justice
Assistant Chief Counsel                                  P.O. Box 386
U.S. Department of Health & Human Services               Washington, DC 20044
Office of the General Counsel                            Tel: (202) 514-1586
White Oak 31 Room 4525                                   Fax: (202) 514-8742
10903 New Hampshire Avenue                               gerald.kell@usdoj.gov
Silver Spring, MD 20993-0002

Dated: July 8, 2011